CURTIS 1000, INC., Plaintiff,

v.

Daniel YOUNGBLADE, Defendant.

No. C 94–4117.

United States District Court,
N.D. Iowa,
Western Division.

Jan. 27, 1995.

**1230**

Roger T. Stetson, Belin, Harris, Lamson, McCormick, Des Moines, IA, for plaintiff Curtis 1000.

James C. Hanks and Douglas L. Phillips, Klass, Hanks, Stoos, Stoik, Mugan & Villone, Sioux City, IA, for defendant Youngblade.

## ORDER REGARDING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION PURSUANT TO FED.R.CIV.P. 65(a)

BENNETT, District Judge.

I. INTRODUCTION AND PROCEDURAL HISTORY ........................1231
II. FINDINGS OF FACT .........................................1232
 A. Curtis 1000's Training Of Its Sales Staff ................................1233
 1. Level I Contacts ......................................1233
 2. Level II Contacts .....................................1234
 3. Level III Contacts ....................................1234
 4. Level IV Contacts And Other Training ...........................1235
 B. Restrictive Covenants .....................................1236
 C. Youngblade's Employment History With Curtis 1000 ....................1238
 1. The Development Of Problems Between Youngblade And Curtis 1000 ....1239
 a. Compensation ....................................1239
 b. Short Counting ...................................1239
 2. Youngblade's Termination ...............................1240
 D. Events After Youngblade's Termination ...........................1241
III. CONCLUSIONS OF LAW ......................................1243
 A. Standards For Granting A Preliminary Injunction .....................1243
 1. State Or Federal Standards? ..............................1243
 2. Dataphase And Its Progeny ...............................1244
 a. Purpose And Standards For Preliminary Injunctions...........1244
 b. The Individual Factors And Their Relationship ...............1245
 i. Likelihood Of Success On The Merits ....................1246
 ii. Threat Of Irreparable Harm ..........................1247
 iii. Balance Of Harm ................................1248
 iv. The Public Interest ...............................1249
 3. Stipulated Grounds For Injunction ..........................1249
 B. Conflict of Laws ........................................1251
 1. The Iowa Conflict Of Laws Rules For Contract Cases ...............1251
 2. Application Of The Choice Of Law Rules ......................1253
 a. The Chosen State Has No Substantial Relationship.............1254
 b. The Chosen State's Law Is Contrary To Iowa's Policy ...........1255
 C. The Covenant Not To Compete .............................1256
 1. Covenants Not To Compete Under Iowa Law ...................1257
 a. An Overview .....................................1257
 b. The Consideration Requirement ..........................1259
 c. The Enforceability Analysis .............................1260
 d. Summary Of Iowa Law .............................1263
 2. Covenants Not To Compete Under Delaware Law .................1264
 3. Comparison Of Iowa And Delaware Law ......................1267
 D. The Grant Or Denial Of A Preliminary Injunction:
 Application Of The Dataphase Factors ............................1268
 1. Likelihood Of Success On The Merits:
 The Validity And Enforceability Of This Covenant ................1268
 a. Validity And Enforceability Under Iowa Law ..................1269
 b. Under Delaware Law ........................................1272

D. The Grant Or Denial Of A Preliminary Injunction:—Continued
 2. Threat of Irreparable Harm ........................................1272
 3. Balance Of Harms ..............................................1274
 4. Public Interest ................................................1274
E. The Requirements Of Fed.R.Civ.P. 65(c) & (d) ..........................1275
 1. The Scope Of A Preliminary Injunction ...........................1275
 2. Fed.R.Civ.P. 65(c)'s Security Requirement ........................1275
IV. CONCLUSION ......................................................1280

This application for a preliminary injunction requires the court to confront a number of intriguing questions raised by a covenant not to compete in an employment contract. First, the court must decide whether a covenant not to compete in an employment contract should be enforced according the law chosen in the contract between the parties (Delaware), which is the law of a forum with no substantial contacts with the parties or the transaction, or the law of the state in which the contract was substantially performed (Iowa). Second, the court must decide whether the covenant is valid and enforceable under the law of either state, identifying in the process significant differences between those bodies of law concerning covenants not to compete. Third, the court must decide whether issuing a preliminary injunction is appropriate in the circumstances of this case. This third issue requires the court to consider what standards apply to the determination of whether the injunction should issue, state law, federal law, or a clause of the contract between the parties which purportedly establishes a lower threshold for this court's exercise of such equitable powers.

An employer, a nationally-recognized manufacturer of business forms and papers, seeks a preliminary injunction against a former top sales representative enjoining the sales representative from violating a covenant not to compete found in the sales representative's employment contract. The sales representative, who was terminated from his position shortly after filing a declaratory judgment action in Iowa district court seeking to determine his rights under the covenant not to compete, has found employment with another local business, and has allegedly been contacting customers he originally obtained for his former employer. Some of those customers have switched allegiance to the sales representative's new company, allegedly causing or potentially causing his former employer serious economic harm and other injuries. The court notes that from at least late 1993, the employee's repeated indications that he could do better elsewhere and could probably take some of his customers with him when he went "hung like the sword of Damocles over the heads of" the employer. The value of the Damoclean sword is "that it hangs—not that it drops." *LaSociete Generale Immobiliere v. Minneapolis Community Development Agency*, 44 F.3d 629, 637 (8th Cir.1994) (quoting Marshall, J., dissenting, in *Arnett v. Kennedy*, 416 U.S. 134, 231, 94 S.Ct. 1633, 1682, 40 L.Ed.2d 15 (1974)). When it did drop in this case, it may have severed more than the employee anticipated.

## I. INTRODUCTION AND PROCEDURAL HISTORY

This matter comes before the court pursuant to the motion of plaintiff Curtis 1000, Inc. ("Curtis 1000"), for a preliminary injunction filed December 22, 1994, in an action filed the same day. On January 6, 1995, an amended complaint was filed by Curtis 1000. Curtis 1000's amended complaint seeks, in Count I, an injunction for breach of contract, and, in Count II, an injunction for violation of Iowa's Uniform Trade Secrets Act, Iowa Code § 550.3 (1993). A return of service was executed on defendant Daniel Youngblade on January 11, 1995.

On December 29, 1994, Youngblade also filed a lawsuit, but in the Iowa District Court for Woodbury County, in a case styled *Youngblade v. Curtis 1000, Inc.*, Equity No. 110095C. In his lawsuit, Youngblade seeks a declaratory judgment with respect to the parties' rights pursuant to a covenant not to compete found in an employment contract between the parties. On January 19, 1995, Curtis 1000 removed that action to this court on the ground that diversity of citizenship

exists between the parties, and the court therefore has jurisdiction in that case pursuant to 28 U.S.C. § 1332. On January 19, 1995, Curtis 1000 filed a motion to consolidate this action with the action for declaratory judgment filed by Youngblade.[1] Also, on January 19, 1995, Youngblade filed his answer which raises the following defenses: that despite Youngblade's intention to continue working for Curtis 1000, he was fired; that his termination was contrary to public policy, because it was motivated by his filing of a declaratory judgment action concerning the covenant not to compete in Iowa district court; that Curtis 1000 has no protectible interest in enforcing the covenant; that the covenant is not supported by adequate consideration; that Curtis 1000 has breached the contract; that the equities balance in favor of Youngblade and against enforcement of the covenant; and that the covenant is excessive in its scope and therefore is unenforceable; that Youngblade cannot be restricted under the covenant from pursuing customers outside of the specified geographical area originally identified in the contract of employment; enforcement of the contract is contrary to the public interest; and that the application for preliminary injunction is impermissibly based on allegations of possible future conduct only.

A hearing on Curtis 1000's motion for preliminary injunction was held on January 20, 1995. Curtis 1000 appeared through its counsel Roger T. Stetson of Belin, Harris, Lamson, McCormick, Des Moines, Iowa. Defendant Youngblade was represented at the hearing by James C. Hanks and Douglas L. Phillips of Klass, Hanks, Stoos, Stoik, Mugan & Villone, Sioux City, Iowa. Prior to the January 20, 1995 hearing, Curtis 1000 filed a brief in support of their motion for

preliminary injunction. Youngblade did not file a pre-hearing brief.

At the conclusion of the hearing, the court suggested the parties brief, on an expedited basis, several issues. In order to assist the parties in filing the expedited briefs, the court waived the formal requirements of the local rules for filing briefs and allowed the parties to submit letter briefs by facsimile by no later than January 24, 1995. Both parties did so. Curtis 1000 also filed a reply by facsimile on January 26, 1995.

A telephonic hearing was held on January 26, 1995 for the purpose of allowing counsel to orally argue their positions with regard to the granting or denial of the requested preliminary injunction. Roger T. Stetson appeared on behalf of the Curtis 1000 and Douglas L. Phillips appeared on behalf of Youngblade. Both counsel made superb and forceful oral presentations on behalf of their respective clients and were exceptionally responsive to the court's questions and concerns. As a result of the high quality of advocacy and the array of close legal issues presented, and recognizing that, in the context of a demand for a preliminary injunction, the court must move with speed, although not with haste, this court is mindful that "[h]ow one wishes to decide a case comes lightly to mind, on a wing; but often how one must decide it comes arduously, weighed down by somber thought." *Letelier v. Republic of Chile*, 748 F.2d 790, 791 (2d Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985).

## II. FINDINGS OF FACT

For the purposes of the January 20, 1995 preliminary injunction hearing, the court issues the following factual findings.[2] On December 11, 1984, Youngblade entered into a written contract ("the Agreement")[3] with

---

1. The court has not yet ruled on the motion to consolidate since it is not yet ripe for adjudication.

2. Of course, Federal Rule of Civil Procedure 65(a)(2) provides that "any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial."

3. A copy of the employment agreement between Curtis 1000 and Youngblade is attached to this opinion as Appendix "A". The Agreement specifically states that it is to be interpreted according to Delaware law. Therein lies much of the controversy in this case, because although Delaware has little connection with the parties or transactions involved in this case, Iowa does, as a substantial part of performance of the Agreement has taken place in Iowa.

Curtis 1000, Inc., for a sales representative position with Curtis 1000. Curtis 1000 is a national printing company which markets envelopes, forms, labels, and commercial printing to businesses. At the time Youngblade was hired by Curtis 1000, the company offered between 700 and 850 products to its customers. Curtis 1000 is made up of 15 divisions with each division having its own printing facility. The Minnesota division includes, *inter alia,* Iowa, Minnesota, and at least part of South Dakota. Curtis 1000's headquarters are located in Atlanta, Georgia.

### A. Curtis 1000's Training Of Its Sales Staff

Curtis 1000 provides its sales staff with extensive training. Unlike many national printing concerns, which hire sales staff already experienced in the area of printing supplies, most of the individuals hired by Curtis 1000 as sale personnel have no experience in either sales or in the printing industry. As a result, Curtis 1000 educates it sales personnel on the printing process, and product lines before sending them into the field.

After being hired by Curtis 1000, a new sales trainee is sent to Atlanta, Georgia for two weeks of intensive training. The sales representatives spend eight hours a day in the classroom and several hours a night learning the printing process, how to identify the various types of paper used in the industry, Curtis 1000's sales techniques, and the products that Curtis 1000 has to offer. The sales representatives also sharpen their sales methods by engaging in role playing.

#### 1. Level 1 Contacts

Once the two week program in Atlanta is completed, the sales representatives are sent to spend one week at the headquarters of the division to which they are assigned. During this week the sales representative meets with the technical support staff, views the equipment, and learns the products offered by Curtis 1000 in that division. The sales manager for that division then goes out with the new sales representative and helps set up the sales representative's office. This is referred to as the I–1 contact. The sales manager then spends two days with the sales representative making sales calls on customers and developing a "contact schedule" for the sales representative. Approximately ten days after the I–1 contact, the sales manager visits the sales representative again for two days. The sales manager spends one day in the office and one day in the field with the sales representative. This second visit is referred to as an I–2 contact.

After the initial contacts, the sales manager has contacts with the sales representative in the field for two days each month. These monthly contacts continue for two years. During the sales representative's fourth month in the field, and approximately five weeks after completion of the I–2 contact, a level I–3 contact is conducted by the sales manager. During this review, the sales manager makes a time analysis of the sales representative, explains sales programs, reviews the sales approach taken by the sales representative, and previews required division sales and product training seminars. After the I–3 contact, the new sales representative takes in a division sales and product training seminar.

Two weeks after completing the division sales and product training seminar, a level I–4 contact is made by the division sales manager. The primary goal of this contact is to reinforce the training taught at the seminar regarding setting telephone appointments. In addition, the sales manager views a video tape with the sales representative concerning commercial account selling.

Five weeks after the I–4 contact, the sales representative has a level I–5 contact with the division sales manager. During this contact the sales manager focuses on sales presentation skills. The sales manager also reviews the sales representative's travel schedule to ensure that the sales representative is making more solid contacts with customers each month. In the sales representative's sixth or seventh month on the job, and approximately five weeks after completion of the I–5 contact, the sales manager conducts a level I–6 review. This evaluation results in either the sales representative being elevated to level II, put on probation at the level I–4 contact level, or terminated for lack of per-

formance. This contact focuses on a territorial analysis which includes in-depth reviews of each account.

### 2. Level II Contacts

If the sales representative meets all the requirements for advancement to level II, the sales representative undertakes Intermediate Classroom Training. Five weeks after this classroom training the sales representative has a level II-1 contact with the sales manager or supervisor. During this contact, one-half day is spent in the sales representative's office discussing the classroom training, a tape rental program, and obtaining referrals. The training at level II is more focused on in-depth sales techniques, advanced selling skills such as negotiating skills, pricing strategies, and major account selling.

Five weeks after the level II-1 contact, the level II-2 contact occurs. On this contact a new travel schedule is completed. The sales manager discusses selling to major accounts. The sales manager is to discuss with the sales representative the need to be intimately familiar with the customer's business in order to allow the sales representative to sell in a consultive manner. In order to counteract possible recruiting efforts by competitors, the sales manager is also supposed to reemphasize the benefits of staying with Curtis 1000.

Contact II-3 occurs five weeks later, and takes place at the division headquarters. One day is spent at the headquarters reviewing orders, answering the sales representative's questions, and discussing problem areas. Finally, the use of plant tours is discussed with the sales representative. A level II-4 contact at the sales representative's office is then made five weeks after the level II-3 contact. Another travel schedule and time analysis is completed on this visit.

At some point after the level II-4 contact, the sales representative attends a negotiating seminar. Five weeks after the level II-4 contact, the level II-5 contact is made by the sales manager or supervisor. During this contact a product review is done and the sales manager discusses the negotiation seminar with the sales representative. In addition, the sales manager discusses contract

selling with the sales representative. Five weeks later, the level II-5 contact is made by the sales manager or supervisor. One-half day is spent in the sales representative's office discussing product lines and sales strategies. The remaining day and a half of the visit is spent in the field with the sales representative.

The level II-7 contact is made five weeks after the level II-6 contact. The two days of this contact are spent in the field. A review of plant tour opportunities are discussed with the sales representative. In addition, the sales representative is reminded of the upcoming level II-8 contact evaluation. The level II-8 evaluation takes place five weeks after the level II-7 contact. This evaluation results in the sales representative being elevated to Level III, put on probation at the level II-5 contact, or terminated. The analysis begins with a territory analysis which includes an in-depth discussion of each account. The purpose of this evaluation is to review the sales representative's approach and effectiveness. The sales manager is supposed to provide guidance to the sales representative regarding sales strategies, approaches and planning.

### 3. Level III Contacts

If elevated to level III, a level III-1 contact is made eight weeks after the level II-8 evaluation. Prior to this contact, the sales representative undergoes advanced classroom training. During the level III-1 contact the sales manager or supervisor discusses this training with the sales representative, and also encourages him or her to stay with Curtis 1000. A level III-2 contact is made eight weeks after the III-1 contact. The sales representative will have been with Curtis 1000 approximately two years at this point. A new travel schedule is completed on this visit and the sales representative's prospective customers are reviewed.

The level III-3 contact is made eight weeks after the III-2 contact. This visit takes place at division headquarters. The emphasis on this trip is to build relationships between the sales representative and the administrative and production departments.

The sales representative also reviews orders and is able to have questions answered by individuals at headquarters.

A level III–4 contact is then made eight weeks after the level III–3 contact. One day is spent at the sales representative's office preparing a new travel schedule, and reviewing accounts. One day is then spent in the field with the sales representative.

The level III–5 contact is made eight weeks later, and involves the sales manager spending two days in the field with the sales representative meeting with the sales representative's four or five best clients. As Curtis 1000's *Field Contact Outline Curtis 1000 Sales Masters Career Development Program*[4] points out:

> Be sure the rep has scheduled at least four or five of his/her best accounts for this contact. It is critical that our better accounts get to recognize, know, and trust Curtis 1000 people other than the rep. In addition to adding to the credibility of our company, it gives the customers added "security" of knowing who they can call should an extraordinary situation develop. In the event of a rep turnover, this familiarity with Curtis management would also serve to put us in a better position to maintain the business.

*Id.* at III/9.

A level III–6 contact is made eight weeks later at the sales representative's office. A complete territory analysis is done during this visit. The purpose of this visit is to help the sales representative review his sales approach and strategies. Eight weeks after this visit, a level III–7 contact occurs in the field for two days. During this trip the sales manager observes the sales representative's sales efforts. The sales manager is also to reemphasize the benefits of staying with Curtis 1000 rather than switching to a competitor.

Eight weeks later, a level III–8 contact occurs. The sales representative will have been with Curtis 1000 for three years at this point. A new travel schedule is completed during this visit at the sales representative's office. A review of current prospects also occurs during this trip. The sales manager or representative is also supposed to discuss the sales representative's career progress with him or her. A level III–9 contact at the division headquarters occurs eight weeks later. The focus of this visit, like the level II–2 contact which took place approximately one year before, is to build relationships between the sales representative and the administration and products departments at the division headquarters.

A level III–10 contact occurs eight weeks after the visit to division headquarters. During this trip to the sales representative's office, the sales manager and sales representative complete a new sales schedule, discussing each account, and reviewing a mailing list. Eight weeks later a level III–11 contact is made in the field by the sales manager or supervisor. During this visit, like the level III–5 contact, the sales representative and sales manager meet with the sales representative's best four or five accounts in order to familiarize these customers with other Curtis 1000 personnel.

An evaluation of the sales representative occurs at the sales representative's office during the level III–12 contact. The sales representative is either promoted to level IV, placed on probation at level III–7, or terminated.

### 4. Level IV Contacts And Other Training

Once elevated to level IV status, a sales representative has quarterly contacts. Level IV–1 and level IV–2 contacts occur in the field. During these quarterly visits, the sales manager or supervisor observes the sales representative while making the rounds and critiques the sales approaches of the sales representative. A level IV–3 contact is a one day visit to the division headquarters. The agenda for this trip is the same as that used in level III–9 and level II–2 contacts. This trip to division headquarters takes place one quarter after the level IV–2 contact. One quarter later, the level IV–4 contact takes place. During this trip the sales manager

---

**4.** The outline is Plaintiff's Exhibit 4.

makes a yearly territorial analysis of the sales representative.

The level IV contacts are then repeated. After two years of level IV contacts, the sales representative is eligible to attend the Masters' Seminar I. Upon completion of that seminar the sales representative is elevated to level V.

In addition to meetings with the division sales manager, sales representatives are subject to "interchanges" in which they may be sent to work in another sales representative's sales territory in order to observe and learn new sales techniques. Sales representatives also are sent to the national headquarters for additional sales training and information on new products.

Curtis 1000 pays for all expenses related to the training of its sales representatives. Curtis 1000 spends approximately $40,000 for training of each new sales representative during the sales representative's first year of employment. The emphasis of Curtis 1000's sales program is to have its sales representative become an integral part of their customers' businesses. In order to achieve this objective, in addition to the training described herein, Curtis 1000 provides its sales representatives with support from the division headquarters in the form of order editors and other personnel who aid sales representatives by providing them with such information as product availability, price, and whether it is feasible to produce a product at the division's plant. At the preliminary injunction hearing, Frank Hunter, division manager of the Minnesota division of Curtis 1000, testified that:

> Our emphasis at Curtis 1000 in trying—in training our sales representatives, as you—as we have discussed the technical standpoint, our emphasis is building our sales representatives to become an integral part of a company's organization. We foster the belief that if you thoroughly know your customers, what their needs are, if you become intregrally [sic] involved with your customers, you cannot only help to—help continue to supply them with the correct product, you can also be of value—a valuable assistance to them in helping to—helping them to streamline their printing. Tr. 20.

### B. Restrictive Covenants

Because of the considerable expenditure of funds and time in training its sales representatives, and the emphasis on having its sales personnel become involved with their respective clients' businesses, Curtis 1000 includes restrictive covenants in its contracts with its sales representatives.

The Agreement entered into between Curtis 1000 and Youngblade on December 21, 1984, contained several restrictive covenants concerning Youngblade's actions during or subsequent to his employment with Curtis. Those restrictive covenants provided as follows:

5. RESTRICTIVE COVENANTS

(a) The Company is engaged in the business of marketing envelopes, business forms, flat printing, and other related products of the Company, and the Sales Representative will acquire by reason of his employment certain valuable and confidential information concerning the Company's accounts, customers, business methods, procedures, and techniques. The Sales Representative agrees to keep confidential such information as the Company may from time to time impart to him regarding its business affairs (including the names of customers), and agrees that he will not at any time disclose said information in whole or in part to any person not in the employ of the Company.

(b) The Sales Representative will devote his entire working time, attention and energy to the performance of his duties and shall not directly or indirectly sell or offer for sale, goods or services of any other business while employed under this Agreement.

(c) The Sales Representative agrees that at all times he will be governed by instructions and orders of the Company as the same may be issued to him from time to time through its executive officers, department managers or other persons delegated to give such instructions, directions and orders. If the Sales Representative

shall not faithfully and properly comply with such instructions, directions and orders, the same shall be sufficient reason for immediate termination of his employment.

(d) In consideration of the valuable business of the Company in the Sales Representative's territory and accounts, the time and expense incurred by the Company in training the Sales Representative, the Company's disclosing to the Sales Representative valuable and confidential information concerning the Company's accounts, customers, business methods, procedures and techniques, and recognizing the highly competitive nature of the Company's business, the Sales Representative hereby expressly covenants and agrees, which covenants and agreements are of essence to this contract that he will not, in the territory assigned to him as set forth in Paragraph 3, for a period of two years immediately following the termination of his employment, directly or indirectly, either solely for his own benefit or for the benefit of another, as that person's agent, employee, partner, or joint venture:

(i) solicit, or provide assistance to another in the taking or soliciting of, orders for printing, envelopes, business forms or other products marketed by the Company and which Sales Representative was authorized to sell, from any account or customer to which the Sales Representative or the Company made one or more sales during the two years immediately preceding the termination of Sales Representative's employment and on whom Sales Representative called for the purpose of soliciting business for the Company;

(ii) call upon or assist another in calling upon any account or customer to whom the Sales Representative or Company made one or more sales during the two years immediately preceding the termination of Sales Representative's employment and on whom the Sales Representative called for the purpose of soliciting business for the Company, for the purpose of selling or soliciting the sale of any product which is the same or similar to those products marketed or sold by the Company which the Sales Representative was authorized to sell while employed by the Company;

(iii) Solicit, or provide assistance to another in the taking or soliciting of, orders for printing, envelopes, business forms or other products marketed by the Company and which Sales Representative was authorized to sell, from any account or customer "followed" by the Sales Representative pursuant to the terms of Paragraph 3(b) on whom Sales Representative called, within the two years immediately preceding the termination of Sales Representative's employment, for the purpose of soliciting business for the Company.

The Agreement at ¶ 5.

The Agreement specifically states that "[t]his Agreement and all matters pertaining to i[t]s validity, construction, interpretation and effect shall be governed by the laws of the State of Delaware." However, the court finds that apart from incorporation of Curtis 1000 in the state of Delaware, Delaware has no connection either to the parties or to the transactions in question here. Curtis 1000 has its headquarters in Atlanta, Georgia. As is discussed further below, Youngblade's sales territory was centered in northwest Iowa, with parts of South Dakota and Nebraska, and Youngblade also has his sales office and residence in Iowa, so his performance of the Agreement was primarily in Iowa.

The Agreement also sets out that the following sales territory was assigned to Youngblade:

IOWA COUNTIES OF: Sioux, O'Brien, Plymouth, Cherokee, Woodbury, Ida, Monona, Crawford, Harrison and Shelby. In addition the town of South Sioux City, Nebraska and the town of North Sioux City, South Dakota

The Agreement at ¶ 3(a). The Agreement further provides that sales territory "may be amended from time to time, subject to correction and modification by the Company." *Id.* Such a modification occurred at some point in 1985, when Youngblade was given part of the territory formerly held by another sales representative who died that year. The modification, albeit never reduced to writing as far as the record before the court

at this time shows, added to Youngblade's territory Clay and Union counties in South Dakota. This modification of Youngblade's territory encompasses his principal customer for Curtis 1000, Gateway 2000, which did not exist at the time of the modification. Additionally, the court takes judicial notice of the fact that, at the time Youngblade entered into the Agreement with Curtis 1000, the property on which Gateway 2000 is now located was outside the corporate limits of the town of North Sioux City, South Dakota. The property on which Gateway 2000 is located was not annexed by the City of North Sioux City, South Dakota, until two years after the date of the Agreement. However, the property was included in the modification to the Agreement adding Union County to Youngblade's sales territory approximately a year before annexation of the property by North Sioux City.

### C. Youngblade's Employment History With Curtis 1000

Youngblade's early history as a sales representative with Curtis 1000 followed the usual course. After completing his two weeks of training in Atlanta, and one week in St. Paul at the Minnesota division headquarters, Youngblade met with John J. Friederichs to set up his office and make calls on customers in Youngblade's sales territory from January 2, 1985, through January 4, 1985. Friederichs then made a follow-up visit on January 24, 1985, through January 26, 1985. During this visit Youngblade mentioned to Friederichs that Curtis 1000's former sales representative, Bill Nooney, was calling on accounts in Youngblade's sales territory.[5] Subsequent follow-up visits by Friederichs were made on March 28, 1985, through March 29, 1985; April 22, 1985, through April 23, 1985; May 30, 1985, through May 31, 1985; and July 10, 1985, through July 11, 1985.

During the July visit, Youngblade and Friederichs discussed Bill Nooney's sales. In a letter to Youngblade dated July 12, 1985, Friederichs comments:

We also had some time to discuss the Mr. Nooney situation. We will be acting as quickly as possible to keep Bill from calling on his previous customers but, until then, you'll have to treat him as any other competitor. As I previously mentioned, I don't feel that the best way to attack this situation is by playing Bill Nooney's game, i.e. bad-mouthing the competition and trying to cut your price so low as to beat his. Remember, Dan Youngblade will be in this for the long-haul and Bill Nooney is in it for the short. Your customers will soon realize that and will be back in good standing with Curtis 1000 in a very short time. You are still the one giving them superior service and new ideas they can use to improve their business. Please keep us informed of any new developments that may happen with this situation.[6]

Friederichs had monthly meetings with Youngblade again in August and September 1985. Following the visit in September, Youngblade was then subject to bi-monthly visits by either Friederichs or a supervisor. At some point in 1985, Youngblade was given part of the territory formerly held by sales representative Jim Carpenter, who died that year. Youngblade was given Clay and Union counties in South Dakota. North Sioux City, which already was specifically part of Youngblade's sales territory, is in Union County, South Dakota.

In September 1986, Youngblade took a forms training class in Atlanta, Georgia. In November 1986, Youngblade undertook an interchange with the sales representative in Fort Dodge, Iowa. Throughout this period, Youngblade received favorable evaluations and had increased sales. In 1987, Youngblade had yearly sales of $473,609 and aver-

---

**5.** On February 6, 1985, Curtis 1000's law firm, Kutak, Rock, & Campbell sent a letter to Bill Nooney, Plaintiff's exhibit 23, informing him that Curtis 1000 would enforce a restrictive covenant with him preventing him from calling on former customers for a period of two years. Nooney's response to the letter does not appear of record. Subsequently, on April 24, 1986, Bob Dahl contacted P.D. Furlong, P.C., to obtain a preliminary injunction against Nooney. Whether such litigation was commenced on behalf of Curtis 1000, and the result of such litigation, does not appear of record.

**6.** A copy of the July 12, 1985, letter is part of Plaintiff's exhibit 5.

age monthly commissions of $4,259. Youngblade's sales continued to increase over the next four years. In September of 1990, Youngblade had yearly sales in excess of $565,000.

Youngblade became one of the top two salespersons, out of a sales staff of 500, in the company. In 1994, Youngblade had net sales of $2,619,183 and commissions of $241,185. Youngblade's sales were very important to the Minnesota division since they represented over ten percent of the division's total sales revenues of $22,000,000 for the year. One customer in particular, Gateway 2000, was responsible for the vast majority of Youngblade's sales. In 1994, his sales to Gateway 2000 stood at $2,100,000.[7]

### 1. The Development Of Problems Between Youngblade And Curtis 1000

#### a. Compensation

Problems between Youngblade and Curtis 1000 first began to develop in the winter of 1993. Youngblade and Frank O. Hunter, the division manager for Curtis 1000's Minnesota division, had a telephone conversation at that time about some concerns Youngblade had regarding Curtis 1000's commission structure. Youngblade's complaint was that he could make substantially more money on the same amount of sales if Curtis 1000 was to utilize a different commission structure.

During that conversation, Youngblade and Hunter decided that Youngblade would fly to St. Paul, Minnesota to meet with the local management group. At that meeting, attended by Youngblade, Hunter, Doug Bengtson, and Terry Bergson, Youngblade showed the others an analysis he had compiled comparing Curtis 1000's commission structure with other printing companies in the region. The point of the analysis was that Youngblade could make more in commissions on the same amount of sales for these other companies.[8] Following the meeting, Hunter contacted the regional vice-president, Bob Dahl, to review the situation and Youngblade's concerns. On May 16, 1993, Youngblade wrote a follow-up letter to Hunter.[9] After receiving this letter Hunter and Dahl met to discuss the situation. It was decided that Youngblade's commission would be changed as a test case in the Minnesota division for sales on certain undisclosed orders.

#### b. Short Counting

The next problem between Curtis 1000 and Youngblade arose in the winter of 1994. In a letter dated February 18, 1994, from Youngblade to Hunter, regarding Youngblade's concerns that his customers were being shorted, or "short counted" to use the vernacular of the printing industry, on products sold to his customers.[10] Following Young-

---

7. The single largest purchase of a product made on an annual basis by Gateway 2000 is a work order that is manufactured by a third party, but sold by Curtis 1000. This item makes up 40 to 45 percent of Curtis 1000's sales to Gateway 2000.

8. Youngblade's analysis is Plaintiff's exhibit 8.

9. A copy of Youngblade's May 16, 1993, letter is Plaintiff's exhibit 9.

10. In the letter, which is Plaintiff's exhibit 20, Youngblade writes:

> I am writing to you in re ards to a problem that has continued to surface over the past few years. I am sure this problem has been around for more than a few years, however, it may have not been brought to your attention as I have continued to do so. It has to do with the actual quantity of product that we ship to my customers versus the quantity amount that you bill my customers.
>
> Frank, this goes beyond a "bad count" problem. Furthermore, we have always been told

> to let our customers know that even if a box is low the next on [sic] will have extra product in it. Overall, it will average out to be the correct quantity. This turns out to be the biggest misrepresentation I have ever heard of. I have written you about this problem many times in the past few years. I have provided factual samples, invoices and customer complaints that show that my customers have been cheated out of 5%, 10%, 20% and up to 38% of the product that they were actually billed for. This is morally and ethically wrong. Furthermore, it is actually stealing from my customers.
>
> As I have stated in the past, the only time this comes to my attention is when my customer has made an actual quantity count. Furthermore, I believe this is the norm and not the unique on our every day shipments. Frank, you have told me that this problem was taken care of. So, it must mean that it was taken care of until things quieted down and then you are right back to stealing from my customers. Let it be known that I have given ample notice of this problem. If it does not immediately

blade's letter, Hunter implemented an investigation into the short count problem. Several measures were taken to alleviate the problem. First, a task force was set up to look at all inbound materials to ensure that Curtis 1000 was receiving correct counts at that end. Second, the counters on the equipment were checked to see if they were accurate. Third, meetings were held with employees to emphasize the need for accurate counts on materials. Finally, Curtis 1000 set up procedures in its shipping department, and purchased a scale to check inventory. Special precautions were taken for Youngblade's customers. These precautions were set out in a letter to Hunter from Dennis Kuperschmidt dated January 1, 1995:

> At Dan Youngblade's insistence, we inspect every job for his accounts (customers). A special hand stamp was made for bindery hand-assembly employees. After each one of his orders is weighed, it is stamped (-weigh counted) before going to the Shipping Department. No orders for Dan Youngblade's territory can leave the building until this has been done.[11]

### 2. Youngblade's Termination

The next problem with Youngblade surfaced in August 1994, when he sent a letter to Hunter in which he indicated his dissatisfaction with Curtis 1000's remedial efforts to solve the short count problems identified in his February 18, 1994, letter.[12] Youngblade also enclosed a copy of a draft of a petition he was contemplating filing in Iowa District Court for declaratory judgment regarding the restrictive covenants in his employment contract with Curtis 1000. In response to this letter Hunter and Youngblade agreed to meet in Atlanta in September. The meeting was attended by Hunter, Youngblade, Bob Dahl, vice-president of the region, Larry Nelson, vice-president of sales and marketing, and Bob Gundeck, president and CEO of American Business Products, which is the holding company of Curtis 1000. The problem with short counts was discussed first, but the bulk of the two-day meeting was spent discussing Curtis 1000's compensation to its sales staff. Youngblade was seeking to increase the percentage of gross profit he received from his customers' orders. Youngblade was seeking to receive 65 percent of the gross profit with Curtis 1000 receiving 35 percent. Typically on an order with Curtis 1000, the company would receive 60 to 65 percent of the gross profits. During these discussions, Youngblade brought up the topic of his value and that Curtis 1000's competitors would like to have someone of Youngblade's abilities. He also mentioned that one of his customers, Gateway 2000, had made the comment to him about what was he waiting for, that he should go ahead and do what he needs to do. It was discussed that a competitor, Moore Business Forms, had approached Gateway 2000 and offered to produce some forms at a lower price than currently being offered by Curtis 1000. Although Curtis 1000 could match this offer, to do so would result in lower commissions to Youngblade. Gateway gave Youngblade until January 1, 1995, to rectify the situation.

On December 19, 1994, Youngblade wrote a letter to Larry Nelson at Curtis 1000 headquarters in which he asserted his concern about a lack of progress in resolution of his complaints since the September meeting in Atlanta. Youngblade points out at the end of the letter than he will be filing a declaratory judgment action on December 22, 1994, "to determine what my legal rights are."[13] On December 30, 1994, Youngblade had a telephone conversation with Curtis 1000 president Robert G. Baker. During this conversation Baker informed Youngblade that his employment with Curtis 1000 was terminated effective January 6, 1995. In a letter dated December 30, 1994, Baker wrote to Youngblade confirming Youngblade's dismissal.[14] In the text of that letter Baker points out:

---

stop, I will be forced to sever all ties with Curtis 1000.

**11.** Kuperschmidt's letter is Plaintiff's exhibit 13.

**12.** A copy of the August 15, 1994, letter is Plaintiff's exhibit 10.

**13.** Youngblade's letter of December 19, 1994, is Plaintiff's exhibit 11.

**14.** A copy of the letter dated December 30, 1994, from Baker to Youngblade confirming the nature of their conversation and Youngblade's firing is Plaintiff's exhibit 19.

Dan, our conversations lead me to believe that your real motive in raising these issues and claiming that they have not been addressed is simply an attempt to find a way to invalidate your employment contract with Curtis 1000 and take your accounts with you to another business in direct violation of your contract. In fact, you have freely told us that is what you intend to do. You also openly stated to three Curtis 1000 managers that you have already discussed this possibility with some of your accounts to see if they would "come with you." This action on your part is, in fact, a blatant violation of your employment contract.

Curtis 1000 subsequently retrieved all of the Curtis 1000 sales material in Youngblade's possession.[15]

### D. Events After Youngblade's Termination

Upon learning of Youngblade's termination, Hunter and Dahl made a trip out to meet with some of Curtis 1000's larger customers in Youngblade's former territory. Hunter and Dahl found that the customers were already aware of Youngblade's termination. At Gateway 2000, Hunter and Dahl were informed by Susan Tillman that, because of Youngblade's importance to the company, Gateway 2000 was going to take its business to Youngblade. This assessment was reiterated at the preliminary injunction hearing by Earle Grueskin, the facilities' director at Gateway 2000. In addition, two other customers of Curtis 1000, who Youngblade served as a sales representative for Curtis 1000, the Avery Brothers Sign Company and the Dennis Supply Company indicated through representatives at the hearing that they would take their business to Youngblade.[16] Youngblade's customers purchased their products from Youngblade without associating him with Curtis 1000.[17]

These customers viewed their purchases as being with Youngblade and not Curtis 1000.

At some point after their trip to visit Curtis 1000 customers in Youngblade's former territory, Hunter learned that Youngblade had sent a letter to his former clients on Artisan Press stationery, a competitor of Curtis 1000. In the letter, dated January 7, 1995, the day following the effective date of his discharge from Curtis 1000, Youngblade states:

1/7/94 [sic]

Dear Customers and Friends,

I am writing you to advise you of my new association with Artisan Press. A locally owned and operated printing company with national connections for all types of printing. Enclosed you will find my new business card along with new 95 calendars.

Curtis 1000's decision to fire me was a surprise and a disappointment. Fortunately, I have had many other options presented to me over the past few years. Now that I have been given the reason to research these, it has been enlightening to see the other options presented from local, regional and other national printers.

I chose Artisan Press for many reasons that will benefit both you and me. The owner, Scott Kuehl is young, honest, aggressive and dedicated to this business. They are financially sound (this aspect really woke me up with those I presumed were financially sound). They offer a tri-state location with local customer service and support staff. They are an experienced printer, manufacturer and supplier of my entire product line. They currently deal with many of the same mills that I have dealt with in the past. They currently sell to many of you. They have an experienced, new, state-of-the-art press department. To sum it all up, Artisan Press offers us a good opportunity to sup-

15. An inventory of materials returned to Curtis 1000 upon Youngblade's termination is Plaintiff's exhibit 6.

16. Avery Brothers Sign Company has been purchasing folders from Artisan Press for six or seven years while at the same time purchasing invoices and other products from Curtis 1000.

17. Although Curtis 1000 representatives at the hearing attributed this loyalty to the force of their sales program, it should be noted that Youngblade grew up in the Sioux City area and was friends and acquaintances with several of his customers before going to work for Curtis 1000.

ply you with a quality product and a stronger support staff.

Attached you will find a letter from one of my customers that has let me know that they want me to continue to call on them and providing my services and products. If you would like me to continue calling on you, please let me know. A letter or note would be fine and can be faxed or sent to the location below. Please advise me as soon as possible.

In the next couple of weeks, I will be back on my travel schedule seeing all of you in person. Again, thank you for your previous business and I look forward to serving your needs in the future.

Sincerely,

/s

Dan Youngblade

A copy of this letter and the attached letter from one of Youngblade's customers was provided to Curtis 1000 by one of its customers who received this mailing.[18] Despite Youngblade's rather peculiar argument at the preliminary injunction hearing, that the January 7, 1995, letter was not a solicitation, the court specifically finds that this letter constitutes a solicitation of Curtis 1000 customers by Youngblade.

The effect on Curtis 1000's Minnesota division if it loses its customers in Youngblade's former territory will be a dramatic reduction in the division's income. Indeed, Frank Hunter, the Minnesota division manager of Curtis 1000, testified at the preliminary injunction hearing that "the economic devastation that will take place within our division will be very apparent." Tr. 47. Hunter also testified that due to the loss of business already suffered at the time of the preliminary injunction hearing, the company would likely take further action. Hunter testified that "probably very shortly we will have to start employee cutbacks in order to meet with the loss of revenues that were generated from this territory. . . ." Tr. 47. Hunter further testified that as a result of the loss of business already incurred, other employees' incomes "and the company's income will have to be restructured to reflect the loss of those sales." Tr. 47–48. Hunter further testified that the present situation in the Minnesota division as a result of the loss of income already incurred was "of extreme concern" to him. Tr. 48. As noted above, Youngblade's sales represented over ten percent of the Minnesota division's sales.

All sales representatives sign an employment contract which contains a covenant not to compete. The term of two years in the restrictive covenant is due to Curtis 1000's assessment that it takes approximately two years for a new sales representative to go into a territory and build up rapport with the customers in that territory. The reason the restrictive covenant covers only customers the sales representative has called on is due to Curtis 1000's philosophy that customers are the property of the company and that

---

**18.** The following letter from Dave Russell, Director of Purchasing at Gateway 2000, accompanied Youngblade's 1/7/94 letter to his former customers:

January 3, 1994
Mr. Dan Youngblade
4418 Cheyenne Blvd.
Sioux City, IA 51104
Dan:
I was surprised to hear that your company fired you as our Curtis 1000 sales representative. Without knowing all of the details, this appears to be a bad decision by Curtis 1000 and not in the best interest of Gateway 2000. Dan, your product line can be purchased from many other vendors. However, the personal attention and service that you give us goes far beyond any "company name" you are representing. We have always bought from, complained to, been serviced by, and appreciated Dan Youngblade.

I am asking you to contact me as soon as possible to advise me on your future plans. We hope you intend to stay in a similar position. If so, Gateway 2000 will continue to request your business, service and personal attention no matter what "company name" you are representing. Furthermore, you have our permission to use or transfer any artwork, dies, supplies, inventory programs, etc., that are associated with Gateway 2000. We have paid for these items and services and will handle them with our best interest in mind. Dan, I am again disappointed with Curtis 1000's decision to terminate you. You may use me or Gateway 2000 for any personal references or credit references.
Sincerely,
/s
Dave Russell
Director of Purchasing
Gateway 2000

due to the rapport built up over the years it would be unfair to the company to have that experience used against a new sales representative. The restrictive covenant does not prevent a competitor from hiring a former Curtis 1000 sales representative, or having that sales representative work in the same territory in which he or she previously sold Curtis 1000 products. The restrictive covenant is also limited to customers to whom the sales representative has made sales or on whom the representative has called to solicit business during the two years immediately preceding the termination of the representative's employment with Curtis 1000. Thus, the covenant does not restrict a representative from soliciting business from any and all customers the representative may have contacted during the entire period of the representative's employment with Curtis 1000.

Because Youngblade did not testify at the hearing the court is unable to ascertain when Youngblade commenced work for Artisan Press, nor what the terms, financial or other benefits of his employment are with Artisan Press, nor when he began soliciting Curtis 1000's customers for Artisan Press. The court is therefore unable to ascertain what, if any, effect granting a preliminary injunction against Youngblade will have on either him or his new employer.

## III. CONCLUSIONS OF LAW

### (INCLUDING SOME ULTIMATE FINDINGS OF FACT)

### A. Standards For Granting A Preliminary Injunction

■ Before the court can state the appropriate standards for issuing a preliminary injunction, it must identify which standards are applicable, state or federal, in a diversity action such as this one. In an action based upon diversity of citizenship jurisdiction, a federal district court must apply the substantive law of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Nonetheless, the court concludes in the first subsection below that the applicable standards for issuance of a preliminary injunction are the *federal* standards. Those

standards are discussed in the second subsection below. Before applying those standards in this case, however, the court must also consider whether a stipulation in the agreement of the parties that a breach of the agreement by the sales representative shall entitle the employer to an injunction sets aside all other applicable standards, and instead requires issuance of an injunction merely upon a showing of breach of the agreement.

### 1. State Or Federal Standards?

■ In a diversity action, the federal court is not free to fashion rules of law from whole cloth. *Jackson v. Anchor Packing Co.,* 994 F.2d 1295, 1310 (8th Cir.1993). A federal court is bound to apply the law of the state as it is able to discern it from the rulings of the state's courts. *Id.; see also Klaxon,* 313 U.S. at 496, 61 S.Ct. at 1021. Therefore, the federal court first examines state law. *See generally Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Austin v. Super Valu Stores, Inc.,* 31 F.3d 615, 618 (8th Cir.1994) (citing *Erie* ); *Gilliam v. Roche Biomedical Labs., Inc.,* 989 F.2d 278, 280 n. 3 (8th Cir.1993). However, federal courts are to apply their own rules of civil procedure. *Hanna v. Plumer,* 380 U.S. 460, 467, 470–71, 85 S.Ct. 1136, 1141, 1143–44, 14 L.Ed.2d 8 (1965). One court has confronted the question of whether the *Erie* doctrine requires the court to apply *state* law to the determination of whether or not it should issue a preliminary injunction. *Ferrero v. Associated Materials, Inc.,* 923 F.2d 1441, 1448 (11th Cir.1991).

■ The court in *Ferrero* found that Georgia law presumes that injunctions are inappropriate remedies and that they should issue only in very limited cases, while federal law would allow a preliminary injunction to issue on a showing of factors identical to those applied in this circuit. *Id.* Even though it believed this difference meant that its choice of the applicable law, state or federal, would be "outcome determinative," the court concluded that reference to the policies of *Erie* showed that federal courts are to apply their own rules of civil procedure, including *Fed.R.Civ.P.* 65, which incor-

porates traditional federal equity practice. *Id.* (citing *Hanna,* 380 U.S. at 467, 470–71, 85 S.Ct. at 1141, 1143–44). Thus, the court held that *Fed.R.Civ.P.* 65 "meets the criteria of *Hanna,* and therefore we apply federal procedure to determine whether the preliminary injunction was properly issued." *Id.* For the reasons cited by the Eleventh Circuit Court of Appeals in *Ferrero,* this court concludes that it should apply federal rather than Iowa law to the determination of whether a preliminary injunction should issue in this case.

As a practical matter, application of federal rather than Iowa law to the question before this court will not be "outcome determinative," as it was for the court in *Ferrero.* That is because Iowa law applies roughly the same test as do federal courts to issuance of a preliminary injunction, although the Iowa standard may in fact be more lenient. The leading case under Iowa law regarding preliminary or temporary injunctions is *Kleman v. Charles City Police Dept.,* 373 N.W.2d 90 (Iowa 1985). In *Kleman,* the court noted that a temporary injunction is a preventive remedy and its purpose is to "maintain the status quo of the parties prior to final judgment and to protect the subject of the litigation." *Id.* at 95 (citing *Kent Prod., Inc. v. Hoegh,* 245 Iowa 205, 214, 61 N.W.2d 711, 716 (Iowa 1953)); *Atlas Mini Storage, Inc. v. First Interstate Bank of Des Moines, N.A.,* 426 N.W.2d 686, 689 (Iowa Ct.App.1988). Recognizing that the court may issue a preliminary injunction in its discretion, the court articulated standards to guide that discretion:

> [T]he district court must have before it some evidence—an affidavit or sworn testimony or their equivalent—on which it may ascertain the circumstances confronting the parties and balance the harm that a temporary injunction may prevent against the harm that may result from its issuance.

*Kleman,* 373 N.W.2d at 96 (citing *Iowa R.Civ.P.* 80(b), which requires an affidavit from someone knowing the facts, and O. Fiss & D. Rendleman, Injunctions 343–44 (2d ed. 1984), suggesting factors for the court to consider); *cf. State ex·rel. Pillers v. Maniccia,* 343 N.W.2d 834, 835 (Iowa 1984) (affirming trial court's dissolution of a temporary

injunction and refusal to grant an permanent injunction, citing a "relative hardship" or "balance of convenience" standard considering "irreparable harm," and lack of an effective remedy at law). The federal court, as explained below, also conducts a more explicit test balancing the harms to the parties.

■ When considering a *permanent* injunction, Iowa courts apply factors almost identical to those applied by the federal courts at the preliminary injunction stage, focusing, as do federal courts, on irreparable harm. *See, e.g., Hockenberg Equip. Co. v. Hockenberg Equip. & Supply Co. of Des Moines, Inc.,* 510 N.W.2d 153, 158 (Iowa 1993) ("A party is entitled to a permanent injunction if proof exists that the injunction would prevent irreparable harm and if the party has no adequate remedy at law," adding that such an injunction should be granted "with caution and only when clearly required."); *Presto–X–Co. v. Ewing,* 442 N.W.2d 85, 89 (Iowa 1989) (applying the "irreparable harm" ·standard to an application for injunctive relief in a covenant not to compete case); *Fischer v. Driesen,* 446 N.W.2d 84, 87–88 (Iowa Ct.App.1989) ("Equity usually invokes its extraordinary injunctive power only when necessary to prevent irreparable harm or when the complaining party is otherwise without an effective remedy. If the injury is light and an injunction would result in serious hardship or loss to defendant, courts have refused to enjoin, leaving the plaintiff to his claim for damages. Under this comparative injury doctrine, injunctions which are likely to cause greater injustice than they seek to prevent are properly refused," quoting *Johnson v. Pattison,* 185 N.W.2d 790, 797 (Iowa 1971)). The court concludes that it will apply federal law to the present application for a preliminary injunction, recognizing that if the plaintiff here can meet the slightly more stringent federal standard for such a preliminary injunction, it can assuredly meet the more lenient Iowa standard.

### 2. Dataphase And Its Progeny
#### a. Purpose And Standards For Preliminary Injunctions

■ Like Iowa courts, the Eighth Circuit Court of Appeals has recognized that the

purpose of issuing a preliminary injunction in a lawsuit is to preserve the status quo and to prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits. *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994) *(per curiam)* (citing *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 & n. 5 (8th Cir.1981) *(en banc)*); *Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 490 (8th Cir.1993); *Rathmann Group v. Tanenbaum,* 889 F.2d 787, 789–90 (8th Cir.1989); *Ferry–Morse Seed Co. v. Food Corn, Inc.,* 729 F.2d 589, 593 (8th Cir.1984). The court therefore requires as a first step the establishment of a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint. *Devose,* 42 F.3d at 471.

█ The Eighth Circuit Court of Appeals has repeatedly cited the standards stated in *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 & n. 5 (8th Cir.1981) *(en banc)*, as the basis on which courts are to determine whether or not to issue a preliminary injunction. *See, e.g., In re Y & A Group Sec. Litigation,* 38 F.3d 380, 383 (8th Cir.1994); *Baker Elec. Co-op., Inc. v. Chaske,* 28 F.3d 1466, 1472 (8th Cir.1994); *City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 556 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994); *Aziz v. Moore,* 8 F.3d 13, 15 (8th Cir.1993); *Sanborn Mfg.,* 997 F.2d at 485–86; *Aswegan v. Henry,* 981 F.2d 313, 314 (8th Cir.1992); *Frank B. Hall & Co. v. Alexander & Alexander, Inc.,* 974 F.2d 1020, 1023 (8th Cir.1992); *Cellular Sales, Inc. v. Mackay,* 942 F.2d 483, 485 (8th Cir.1991); *Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 369 (8th Cir.1991); *Tullos v. Parks,* 915 F.2d 1192, 1193 (8th Cir.1990).[19] The most recent formulation of the *Dataphase* standards is as follows:

When considering a motion for a preliminary injunction, a district court weighs the movant's probability of success on the merits, the threat of irreparable harm to the movant absent the injunction, the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest. *Dataphase Sys., Inc. v. C L. Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) *(en banc).* We reverse the issuance of a preliminary injunction only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise." *City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 556 (8th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994).

*Pottgen v. Missouri State High Sch. Activities Ass'n,* 40 F.3d 926, 929 (8th Cir.1994); *Timber Lake,* 10 F.3d at 556 (review is for abuse of discretion or erroneous legal premise); *Aswegan,* 981 F.2d at 314 (abuse of discretion or erroneous legal premise review); *Frank B. Hall,* 974 F.2d at 1023 (same); *Tullos,* 915 F.2d at 1196. The burden of establishing the propriety of a preliminary injunction is on the movant. *Baker Elec. Co-op.,* 28 F.3d at 1472; *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 737 (8th Cir.1989) *(en banc).* The movant's burden is particularly heavy in those cases where granting the preliminary injunction will give that party substantially the relief it would obtain after a full trial on the merits. *Sanborn Mfg.,* 997 F.2d at 496 (citing *Dakota Indus., Inc. v. Ever Best Ltd.,* 944 F.2d 438, 440 (8th Cir. 1991) (hereinafter *Ever Best)).*

### b. The Individual Factors And Their Relationship

"No single [*Dataphase*] factor in itself is dispositive; in each case all of the factors

---

**19.** However, the Eighth Circuit Court of Appeals has ruled that the *Dataphase* standards are not applicable to orders enjoining a party from proceeding with a duplicative, second-filed lawsuit in another forum, because in such a case, "the question has nothing to do with the merits of the underlying controversy and is simply whether, as between two courts both having jurisdiction over parties and the subject matter of the dispute, the court in which jurisdiction first attached should proceed to adjudicate the controversy and should restrain the parties from proceeding with the later-filed action." *Northwest Airlines v. American Airlines, Inc.,* 989 F.2d 1002, 1004 (8th Cir. 1993) (finding that the standards applicable to the grant of an injunction in such a controversy are set forth in *United States Fire Ins. Co. v. Goodyear Tire & Rubber Co.,* 920 F.2d 487, 488– 89 (8th Cir.1990)).

must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op.*, 28 F.3d at 1472 (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir.1987) (hereinafter *Lenox Labs.*), and also citing *Dataphase*); *Sanborn Mfg.*, 997 F.2d at 486 (citing *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667 (8th Cir.1987) (hereinafter *Parfums de Coeur*)); *Sanborn Mfg.*, 997 F.2d at 486 (quoting *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 988 F.2d 61, 64 (8th Cir.1993) (hereinafter *Dakota Indus.*)); *Frank B. Hall*, 974 F.2d at 1023; *see also In re Y & A*, 38 F.3d at 383 (focusing on appeal in that case on court's determination of likelihood of success on the merits); *ILQ Inv., Inc. v. City of Rochester*, 25 F.3d 1413, 1416 (8th Cir.) (focus on appeal also success on the merits), *cert. denied*, —— U.S. ——, 115 S.Ct. 578, 130 L.Ed.2d 493 (1994); *S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir.) (district court applied only one of the *Dataphase* factors, likelihood of success on the merits, but the appellate court applied all of the *Dataphase* factors on appeal while noting that likelihood of success on the merits was the most significant under the circumstances), *cert. denied*, —— U.S. ——, 113 S.Ct. 184, 121 L.Ed.2d 129 (1992); *James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544–45 (8th Cir.1982) (*per curiam*) (court must apply all of *Dataphase* factors).

 Despite this requirement that the court consider all of the factors, in this circuit

"a party moving for a preliminary injunction is required to show the threat of irreparable harm," *Baker Elec. Co-op*, 28 F.3d at 1472 (citing *Modern Computer Sys.*, 871 F.2d at 738, and *Dataphase*), and the lack of irreparable harm is sufficient ground for denying or vacating a preliminary injunction. *Aswegan*, 981 F.2d at 314 (citing *Modern Computer*, 871 F.2d at 738). To put it another way, "[t]he threshold inquiry is whether the movant has shown the threat of irreparable injury." *Glenwood Bridge*, 940 F.2d at 371 (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987)). Thus, the Eighth Circuit Court of Appeals has held that

> the movant's failure to sustain its burden of proving irreparable harm ends the inquiry "and the denial of the injunctive request is warranted." [*Gelco*, 811 F.2d] at 420. *Accord Modern Computer Sys.*, 871 F.2d at 738; *Dataphase*, 640 F.2d at 114 n. 9. We must inquire, then, whether [movant] has met its burden of proving that it will suffer irreparable harm absent a preliminary injunction.

*Id.*[20]

 *i. Likelihood Of Success On The Merits.* The first factor considered by the courts under *Dataphase* when considering an application for a preliminary injunction is the likelihood or probability of success on the merits. *Pottgen*, 40 F.3d at 929. When considering this factor, the court is not deciding whether the movant for a preliminary injunction will ultimately win. *Glen-*

20. There is one exception to the rule requiring the court to examine the "threshold question" of whether the movant has shown a threat of irreparable harm: Where Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate irreparable harm to secure an injunction. *Burlington N.R. Co. v. Bair*, 957 F.2d 599, 601 (8th Cir.) (citing *United States v. City and County of San Francisco*, 310 U.S. 16, 31, 60 S.Ct. 749, 757, 84 L.Ed. 1050 (1940), which holds that controlling issue is whether Congress has already balanced the equities, and if it has, it is not for the courts to do so), *cert. denied*, —— U.S. ——, 113 S.Ct. 69, 121 L.Ed.2d 36 (1992). When Congress has provided for injunctive relief for violation of a statute, the standard is one of "reasonable cause" to believe that a violation of the act has or is about to occur. *Id.* at 601–02. However, in one recent case the Eighth Circuit

Court of Appeals still considered whether the plaintiff had demonstrated likelihood of success on the merits before considering whether the presumption of irreparable harm applied. *See Sanborn Mfg.*, 997 F.2d at 488–89 (recognizing that the presumption might arise in an injunction action under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), citing *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 753 (8th Cir.1980), and *Lenox Labs, Inc.*, 815 F.2d 500, 505 (8th Cir.1987), but finding the presumption did not arise in the case before it because the movant failed to establish likelihood of success on the merits). As this case does not present such a situation in which Congress has established the availability of an injunction for violation of a statute, the court turns to examination of the requirements of each of the *Dataphase* factors in more detail.

*wood Bridge,* 940 F.2d at 371; *O'Connor v. Peru State College,* 728 F.2d 1001, 1002 (8th Cir.1984) (in such preliminary proceedings, "the court should avoid deciding with any degree of certainty who will succeed or not succeed."). In isolation, the likelihood of success on the merits is meaningless. *Glenwood Bridge,* 940 F.2d at 371 (quoting similar language in *Dataphase* ). Therefore, the court must consider other factors, especially the threat of irreparable harm. *Id.*

 Likelihood of success on the merits requires that the movant find support for its position in governing law. *See, e.g., Baker Elec. Co-op,* 28 F.3d at 1473–74 (Indian tribe's sovereignty to regulate electrical services); *ILQ Investments,* 25 F.3d at 1416 (first amendment and prior restraint of expression); *Timber Lake,* 10 F.3d at 556–58 (Indian tribe's regulatory authority and authority of states to regulate activities on tribal lands); *Aziz,* 8 F.3d at 15 (denial of injunctive relief proper because federal courts "must abstain from imposing injunctions on prison officials [in an action under 42 U.S.C. § 1983 action] 'in the absence of a concrete showing of a valid claim and constitutionally mandated directives for relief,'" quoting

*Rogers v. Scurr,* 676 F.2d 1211, 1214 (8th Cir.1982)). In order to weigh in the movant's favor, the movant's success on the merits must be "at least ... sufficiently likely to support the kind of relief it requests." [21] *Sanborn Mfg.,* 997 F.2d at 488 (action under the Lanham act in which the court concluded that either result argued by the opposing parties was directly supported by the evidence presented).[22]

 *ii. Threat Of Irreparable Harm.* The next factor in the *Dataphase* analysis is the "threat of irreparable harm to the movant absent the injunction." *Pottgen,* 40 F.3d at 929. Sufficient showing on this factor can be made, for example, by showing that the movant has no adequate remedy at law. *Baker Elec. Co-op,* 28 F.3d at 1473. Conversely, where the movant has an adequate legal remedy, a preliminary injunction will not issue. *Frank B. Hall,* 974 F.2d at 1025 (but finding in that case that the district court's conclusion that there was an adequate remedy was based on an erroneous legal premise, and requiring a proper balance of *Dataphase* factors).

21. Another circuit court of appeals has recently described the meaning of likelihood of success on the merits and its interplay with the balance of harms as follows:

What is true is that if the party seeking the preliminary injunction would suffer more harm from the denial of it than his opponent would suffer from its being granted, the injunction should be granted even if the party seeking it has no more than a 50–50 chance of winning, and even, in some cases, if the odds are worse. If for example the party seeking the injunction would lose $10,000 if it was denied, and has a 40 percent chance of being in the right, and the other party would lose only $1,000 if the injunction is granted and has (necessarily) a 60 percent chance of being in the right, then the cost of denial of the injunction to the party seeking it, when discounted by the probability that he is in the right, would exceed the cost of granting the injunction to the other party, when discounted by the probability of his being in the right. (That is, $4,000 ($10,000 × .40) is greater than $600 ($1,000 × .60).). E.g., *Green River Bottling Co. v. Green River Corp.,* 997 F.2d 359, 361 (7th Cir.1993); *Curtis v. Thompson,* 840 F.2d 1291, 1296 (7th Cir.1988). But if as in this case the judge, having obtained in the preliminary hearing all the facts that [the judge] believes pertinent to

deciding which party is in the right, is able to make up [his or her] mind that the party seeking the injunction has no legal ground for his case, [the judge] should not only deny the injunction, [he or she] should also dismiss the suit; for [the judge] knows how it will come out.
*Curtis 1000, Inc. v. Suess,* 24 F.3d 941, 945 (7th Cir.1994).

22. Special considerations for the analysis of the "success on the merits" requirement have also been articulated for certain areas of the law in which preliminary injunctions are specifically authorized by statute. *See, e.g., Dakota Indus.,* 988 F.2d at 64 (15 U.S.C. § 1116(a) authorizes a registered trademark owner to petition for injunctive relief for trademark infringement, and *Squirt Co. v. Seven–Up Co.,* 628 F.2d 1086, 1091 (8th Cir.1980), identifies the factors in a "success on the merits" analysis for a trademark case); *Mutual of Omaha Ins. Co. v. Novak,* 836 F.2d 397, 399 (8th Cir.1987), *cert. denied,* 488 U.S. 933, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988) (same); *SquirtCo.,* 628 F.2d at 1091 (identifying several factors to be considered in the "success on the merits" analysis in a trademark case); *Cellular Sales,* 942 F.2d at 486 (standard of proof for plaintiff seeking preliminary injunction varies depending on the strength or type of mark at issue).

 However, the fact that the movant may assert a valid damages claim does not necessarily preclude issuance of a preliminary injunction, because damages relief may not fully compensate the movant for being denied its rights. *Glenwood Bridge*, 940 F.2d at 371–72. This is because, even when money damages are available to compensate for some of the harm to the plaintiff, other less intangible injuries cannot be so easily valuated or compensated. *Id.* For example, the loss of customer goodwill can constitute irreparable injury because damages flowing from such losses are difficult to compute. *See Basicomputer Corp.*, 973 F.2d at 512 (holding that irreparable injury shown where facts supported finding that plaintiff would suffer loss of customer goodwill and competitive injury from defendants' alleged breach of their covenants); *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir.1991); *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir.1981) (holding that loss of customers and good will gives rise to an irreparable injury); *Medtronic, Inc. v. Gibbons*, 684 F.2d 565 (8th Cir.1982) (holding that irreparable injury shown by sales representative's employment in same sales territory, "symbiotic relationship" between sales representative and medical manufacturer, relationship between sales representative and customers, and substantial investment made by former employer in training of sales representatives).[23] Also of particular interest here is the conclusion of some courts that irreparable harm can be inferred in certain circumstances from wrongful conduct of the defendant, such as upon "a trial court's actual finding of a breach [of a restrictive cove-

nant] by the defendant." *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir.1991).[24]

 Irreparable harm will not be found where alternatives already available to the plaintiff make an injunction unnecessary. For example, in the context of a request for a preliminary injunction to protect a prisoner's right of access to the courts, if the prisoner is able to use existing methods of access to the courts, the prisoner has failed to show either irreparable harm or prejudice. *Aswegan*, 981 F.2d at 314. The present case does not present such circumstances, however.

 *iii.* **Balance Of Harm.** The court notes that the analysis of the next *Dataphase* factor, "the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest," *Pottgen*, 40 F.3d at 929, is not identical to the "irreparable harm" analysis. Irreparable harm focuses on the harm or potential harm to the plaintiff of the defendant's conduct or threatened conduct. *Dataphase*, 640 F.2d at 114. In contrast, the balance of harm analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public, as well. *Id.; see also Glenwood Bridge*, 940 F.2d at 372 (considering the effect of granting or denying the injunction on the public's interest in a public works construction project as well as upon the parties in the balance of harm analysis); *Modern Computer Sys.*, 871 F.2d at 737–38

---

**23.** The court of another circuit has held, under a test somewhat different from that stated in *Dataphase*, considering irreparable harm and probable success on the merits *or* a balance of hardships tipping strongly in favor of the preliminary injunction, that "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent–A–Center v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991). The court continued that it had found that "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Id.* Such intangible injuries may be difficult to valuate and thus constitute possible irreparable harm. *Id.*

**24.** Additional situations in which irreparable harm may be found, not present in this case, involve imminent health or safety risks. *Harris v. Blue Cross Blue Shield of Mo.*, 995 F.2d 877, 879 (8th Cir.1993) (injunctive relief ordered to prevent denial of coverage for treatment of a life threatening illness presented "no question" that irreparable harm existed at the time the injunction was ordered). However, permanent injunctive relief may be mooted by removal of that risk, e.g., by the provision of medical treatment where it had previously been denied. *Id.* (although the opinion does not indicate whether it was action of the nonmovant or a third party that alleviated the risk of the injury, nor whether the agency of the relief would make a difference to the permanent injunction analysis).

(harm to other interested parties also considered).

In conducting the balance of harm required under *Dataphase*, it is obvious that an illusory harm to the movant will not outweigh any actual harm to the nonmovant. *Frank B. Hall*, 974 F.2d at 1023. To determine what must be weighed, the court finds that courts of this circuit have looked at the threat to each of the parties' rights that would result from granting or denying the injunction. *Baker Elec. Co-op*, 28 F.3d at 1473. Also, the potential economic harm to each of the parties and to interested third parties of either granting or denying the injunction is relevant. *Id.* Another consideration in the balance of harm calculus is whether the defendant has already voluntarily taken remedial action. *Sanborn*, 997 F.2d at 489. Where the nonmovant has taken such action, the balance of harms is readjusted, because the potential for economic or other harm to the movant has been eliminated. *Id.* (citing *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 774 (2d Cir.1984), which held that injunctive relief was "wholly unnecessary" when the defendant had voluntarily brought his product labeled with the UL mark into compliance with UL standards and where there was not a likelihood of repetition or hazard to the public.). Similarly, present harm as the result of past misconduct is not sufficient to justify the injury to the nonmovant of granting a preliminary injunction requiring some additional corrective action, because such relief "goes beyond the purpose of a *preliminary* injunction." *Id.* at 490 (emphasis in the original).

*iv. The Public Interest.* The final factor in the *Dataphase* analysis is the impact of granting or denying the preliminary injunction upon the public interest. *Pottgen*, 40 F.3d at 929. The "public interest" factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious.[25] However, more nearly on point in a case

involving enforcement of contract provisions is the assertion of the Eighth Circuit Court of Appeals that the public interest "does not favor forcing parties to a[n] agreement to conduct themselves in a manner directly contrary to the express terms of the agreement." *Frank B. Hall*, 974 F.2d at 1026. In a case specifically examining the public interest in covenants not to compete, the court has found that "if these noncompete agreements are valid, the public interest calls for their enforcement." *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir.1984); *see also Millard v. Electronic Cable Specialists*, 790 F.Supp. 857, 863 (D.Minn.1992) ("Finally, public interest is served by upholding valid restrictive covenants. Restraining unfair competition does not violate public policy. *See Olin Water Servs. v. Midland Research Labs., Inc.*, 596 F.Supp. 412, 415 (E.D.Ark. 1984), *appeal dismissed*, 774 F.2d 303 (8th Cir.1985).").

Although the court has concluded that these federal standards, rather than the Iowa standards, for issuance of a preliminary injunction should be applied in this diversity action, the court must nonetheless consider one more standard for issuance of a preliminary injunction before turning to analysis of whether a preliminary injunction should issue in this case. That issue arises because the parties included in their contract a clause providing that an injunction is available upon a showing of breach of the terms of the agreement.

### 3. Stipulated Grounds For Injunction

The parties to the present action, in the contract for employment, appear to have stipulated to a lower threshold for invocation of injunctive relief. Paragraph 7 of the Agreement provides, in pertinent part, that

[i]t is futher [sic] agreed that upon proof of the existence of such violation of any of the covenants in Paragraph 5, the Company will be entitled to injunctive relief by an

---

**25.** The "public interest" factor involves, among other things, the "public's interest in minimizing unnecessary costs" to be met from public coffers. *Baker Elec. Co-op*, 28 F.3d at 1474 (citing *James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544–45 (8th Cir.1982) (*per curiam* )); *James River*

*Flood Control Ass'n*, 680 F.2d at 544–45 (public interest served by avoiding "greater expenditures from the public treasury"). The public interest also favors enjoining false statements, and enjoining the safety risks arising from false labelling of products. *Sanborn Mfg.*, 997 F.2d at 490.

court of jurisdiction having authority to grant such relief.

Thus, under the terms of the agreement between the parties, Curtis 1000 need only prove the existence of a breach of the covenant not to compete, not proof on each of the *Dataphase* factors, in order to be entitled to injunctive relief.

The parties' stipulation that breach of the terms of the agreement is sufficient ground for issuance of an injunction finds support in Iowa law. "When injunctive relief is part of the remedy that the parties stipulated in their agreement, the district court should issue the injunction." *Hockenberg Equip. Co.*, 510 N.W.2d at 158; *see also Presto–X– Co.*, 442 N.W.2d at 89 ("Despite the usual and proper reluctance of courts to issue injunctions, the district court should have done so in this case because injunctive relief is part of the remedy that the parties stipulated in their agreement").[26] Nor would such a provision be at odds with Eighth Circuit standards for issuance of an injunction, since the Court of Appeals of this circuit has held that irreparable harm "can be inferred from a trial court's actual finding of a breach [of a restrictive covenant] by the defendant." *Overholt Crop Ins. Serv. Co.*, 941 F.2d at 1371. The court found above that Youngblade's

letter of January 7, 1995, was a solicitation of Curtis 1000's customers, and now finds that the solicitation was a breach of the restrictive covenant in this case.[27] Under the Eighth Circuit standard, however, this conclusion would only dispense with the requirement to show irreparable harm, because the court is entitled to presume irreparable harm from the breach of the agreement not to compete. Curtis 1000 would still have to show that it meets the remaining *Dataphase* factors.

This court is persuaded that the parties' contractual standard for issuance of a preliminary injunction might be sufficient to invoke that equitable relief. The principle of freedom of contract takes precedence in a context where courts have already accepted that certain restraints on trade are acceptable, as shall be shown below in the discussion of covenants not to compete. The court, by accepting the parties' stipulation of the grounds for issuance of a preliminary injunction, would not thereby surrender all of its equitable power into the hands of the parties. Rather, the court would maintain its authority to enforce any injunction only to the extent it found reasonable, another matter considered in more detail below. However, the court finds that it need not decide this issue, because if in this case Curtis 1000 is entitled

---

**26.** Youngblade argues that the court in *Presto–X– Co.* required a showing of irreparable harm, despite the clause in the contract in question there which appeared to authorize an injunction based merely on a showing of breach of contract. He also argues that it is distinguishable because the plaintiff in that case presented proof of solicitation of customers and resulting loss of profits, but that there has been no such solicitation here. The court specifically rejects the second argument, having found that Youngblade's January 7, 1995, letter was indeed a solicitation. As to the first argument, the court agrees that the court in *Presto–X–Co.* did examine irreparable harm, but this court reads the decision to issue the permanent injunction based on the contract clause to have been in the alternative. In *Presto–X–Co.*, the court began by stating that

> We think a permanent injunction was clearly required here. The restrictive covenant provides that "violation of [it] will subject [Ewing] to injunction to restrain such violation and damages resulting therefrom."

*Presto–X–Co.*, 442 N.W.2d at 89. The court therefore concluded that the stipulated remedy should be granted. Then the court continued as follows:

> Further, "it is clear that where there is a violation of a plain right of the [plaintiff] and [the] injury is regarded as irreparable, [the plaintiff] is ordinarily entitled to an injunction."

*Id.* (quoting *Orkin*, 259 Iowa at 1228, 146 N.W.2d at 327). The court determined that such an irreparable injury had occurred in the case before it, and an injunction should issue. *Id.* This conclusion based on a finding of irreparable harm was plainly in the alternative.

**27.** Youngblade has cited *Core v. Martin*, 543 So.2d 619 (La.Ct.App.1989), as holding that similar letters are not solicitations. This court respectfully disagrees with the conclusions of the court in that case, and, in any event, concludes that the January 7, 1995, letter in this case is a far more explicit solicitation than the letters considered in *Core*. To refuse to call the letter in question here a solicitation would be as disingenuous as "calling the rabbit who lurks in Houdini's hat a magician." *United States v. Gibbens*, 25 F.3d 28, 34 (1st Cir.1994) (applying this analogy to calling the government the "victim" of a "sting" or controlled buy of contraband that it had set up).

to a preliminary injunction under the more stringent standards established by *Dataphase* and its progeny, then the court need not consider the lower threshold purportedly set by the contract.[28]

Having established which standards are applicable to determination of whether or not a preliminary injunction should issue in this case, the court next turns to other questions of what law applies in the circumstances presented here. Of particular concern is what law applies to determination of Curtis 1000's likelihood of success on the merits in the *Dataphase* analysis of Curtis 1000's request for a preliminary injunction.

## B. Conflict of Laws

■■■ Before turning to examination of the equitable constraints on covenants not to compete and their validity despite restraints upon trade, the court must first resolve which state's standards should be used to measure the validity and enforceability of the covenant in question here, the standards of Delaware, the state identified in the parties' choice of law clause in the Agreement between them, or Iowa, the state in which the Agreement was primarily performed. To resolve this issue, the court looks to the conflict of laws or choice of law rules of the state of Iowa, because in an action based upon diversity of citizenship jurisdiction, a federal district court must apply the substantive law of the state in which it sits, including its conflict of laws or choice of law rules. *Klaxon Co.,* 313 U.S. at 496, 61 S.Ct. at 1021; *Smith v. Gould, Inc.,* 918 F.2d 1361, 1363 n. 3 (8th Cir.1990) (citing *Klaxon* ); *Modern Leasing, Inc., of Iowa v. Falcon Mfg. of Cal., Inc.,* 888 F.2d 59, 62 (8th Cir.1989) (citing *Klaxon* ); *Lourdes High School of Rochester, Inc. v. Sheffield Brick & Tile Co.,* 870 F.2d 443, 445 (8th Cir.1989) (same); *Freeze v. American Home Prod. Corp.,* 839 F.2d 415 (8th Cir. 1988); *Pritchard–Keang Nam Corp. v. Jaworski,* 751 F.2d 277, 281 n. 4 (8th Cir.1984),

*cert. denied,* 472 U.S. 1022, 105 S.Ct. 3491, 87 L.Ed.2d 625 (1985) (same).

### 1. The Iowa Conflict Of Laws Rules For Contract Cases

■■■ Iowa courts have adopted the "most significant relationship" test of § 188 of the Restatement (Second) of Conflicts of Laws for determination of conflict of laws questions pertaining to contract actions. *Smith,* 918 F.2d at 1363 n. 3 (citing *Cole v. State Auto & Casualty Underwriters,* 296 N.W.2d 779, 781 (Iowa 1980) (*en banc* )); *Modern Leasing,* 888 F.2d at 62; *Freeze,* 839 F.2d at 417 (citing *Cole,* 296 N.W.2d at 781, and *Joseph L. Wilmotte & Co. v. Rosenman Bros.,* 258 N.W.2d 317, 326 (Iowa 1977), for this proposition as to contract actions); *see also In re Marriage of Whelchel,* 476 N.W.2d 104, 109 (Iowa Ct.App.1991) (citing *Lindstrom v. Aetna Life Ins. Co.,* 203 N.W.2d 623 (Iowa 1973), as applying this test to contract actions). That test applies both to situations in which the parties have not made a choice of law in the contract, and as part of the analysis of the conflict of law question when the parties have made a choice of law in the contract. *Wilmotte,* 258 N.W.2d at 328 (§ 187 of the Restatement permits parties to agree on the law to be applied to the contract so long as it does not override the public policy of a state having a materially greater interest in the transaction as determined under § 188). The "most significant relationship" test swept away the "place-of-contract theory" of the original Restatement, which had been adopted by Iowa in *Haverly v. Union Constr. Co.,* 236 Iowa 278, 18 N.W.2d 629 (1945), but which had fallen into disfavor. *George H. Wentz, Inc. v. Sabasta,* 337 N.W.2d 495, 499 (Iowa 1983) (citing *Wilmotte* as establishing the new rule); *Cole,* 296 N.W.2d at 781 ("The second Restatement recognizes widespread repudiation of the test espoused in the first Restatement.").

---

**28.** Youngblade has spent considerable time arguing the import of the clause of the Agreement which provides the stipulation that an injunction is an appropriate remedy for any violation of the contract that the court has been considering here. Although not convinced that it follows the thrust of defendant's arguments, the court finds that they are irrelevant, because the court has concluded that if the preliminary injunction can be issued on the basis of the more stringent standard articulated in *Dataphase,* it could also be issued on the lesser standard provided for in the Agreement.

Under the Iowa conflict of laws test for contract actions, the parties may, with certain restrictions, select for themselves the law which will apply to their contract. *Cole,* 296 N.W.2d at 781 (citing Restatement (Second) of Conflict of Laws § 187). Where the parties do not make that choice, then the "most significant relationship" test of Restatement (Second) of Conflict of Laws § 188 applies, and the court applies the law of the jurisdiction with the "most significant relationship" to the transaction or dispute. *Id.* (Adding that "[w]e think it clear that choice-of-law questions are now to be determined under the Restatement (Second) test.").[29] The "most significant relationship" test of § 188 was explained in *Wilmotte,* 258 N.W.2d at 326, as follows:

> Section 188 of the Restatement has reference to the "most significant relationship" rule to determine the law to be applied with respect to the rights and duties of the parties under a contract where the contract did not make an effective choice as to which state law should be applied in construing or enforcing the contract. In determining which state has the most significant relationship to the issue in question various contacts with the different states are determined. These contacts include the place of contracting, the place of negotiation of the contract, the place of performance, the locale of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation, and

place of business. Also, in determining any conflicts of law questions with respect to the interpretation or enforcement of contracts, the following factors must be taken into account:

> "(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

> "(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

> > "(a) the needs of the interstate and international systems,

> > "(b) the relevant policies of the forum,

> > "(c) the relevant polices of other interested states and the relative interests of those states in the determination of the particular issue,

> > "(d) the protection of justified expectations,

> > "(e) the basic policies underlying the particular field of law,

> > "(f) certainty, predictability and uniformity of result, and

> > "(g) ease in the determination and application of the law to be applied."

*See* Restatement, Second, Conflict of Laws, Choice of Law Principles, § 6, p. 10.

*Wilmotte,* 258 N.W.2d at 326.

The court in *Wilmotte* also addressed the requirements of § 187,[30] which applies when

---

**29.** Section 188 of the Restatement (Second) of Conflict of Laws is as follows:

§ 188. Law Governing in Absence of Effective Choice by the Parties

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

**30.** Section 187 of the Restatement (Second) of Conflict of Laws is as follows:

§ 187. Law of the State Chosen by the Parties

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved

the parties have made a choice of law in the contract:

> Restatement Second, Conflicts of Law, § 187, permits the parties to agree on the law to be applied to the contract in most cases *so long as it does not override the public policy of a state having a materially greater interest in the transaction.*

*Id.* at 328. This language in the *Wilmotte* decision is drawn from § 187(2)(b), but this court does not read the *Wilmotte* decision as limiting the Iowa Supreme Court's acceptance of § 187 only to that subsection. The other subsections of § 187 were inapplicable to the case before the court in *Wilmotte,* because the chosen state had a substantial relationship to the parties and the transaction. *Id.* at 326–328 (New York law was chosen, rather than Iowa law, the plaintiff was from New York, and the arbitration proceedings at issue were in New York; the court concluded that New York had significant relationships as well as being the law chosen in the contract).

The Eighth Circuit Court of Appeals explained the analytical process under § 187(2)(b) of the Restatement for a choice of law clause in an agreement containing a covenant not to compete. *Baxter Int'l, Inc. v. Morris,* 976 F.2d 1189, 1195–96 (8th Cir.1992) (applying Missouri law, which also uses § 187 in situations in which the parties' contract has a choice of law clause). The court agreed with the district court's determination that section 187(1) was not applicable to the case before it, because

> the parties could not have provided for the enforceability of the noncompete covenant. Only a court applying the appropriate law can assess the validity of contract terms.

*Id.* at 1196. The appellate court, however, did not agree with the district court's application of § 187(2)(b), and therefore clarified the process:

> by an explicit provision in their agreement directed to that issue, unless either
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater inter-

Section 187(2)(b) provides a three-step process to determine whether the parties' contractual choice of law will be honored by the forum. First, the court must determine which state's law would apply in default under section 188 in the absence of an effective choice of law by the parties. Second, the court must decide whether the default state has a materially greater interest in the outcome of the particular issue than the chosen state. Finally, the court must determine whether application of the law of the chosen state would be contrary to a fundamental policy of the default state.

*Id.* (finding that the district court had failed to apply the second step in the process). The court found that the default state was California, but that that state did not have a materially greater interest, largely because a post-employment restrictive covenant provides the default state with no interest when the employee no longer resides in that state nor works there. *Id.* at 1196–97. The court found that in circumstances where neither state had a materially greater interest, § 187(2)(b) required deferral to the contractual choice of law. *Id.* at 1197. Like the Iowa court in *Wilmotte,* however, the Eighth Circuit Court of Appeals in *Baxter* did not consider the application of § 187(2)(a), because the chosen state had a substantial relationship to the parties and the transaction. *Id.* at 1195–96 (Illinois was law chosen in contract, and both California and Illinois had substantial interests in the transaction, although neither had a materially greater interest than the other).

### 2. *Application Of The Choice Of Law Rules*

 In the present case, the Agreement does have a choice of law provision, selecting Delaware law. Thus, this court's analysis will follow § 187 of the Restatement. The

> est than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
> (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

court's task is to consider whether this choice of law is to be honored in selecting the law to be applied to the validity and enforceability of the covenant not to compete. This court is bound by *Baxter* to conclude that § 187(1) is inapplicable to this matter, because the parties could not have provided for the enforceability of the noncompete covenant. *Baxter*, 976 F.2d at 1196. The next step in the analysis is therefore to decide whether either of the conditions stated in § 187(a) or (b) applies to the circumstances of this case, either of which would require the court to ignore the law chosen by the parties. Because the court concludes that both conditions are present, and either alone is sufficient for the court to refuse to apply the law of the state chosen, the court concludes that Iowa law will apply in this action to the questions of the validity and enforceability of the covenant not to compete.

### a. The Chosen State Has No Substantial Relationship

■ The first condition to be considered under § 187(2) is whether the "chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." Restatement (Second) of Conflict of Laws § 187(2)(a). This condition has been met in the present case, because the only relationship between the chosen state and the parties or the transaction is that Curtis 1000 is incorporated in Delaware. The contract at issue was not negotiated, entered into, or performed in Delaware, and the company's headquarters is in Georgia, not Delaware. The factors for consideration of the most significant relationship identified in § 188 of the Restatement all point instead to the application of Iowa law. The contract was to be performed principally in Iowa, with some performance in both Nebraska and South Dakota, Youngblade's primary place of business, his office, and his residence, at all material times were in Iowa, as they are now.

■ Although courts do consider the place of incorporation of a business when seeking a sufficient relationship between the chosen state and the transaction or parties to sustain the parties' choice of law, they do not generally find that relationship alone sufficient. *See, e.g., Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 948 (7th Cir.1994) (place of incorporation alone insufficient to sustain choice of that state's law); *Ferrofluidics v. Advanced Vacuum Components, Inc.*, 968 F.2d 1463, 1467 (1st Cir.1992) (chosen state was place of incorporation, and such relationship was sufficient to sustain the choice of law when company also did a substantial amount of business there); *but see Carlock v. Pillsbury Co.*, 719 F.Supp. 791, 807 (D.Minn.1989) ("A party's incorporation in a state is a contact sufficient to allow the parties to choose that state's law to govern their contract."). In *Suess*, the court discussed the importance of the decision of Curtis 1000, the same plaintiff currently before this court, and other businesses to incorporate in Delaware to the conflict of laws question:

> Businesses incorporate in Delaware in order to take advantage of that state's corporation law, and its judicial expertise concerning corporate governance, rather than to conduct business there. Curtis's headquarters are in Georgia, and it has no offices or operations in Delaware. Curtis and Suess are operating in Illinois, so Illinois has an interest in applying its law to their relations. If the choice of law provision in the covenant not to compete had designated Georgia law we assume the Illinois courts would defer to that designation, recognizing that Georgia has as much interest in regulating the out of state operations of "its" firm as Illinois does in protecting its citizen, Mr. Suess. But that is not the case here.

*Suess*, 24 F.3d at 949. The court therefore concluded that Illinois law applied, despite the choice of Delaware law in the agreement, because "there is insufficient connection between the contract and the State of Delaware." *Id.* at 948. Although the court did not specifically say so, this is the criterion stated in § 187(2)(a).

Similarly, this court finds that there is no substantial relationship between Delaware, which is only the place of incorporation of Curtis 1000, to the parties or the transactions involved here and there is no other reasonable basis for the parties' choice of Delaware

law. The state with the most significant relationship to the parties and the transaction in question here is plainly Iowa, and the court should apply the Iowa law on covenants not to compete. Therefore, the presence of the condition stated in § 187(2)(a) dictates application of Iowa law rather than the law chosen by the parties in their contract.

#### b. The Chosen State's Law Is Contrary To Iowa's Policy

In the alternative, the court finds that the second condition is also present, thus dictating application of Iowa law. The second condition found in Restatement § 187(2) which would preclude application of the law chosen in the contract is that "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state" when the factors articulated in § 188 are applied. Restatement (Second) of Conflict of Laws § 187(2)(b). This court, applying the three-step analysis necessary under § 187(2)(b) as stated in *Baxter,* 976 F.2d at 1196, again finds that Iowa law should be applied to the covenant not to compete in question here.

First, the law of Iowa would apply "in default" applying § 188. The court has concluded above that Iowa has the most significant relationship to the present controversy. Second, Iowa has a materially greater interest in the outcome of the particular issue than does the chosen state of Delaware. Delaware's interest is in corporate governance, not in performance of and conditions in a sales representative's contract. *Suess,* 24 F.3d at 949. Only the third step in the analysis need detain the court more than briefly.

That third step requires the court to consider whether application of the law of the chosen state, Delaware, would be contrary to a fundamental policy of the default state, Iowa. A number of jurisdictions have found public policy to be articulated in the judicial decisions of the state's courts.[31] In the seminal case finding a public policy exception to the employment at-will doctrine, the Illinois Supreme Court held that a "clearly mandated public policy ... is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions." *Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 130, 421 N.E.2d 876, 878, 52 Ill. Dec. 13, 15 (1981) (citations omitted). In the present case, the court finds that Iowa's public policy concerning covenants not to compete is indeed stated in the decisions of Iowa's courts, and that that public policy would be violated by application of Delaware

---

**31.** *See, e.g., Building Serv. Employees Int'l Union, Local 262 v. Gazzam,* 339 U.S. 532, 537, 70 S.Ct. 784, 787, 94 L.Ed. 1045 (1950) ("The public policy of any state is to be found in its constitution, acts of the legislature, and decisions of its courts."); *Anderson ex rel. Doss v. Jackson Mun. Airport Auth.,* 691 F.2d 742, 753 (5th Cir.1982) (Mississippi is committed to the doctrine that public policy of the state must be found in its constitution and statutes, "and when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials," citing *State ex rel. Knox v. Edward Hines Lumber Co.,* 150 Miss. 1, 115 So. 598 (1928), and *Anderson ex rel. Doss v. Jackson Mun. Airport Auth.,* 419 So.2d 1010; 1023 (Miss.1982)); *Hutson v. Analytic Sciences Corp.,* 860 F.Supp. 6, 3 (D.Mass.1994) (applying Massachusetts law, and including judicial decisions among the sources of public policy); *Hicks v. Resolution Trust Corp.,* 736 F.Supp. 812, 815 (N.D.Ill.1990) (applying Illinois law, and finding judicial decisions among the sources of public policy); *Wilmot v. Kaiser Aluminum & Chem. Corp.,* 118 Wash.2d 46, 821 P.2d 18 (1991) (opinion on certified question to the United States District Court for the Eastern District of Washington holding that public policy may be judicially recognized even in the absence of statutory authority); *Williams v. Patton,* 821 S.W.2d 141, 148 (Tex.1991) (concurring opinion, recognizing that Texas also finds public policy in judicial decisions); *Salter v. Alfa Ins. Co.,* 561 So.2d 1050, 1056 (Ala.1990); *Watson v. Cleveland Chair Co.,* 789 S.W.2d 538, 540 (Tenn.1989) (including judicial decisions among the sources of public policy); *O'Hara v. Ahlgren, Blumenfeld & Kempster,* 127 Ill.2d 333, 130 Ill.Dec. 401, 405, 537 N.E.2d 730, 734 (1989) (same); *Barr v. Kelso–Burnett Co.,* 106 Ill.2d 520, 527, 88 Ill.Dec. 628, 631, 478 N.E.2d 1354, 1357 (1985) (same); *Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 377, 710 P.2d 1025, 1032 (1985) (same); *Dainton v. Watson,* 658 P.2d 79, 82 (Wyo.1983) (same); *Parnar v. Americana Hotels, Inc.,* 65 Haw. 370, 379, 652 P.2d 625, 631 (1982) (same); *Richmond County v. Pierce,* 234 Ga. 274, 276, 215 S.E.2d 665, 668 (1975) (same); *Payne v. Jackson County, Mo.,* 484 S.W.2d 483, 484 (Mo.1972) (same); *Pacific Employers Ins. Co. v. Industrial Accident Comm'n,* 10 Cal.2d 567, 578, 75 P.2d 1058, 1063 (1938) (same), *cert. granted,* 305 U.S. 563, 59 S.Ct. 76, 83 L.Ed. 355 (1938), *judgment aff'd,* 306 U.S. 493, 59 S.Ct. 629, 83 L.Ed. 940 (1939).

law. Examinations of the Iowa law and the Delaware law concerning covenants not to compete, and a comparison of the two, are presented below in section III.C. of this opinion. For the moment, it is sufficient to state that Delaware's extensive consideration of the economic impact upon the employee of enforcing the covenant as potentially outweighing the employer's interest in enforcement of the covenant is repugnant to the Iowa policy behind such covenants, which is that covenants shown to be reasonably necessary to protect the employer's business interests should be enforced. Thus, either because of the presence of the condition stated in § 187(2)(a), or because of the presence of the condition stated in § 187(2)(b), the choice of law of the parties in their contract must be disregarded, and the court should apply Iowa law.

Even though it has concluded that under the Iowa choice of law or conflict of laws rules, Iowa law would apply to enforcement of the present covenant not to compete, in an abundance of caution, the court will consider the enforceability of this covenant under both Iowa and Delaware law. Under the law of either jurisdiction, this court concludes that the covenant is valid and enforceable.

### C. The Covenant Not To Compete

Over forty years ago, Judge Hoover of the Court of Common Pleas of Ohio was already distressed at the difficulties of sorting out what authority is applicable, and persuasive, to resolving a dispute over a covenant not to compete:

> This is not one of those questions on which the legal researcher cannot find enough to quench his thirst. To the contrary there is so much authority it drowns him. It is a sea—vast and vacillating, overlapping and bewildering. One can fish out of it any kind of strange support for anything, if he lives so long.

*Arthur Murray Dance Studios of Cleveland, Inc. v. Witter,* 62 Ohio Law Abs. 17, 105 N.E.2d 685 (1952). The sea is no less bewildering now. However, because of the time constraints imposed by a demand for a preliminary injunction, the court will restrict its fishing only to the two sources of authority that may be controlling here, Iowa and Delaware decisions on covenants not to compete in employment contracts. Nonetheless, the law of those jurisdictions will make the most sense if viewed with some awareness of historical context.

Noncompetition clauses in employment contracts have been the source of litigation for over 500 years. Harlan M. Blake, *Employee Agreements Not to Compete,* 73 HARV. L.REV. 625, 631 (1960) (hereinafter Blake, 73 HARV.L.REV.) (asserting that the first significant case involving a noncompetition covenant occurred in 1414).[32] Under early English common law, courts were hostile to employee covenants not to compete and regarded them as contrary to public policy. *See Colgate v. Bacheler,* 78 Eng.Rep. 1097 (1596) (holding it unlawful "to restrain any [person] to use a lawful trade at any time or at any place"); *see also* Note, *Enforceability of Contracts Not to Compete After a Term of Employment,* 28 COL.L.REV. 81, 82–83, n. 19 (1928). For at least 250 years, the most cited case on common-law restraints of trade has been *Mitchel v. Reynolds,* 1 P.Wms. 181, 24 Eng.Rep. 347 (Q.B.1711), which sought a unifying principle to guide judicial decisions in all subsequent cases involving enforcement of a covenant not to compete. Blake, 73 HARV.L.REV. at 629. In that case, Lord Macclesfield noted that there was a presumption that all restraints of trade are invalid, but nonetheless held that the presumption could be overcome:

> [A] special consideration being set forth in the condition, which shows it was reasonable for the parties to enter into it, the same is good.... [A] man may, upon a valuable consideration, by his own consent, and for his own profit, give over his trade, and part with it to another ...

*Mitchel v. Reynolds,* 1 P.Wms. at 182, 186, 24 Eng.Rep. at 348, 349; *see also* Blake, 73 HARV.L.REV. at 629. The court will show below that these principles still guide courts in Iowa and Delaware in their examination of covenants not to compete.

Even today, every time a noncompetition clause is litigated, the court is forced to

---

**32.** The case identified by Blake was *Dyer's Case,* Y.B.Mich. 2 Ilen. 5, f, 5, pl. 26 (C.P.1414).

grapple with two conflicting policies, freedom to contract and the doctrine against contractual restraints of trade. Peter J. Whitmore, *A Statistical Analysis of Noncompetition Clauses in Employment Contracts*, 15 J.Corp.L. 483, 486 (1990) (hereinafter Whitmore, 15 J.Corp.L.). *Compare Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 539 (Wyo.1993) ("Two principles, the freedom to contract and the freedom to work, conflict when courts test the enforceability of covenants not to compete."). The first policy has been protected by American courts since the early nineteenth century to "encourage individual entrepreneurial activity," *Id.* (citing E. Farnsworth, Contracts 21 (1982)), and has "been extolled as one of the great boons of modern democratic civilization, as one of the principal causes of prosperity and comfort." *Id.* (citing A. Corbin, Corbin on Contracts (One Volume Ed.) § 1376, at 1166 (1952)). The second doctrine is "[o]ne of the oldest and best established . . . [contract] policies developed by courts." *Id.* (citing E. Farnsworth, Contracts at 335). The court turns next to examination of how Iowa and Dela-

ware courts have resolved the conflicts between these policies.

### 1. Covenants Not To Compete Under Iowa Law

#### a. An Overview

◼ The court's analysis of the propriety of issuing a preliminary injunction ordering compliance with the covenant not to compete, of course, requires an examination of Iowa law on such covenants in order to determine whether such a covenant is valid and enforceable, and hence whether Curtis 1000 has a likelihood of success on the merits of its lawsuit against Youngblade. Iowa courts have for many years upheld the validity of covenants not to compete, or at the very least have ordered trials on their validity and enforceability. *Ma & Pa, Inc. v. Kelly*, 342 N.W.2d 500, 501–02 (Iowa 1984) (listing Iowa cases to uphold or order trial on such covenants).[33] The general rule in Iowa is that the court "will enforce a noncompetitive provision in an employment contract if the cove-

---

**33.** The court in *Ma & Pa, Inc.*, made the following survey of Iowa decisions on covenants not to compete:

Decisions upholding such covenants or ordering trial on them include *Tasco, Inc. v. Winkel*, 281 N.W.2d 280 (Iowa 1979) (reversing summary judgment for employee); *Farm Bureau Service Co. v. Kohls*, 203 N.W.2d 209 (Iowa 1972) (covenant enforced to extent found reasonable); *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, *supp. opinion*, 190 N.W.2d 413 (Iowa 1971) (same); *Orkin Exterminating Co. v. Burnett*, 259 Iowa 1218, 146 N.W.2d 320 (1967); *Cogley Clinic v. Martini*, 253 Iowa 541, 112 N.W.2d 678 (1962); and *Federated Mutual Implement & Hardware Ins. Co. v. Erickson*, 252 Iowa 1208, 110 N.W.2d 264 (1961). Decisions refusing to uphold such covenants under the facts are *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376 (Iowa 1983); *Baker v. Starkey*, 259 Iowa 480, 144 N.W.2d 889 (1966); *Mutual Loan Co. v. Pierce*, 245 Iowa 1051, 65 N.W.2d 405 (1954); and *Brecher v. Brown*, 235 Iowa 627, 17 N.W.2d 377 (1945), *overruled, Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, *supp. opinion*, 190 N.W.2d 413 (Iowa 1971). *See also Pathology Consultants v. Gratton*, [343] N.W.2d [428] (Iowa 1984) (partnership of physicians); *Van Hosen v. Bankers Trust Co.*, 200 N.W.2d 504 (Iowa 1972) (attempted forfeiture of pension); *Kunz v. Bock*, 163 N.W.2d 442 (Iowa 1968) (covenant in connection with sale of business); *Insurance Agents, Inc. v. Abel*, 338 N.W.2d 531 (Iowa App.1983) (covenant

held unsupported by consideration); *Kroeger v. Stop & Shop Companies, Inc.*, 13 Mass.App. 310, 432 N.E.2d 566 (1982) (attempted forfeiture of deferred compensation; *cf. Van Hosen, supra*).
*Ma & Pa, Inc.*, 342 N.W.2d at 501–02. To this list the court would add the following cases: *Dental Prosthetic Servs., Inc. v. Hurst*, 463 N.W.2d 36, 38–40 (Iowa 1990) (held dentist did not violate covenant in employment contract, therefore court did not need to consider its reasonableness as to time and area); *Presto–X–Co. v. Ewing*, 442 N.W.2d 85, 89–91 (Iowa 1989) (upholding covenant, reversing district court and remanding for issuance of permanent injunction); *Lamp v. American Prosthetics, Inc.*, 379 N.W.2d 909, 910–911 (Iowa 1986) (holding covenant unenforceable as overbroad, and refusing to enforce partially where that issue had not been properly raised); *The Phone Connection, Inc. v. Harbst*, 494 N.W.2d 445, 449–50 (Iowa App. 1992) (enforcing covenant, but as modified to establish reasonable area and time restrictions); *Dental East, P.C. v. Westercamp*, 423 N.W.2d 553, 555 (Iowa App.1988) (dentist's covenant not to compete held enforceable, reversing and remanding to trial court for order to produce patient records and to determine damages from breach of covenant); *Dain Bosworth Inc. v. Brandhorst*, 356 N.W.2d 590, 593–94 (Iowa App. 1984) (upholding enforcement of covenant as not unreasonable as to time and area, and not oppressive or imposing disproportionate hardship).

nant is reasonably necessary for the protection of the employer's business and is not unreasonably restrictive of the employee's rights nor prejudicial to the public interest." *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983); *Insurance Agents, Inc.*, 338 N.W.2d at 535; *Tasco, Inc. v. Winkel*, 281 N.W.2d 280, 281 (Iowa 1979) (setting out the same general rule as designed to answer the "ultimate question [of] whether the covenant ... is valid and enforceable."); *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 369 (Iowa 1971), *as modified*, 190 N.W.2d 413 (Iowa 1971); *Orkin Exterminating Co., Inc. (Arwell Div.) v. Burnett*, 146 N.W.2d 320, 324 (Iowa 1967). Iowa courts recognize a distinction between a noncompetition covenant in the sale of a business and one in an employment contract, and "because of countervailing policy considerations will not enforce the latter as freely." *Ehlers*, 188 N.W.2d at 369 (citing cases from Iowa and other jurisdictions for this proposition, and therefore applying the reasonableness rule articulated above to covenants not to compete in employment contracts);[34] *Baker v. Starkey*, 259 Iowa 480, 144 N.W.2d 889, 895 (1966).

 A covenant not to compete may be invalid and unenforceable because of "oppressive restrictions therein and the bad faith involved in its execution." *Tasco, Inc.*, 281 N.W.2d at 281. In *Tasco, Inc.*, the court reversed the trial court's grant of a·motion for summary judgment on the ground that the covenant not to compete was "unconscio-nable," because it determined that whether the following circumstances constituted "taking unconscionable advantage" of the defendant was a question of fact upon which there was a "genuine and serious dispute":

(1) The agreement extends to the entire United States.

(2) Defendant was compelled to sign the agreement under threat of discharge.

(3) Defendant had been an employee for five years prior to the time of signing.

(4) The restrictive covenant was not part of his original contract.

*Id.* at 281–282. In establishing the rule that covenants not to compete may be enforced to the extent reasonable, the court in *Ehlers* asserted that it was not retreating from the rule, found in *Baker v. Starkey*, 259 Iowa 480, 495, 144 N.W.2d 889, 898 (1966), to the effect that if the circumstances disclosed by the evidence show that the employer has acted in "bad faith" *in seeking the covenant,* "for reasons other than an attempt to protect the employer's legitimate interests," the "good faith of the employer would become an issue" in the enforcement of the covenant. *Ehlers*, 188 N.W.2d at 374.[35] The court in *Orkin* identified these and other issues pertaining to contracts generally that affect their enforceability. *Orkin*, 146 N.W.2d at 324. The court concluded that

[w]here, as here, the covenant not to compete is based upon an agreement to instruct, direct, hire and pay the employee a salary, and grants other benefits in return for servicing designated area company ac-

---

**34.** Although the court is not yet confronted with the issue, the Iowa Supreme Court stated some time ago that "[t]he measure of damages resulting from the wrongful breach of an agreement not to compete is the loss naturally resulting from the breach, including loss of profits." *Orkin Exterminating Co., Inc. (Arwell Div.) v. Burnett*, 160 N.W.2d 427 (Iowa 1968). The court reiterated this conclusion in *Presto–X–Co.*, 442 N.W.2d at 90 (citing *Orkin* ).

**35.** The court has found the following helpful to elucidate further the kind of bad faith courts consider when looking at covenants not to compete:

For example, if an employer hired an employee at will, obtained a covenant not to compete, and then terminated the employee, without cause, to arbitrarily restrict competition, we believe such conduct would constitute bad faith. Simple justice requires that a termination by the employer of an at will employee be in good faith if a covenant not to compete is to be enforced. *Dutch Maid Bakeries* [*v. Schleicher*, 58 Wyo. 374], 131 P.2d [630,] 635–36 [ (1942) ]; *American Nat. Ins. Co. v. Coe*, 657 F.Supp. 718, 723 (E.D.Mo.1986). *See Adrian N. Baker & Co. v. Demartino*, 733 S.W.2d 14, 18 (Mo.App.1987) (enforcing covenant not to compete when discharge of employee occurred with good cause).

*Hopper*, 861 P.2d at 541–42. The court recognizes that Youngblade asserts here that his discharge was in bad faith and in violation of public policy, because it was in retaliation for certain of his conduct. However, that allegation of bad faith does not involve the manner in which Curtis 1000 obtained the covenant not to compete.

counts, and where the contract itself recites that the covenant not to compete is a major inducement in the employment, we must conclude there was a valid consideration and this contract is not lacking in mutuality. The trial court so found and we agree. In the absence of bad faith or a showing that there was an employer intent that the employment was only to be long enough to bind the employee and prevent him from working elsewhere in competition with the employer, covenants reasonable as to time and area are generally upheld and enforced by equitable proceedings.

*Id.* (citations, all from other jurisdictions, omitted).

Taking issue with the indulgence in "loose generalities" evident in earlier cases to the effect that "the law does not favor contracts in restraint of trade," *Dental Prosthetic Serv. v. Hurst,* 463 N.W.2d 36, 38 (Iowa 1990) (citing *Uptown Food Store, Inc. v. Ginsberg,* 255 Iowa 462, 467–68, 123 N.W.2d 59, 62–63 (1963), in turn citing *Sickles v. Lauman,* 185 Iowa 37, 45, 169 N.W. 670, 673 (1918)), the Iowa Supreme Court recently shifted its focus to other language in one of the earlier decisions:

"[T]here is no public policy or rule of law which condemns or holds in disfavor a fair and reasonable agreement of this character, and such a contract is entitled to the same reasonable construction ... that [is] accorded to business obligations in general."

*Id.* at 38–39 (quoting *Uptown Food Store,* 255 Iowa at 467–68, 123 N.W.2d at 62–63).

### b. The Consideration Requirement

■■■ Covenants not to compete are contractual agreements, and as such require consideration to support them. *Iowa Glass Depot, Inc. v. Jindrich,* 338 N.W.2d 376, 381 (Iowa 1983); *Insurance Agents, Inc. v. Abel,* 338 N.W.2d 531, 533 (Iowa 1983); *Farm Bureau Serv. Co. of Maynard v. Kohls,* 203

N.W.2d 209, 212 (Iowa 1972); *The Phone Connection, Inc. v. Harbst,* 494 N.W.2d 445, 449 (Iowa Ct.App.1992). Iowa courts have upheld covenants not to compete even where the only consideration was continued employment:

We held in *Farm Bureau Services [Service] Co. of Maynard v. Kohls,* 203 N.W.2d 209 (Iowa 1972)[,] and *Ehlers v. Iowa Warehouse Co.,* 188 N.W.2d 368 (Iowa 1971)[,] that continued employment for an indefinite period of time is sufficient consideration to support a covenant not to compete. Although other jurisdictions are evenly split on the question of whether continued employment by itself is adequate consideration, *see Davies and Davies Agency, Inc. v. Davies,* 298 N.W.2d 127, 130 (Minn.1980), we find no compelling reason to overrule our prior decisions. This is especially true since we determine the covenant is invalid for reasons indicated hereafter.

*Iowa Glass Depot,* 338 N.W.2d at 381 (finding the covenant invalid because it "is not reasonably necessary for the protection of Glass's business and would be unreasonably restrictive of Jindrich's rights," at 385).[36] However, even if the consideration of continued employment was sufficient to bind a covenant not to compete, "the court may still consider it in determining whether the consideration is grossly disproportionate to the injury incurred by the covenant[o]r or the benefit accruing to the covenantee from the enforcement of the covenant." *Id.* at 384 (citing 54 Am.Jur.2d *Monopolies, Restraints of Trade, and Unfair Trade Practices* § 513 at 960 (1971), and finding the consideration sufficient to bind the covenant, but grossly disproportionate to the injury the employee would sustain from enforcement of the covenant and the potential gain to the employer where the employee "did not receive any additional compensation, security, promises or other benefits ... [and the employee] was not required to sign it and no adverse action

---

**36.** Similarly, a covenant not to compete in a sale-of-business contract would, as a general principle, be supported by sufficient consideration in the form of a promise of continuing employment in the business sold, but was not where the covenant not to compete was repeated in an agreement for employment subsequent to the agreement for sale of the business. *Insurance Agents, Inc.,* 338 N.W.2d at 534–35.

would probably have been taken if he refused to do so.").

### c. The Enforceability Analysis

■ Iowa courts have formulated the general rule concerning covenants not to compete into a three-pronged test to determine whether a restrictive covenant is enforceable:

> (1) Is the restriction reasonably necessary for the protection of the employer's business; (2) is it unreasonably restrictive of the employee's rights; and (3) is it prejudicial to the public interest?

*Lamp v. American Prosthetics, Inc.*, 379 N.W.2d 909, 910 (Iowa 1986); *Iowa Glass Depot*, 338 N.W.2d at 381; *Ehlers*, 188 N.W.2d at 369; *The Phone Connection*, 494 N.W.2d at 449; *Dain Bosworth, Inc. v. Brandhorst*, 356 N.W.2d 590, 593 (Iowa Ct. App.1984). These three factors provide a framework for addressing the general concern with the reasonableness of the covenant:

> Essentially, [this rule requires] us to apply a reasonableness standard in maintaining a proper balance between the interests of the employer and the employee. Although we must afford fair protection to the business interests of the employer, the restriction on the employee must be no greater than necessary to protect the employer. Moreover, the covenant must not be oppressive or create hardships on the employee out of proportion to the benefits the employer may be expected to gain.

*Iowa Glass Depot*, 338 N.W.2d at 381 (noting later in the opinion, at 383, that "[i]n testing the validity of a restrictive covenant, we must look to the facts and circumstances of the particular case that shed light on the reasonableness of the restraint as applied to the individual interests of both parties.");[37] *see also Dain Bosworth*, 356 N.W.2d at 593 (quoting *Iowa Glass Depot*); *Ma & Pa, Inc.*, 342 N.W.2d at 502 (quoting *Iowa Glass Depot*).

■ The employer bears the initial burden on the first prong of this test of showing that enforcement of the covenant is "reasonably necessary to protect its business." *Dain Bosworth*, 356 N.W.2d at 593; *Iowa Glass Depot*, 338 N.W.2d at 381; *Ehlers*, 188 N.W.2d at 373–74; *Dental East, P.C. v. Westercamp*, 423 N.W.2d 553, 555 (Iowa Ct. App.1988). To meet this requirement, there must be

> some showing that defendant, when [defendant] left plaintiff's employment, pirated or had the chance to pirate part of plaintiff's business; took or had the opportunity of taking some part of the good will of the plaintiff's business, or it can reasonably be expected some of the patrons or customers [defendant] served while in plaintiff's employment will follow [defendant] to the new employment.

*Iowa Glass Depot*, 338 N.W.2d at 381 (quoting *Ehlers*); *Ehlers*, 188 N.W.2d at 373; *see also Dental East, P.C.*, 423 N.W.2d at 555 (quoting *Iowa Glass Depot*).[38] Another way

---

**37.** The court in *Iowa Glass Depot* went further in elucidating the interests to be balanced, and the reasons why they were relevant:

> Although an employer has an interest in protecting his business from an employee's use of personal influence or peculiar knowledge gained in employment, the employer has no right to unnecessarily interfere with the employee following any trade or calling for which he is fitted and from which he may earn his livelihood. An employee cannot be precluded from exercising the skill and general knowledge he has acquired or increased through experience or even instruction while in the employment. *Baker v. Starkey*, 259 Iowa 480, 493–94, 144 N.W.2d 889, 897 (1966). Thus we are required to consider the employee's situation and the surrounding circumstances in order to fairly weigh the interests of the parties. *Iowa Glass Depot*, 338 N.W.2d at 383–84.

**38.** The court in *Iowa Glass Depot* admitted that "not all of our past cases have required a concrete showing of harm from subsequent competition by a former employee as a prerequisite to obtaining enforcement of noncompetitive covenants." *Iowa Glass Depot*, 338 N.W.2d at 384 (citing *Cogley Clinic v. Martini*, 253 Iowa at 548, 112 N.W.2d at 682). However, the court concluded that "the circumstances of this case require a greater showing of harm or, conversely, a greater likelihood of expected gain to Glass before it is entitled to enforce the restrictive covenant," because the employer had eleven months without competition from the former employee during which to establish himself with the customers, sales were comparable before and after this period, and there was consequently no showing that the former employee's subsequent competition had caused substantial harm to the employer's business. *Id.*

to meet this burden is to show that the employee "received from his employer 'special training or peculiar knowledge that would allow him to unjustly enrich himself at the expense of his former employer.'" *Dain Bosworth*, 356 N.W.2d at 593 (quoting *Iowa Glass Depot*, 338 N.W.2d at 382). For example, in *Dain Bosworth*, the court found that the plaintiff had met this initial burden by showing that the noncompetition agreement in part sought to protect the company's $20,000 investment in training the defendant to be a broker. *Id.; see also Orkin Exterminating Co. v. Burnett*, 259 Iowa 1218, 146 N.W.2d 320 (Iowa 1967) (enforcing noncompetition agreement where employee had been given eight weeks training in exterminating insects and methods of operation); *Cogley Clinic v. Martini*, 253 Iowa 541, 112 N.W.2d 678 (Iowa 1962) (upholding noncompetition agreement where it cost clinic $10,000 to establish a new doctor). In *Iowa Glass Depot*, the court summarized the justification for enforcing covenants not to compete against employees:

> [W]e have often relied upon the employee's close proximity to customers along with peculiar knowledge gained through employment that provides a means to pirate the customer. *Kohls*, 203 N.W.2d at 211; *Ehlers*, 188 N.W.2d at 373; *Orkin Exterminating Co., Inc. v. Burnett*, 259 Iowa 1218, 1222–23, 146 N.W.2d 320, 234 (1967); *Cogley Clinic v. Martini*, 253 Iowa 541, 112 N.W.2d 678 (1962); *Federated Mutual Implement and Hardware Insurance Co. v. Erickson*, 252 Iowa 1208, 1215–16, 110 N.W.2d 264, 267 (1961); *Sioux City Night Patrol v. Mathwig*, 224 Iowa 748, 752–53, 277 N.W. 457, 460 (1938). Where there is little customer contact, we have refused to enforce the covenant on the basis that the restriction was unreasonable. *[Mutual Loan Co. v.] Pierce*, 245 Iowa [1051,] 1059, 65 N.W.2d [405,] 408 [ ( 1954) ].

*Iowa Glass Depot*, 338 N.W.2d at 382. The court continued, noting that "[p]roximity to customers is only one aspect," and recognizing others as including the nature of the business itself, accessibility to information peculiar to the employer's business, and the nature of the occupation which is retrained. *Id.* (citing 54 Am.Jur.2d, *Monopolies, Re-*

*straint of Trade, and Unfair Trade Practices* § 512 at 959 (1971)); *Orkin*, 146 N.W.2d at 324 (covenants not to compete are usually held valid and enforceable "where[ ] employees come into personal contact with their employer's customers and agree not to enter into competition with the business of the employer."). The customer-contact rule "finds its expression" in time and area restrictions. *Orkin*, 146 N.W.2d at 324.

Hence, Iowa Courts have focused the inquiry as to whether or not a covenant not to compete was unreasonably restrictive primarily on whether the covenant was properly limited as to both time and area. *Pathology Consultants v. Gratton*, 343 N.W.2d 428, 434 (Iowa 1984) ("Covenants not to compete are unreasonably restrictive unless they are tightly limited as to both time and area," citing *Ehlers*); *Iowa Glass Depot*, 338 N.W.2d at 381 ("Assessment of the reasonableness of noncompetitive covenants generally requires us to examine both the time and area restrictions contained in the covenant."); *Insurance Agents, Inc.*, 338 N.W.2d at 535; *Farm Bureau Serv. Co.*, 203 N.W.2d at 211; *Ehlers*, 188 N.W.2d at 373–74; *The Phone Connection*, 494 N.W.2d at 449. Originally, Iowa courts, upon finding a covenant not to compete too restrictive in either time or area, held the entire covenant to be unenforceable. *Lamp*, 379 N.W.2d at 910 (recognizing that this line of cases had been overruled in *Ehlers*, 188 N.W.2d at 370); *Brecher v. Brown*, 235 Iowa 627, 17 N.W.2d 377 (1945) (principal case cited for this earlier rule); *Baker v. Starkey*, 259 Iowa 480, 144 N.W.2d 889 (1966). The rationale for the "all or nothing" rule was that "the parties' agreement must be enforced, if at all, in the form in which it had been drafted; the court would not rewrite it for them." *Lamp*, 379 N.W.2d at 910 (citing *Smith v. Stowell*, 256 Iowa 165, 125 N.W.2d 795 (1964)). However, some time ago, the Iowa courts adopted the position that the court may modify the covenant to make it no more restrictive than necessary. *Presto–X–Co. v. Ewing*, 442 N.W.2d 85, 90 (Iowa 1989) (citing *Ehlers*); *Farm Bureau Serv. Co.*, 203 N.W.2d at 211 (recognizing the *Brecher* had been overruled on this ground by *Ehlers*); *Ehlers*, 188 N.W.2d at 374 (spe-

cifically overruling *Brecher* on this issue); *The Phone Connection*, 494 N.W.2d at 449. The rationale for this " 'emerging' view," as it was characterized when the *Ehlers* decisions was handed down, was that "if such a covenant is void only because it is too broad, a court in the interest of justice should require enforcement of it to the extent that it is not overbroad." *Lamp*, 379 N.W.2d at 910 (citing *Ehlers*, 188 N.W.2d at 370, which in turn relied on commentators such as Williston and Corbin). The court in *Ehlers* also recognized that the "arbitrary rule of 'all or nothing at all' in the enforcement of noncompetitive agreements has, in some cases, led to results of questionable equity." *Ehlers*, 188 N.W.2d at 371.[39] The court also rejected "doubtful constructions" or a legalistic "blue pencil rule" which the court found "permits a noncompetitive covenant to be partially enforced if the words which make it unreasonable can be stricken and still leave a grammatically meaningful reasonable result." *Ehlers*, 188 N.W.2d at 371 (citing as a case articulating this "blue pencil rule," the decision in *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53, 60 (1970)).

The court in *Ehlers* therefore identified three distinct approaches to the enforcement of covenants not to compete: (1) the "all or nothing rule," refusing to enforce the covenant at all if it was found to be unreasonable in any respect; (2) the "blue pencil rule," allowing the court to strike the unreasonable language from the covenant and enforce the remainder if a "grammatically meaningful reasonable result" would follow from excising the words containing the unreasonable conditions; and (3) the "enforcement to the extent reasonable rule," which allows the court to make whatever modification of the covenant is necessary to make it reasonable and enforceable. *Id.* The *Ehlers* court specifically

adopted the third rule, as drawn from *Solari Industries*, 264 A.2d at 61:

> [P]laintiffs are entitled, subject to any affirmative defenses such as those asserted in defendant's answer (citations) to that limited measure of relief within the terms of the noncompetitive agreement which is reasonably necessary to protect their legitimate interests, will cause no undue hardship on the defendant, and will not impair the public interest.

*Id.* at 371–72. However, "while *Ehlers* allows for modification of such agreements, it does not require a court to do so sua sponte." *Lamp*, 379 N.W.2d at 911 (declining to modify overbroad restrictive covenant because the parties had never raised the issue).

Citing a prior survey of Iowa cases by the Iowa Court of Appeals, that court noted that "the duration of a restrictive covenant typically ranges from two to three years. Restrictive employment covenants beyond five years have not been enforced." *The Phone Connection*, 494 N.W.2d at 449–450 (citing *Rasmussen Heating & Cooling, Inc. v. Idso*, 463 N.W.2d 703, 705 (Iowa Ct.App.1990)); *see also Dain Bosworth, Inc.*, 356 N.W.2d at 593 (ninety days and thirty miles reasonable in light of restrictions in *Cogley*, 253 Iowa at 541, 112 N.W.2d at 678 (three years and twenty-five miles), and *Orkin*, 259 Iowa 1218, 146 N.W.2d at 320 (three years and ten miles)); *Baker*, 144 N.W.2d at 895 (three-year period not in itself unreasonable, but area, including "territory into which [the employee's] former work had not taken [the employee] or given [the employee] the opportunity to enjoy undue advantage in later competition with [the employee's] employer," was unreasonable, and, under the "all or nothing rule," refusing to enforce the covenant as "illegal"); *Rasmussen Heating*, 463 N.W.2d at 705 (refusing to enforce covenant not to compete in a sale-of-business agree-

---

39. The results of "questionable equity" in cases from Iowa and other jurisdictions cited by the court in *Ehlers*, 188 N.W.2d at 371, were identified as follows: *Cogley Clinic v. Martini*, 253 Iowa 541, 112 N.W.2d 678 (1962) (doctor prevented from practicing anywhere in the Council Bluffs–Omaha area); *Brecher v. Brown*, 235 Iowa 627, 17 N.W.2d 377 (1945) (veterinarian was permitted to practice within 100 feet of his former employer); *Larsen v. Burroughs*, 224 Iowa 740, 277 N.W. 463 (1938) (doctor prohibited from practicing in area for 10 years); *Beit v. Beit*, 135 Conn. 195, 135 Conn. 413, 63 A.2d 161, 65 A.2d 171, 10 A.L.R.2d 734 (1948) (citing the note in 23 Conn.Bar Jour. 40); and *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53, 60 (1970) (cited without explanation, but which actually cites other inequitable results and establishes a different rule).

ment, because "[a] ten-year covenant is neither tightly time limited nor reasonably necessary for the protection of the business," and the five years of business prior to the defendant's competing business activities had been ample).

In *Ma & Pa, Inc.*, the court considered a factor "not present in most cases[, which was] the discharge of Kelly by Ma & Pa as distinguished from a resignation originating with Kelly." *Ma & Pa*, 342 N.W.2d at 502. The court recognized a split in authority on whether termination or discharge of the employee would "disentitle" the employer to rely on the non-competition clause:

> Under some circumstances termination of the employment by Ma & Pa would not invalidate the covenant not to compete. *See Wark v. Ervin Press Corp.*, 48 F.2d 152 (7th Cir.1931); *Moskin Bros. v. Swartzberg*, 199 N.C. 539, 155 S.E. 154 (1930); *Red Star Yeast & Products Co. v. Hague*, 25 Ohio App. 100, 157 N.E. 393 (1927). On the other hand discharge by the employer is a factor opposing the grant of an injunction, to be placed in the scales in reaching the decision as to whether the employee should be enjoined. *Halloway v. Brown*, 171 Ga. 481, 155 S.E. 917 (1930); *Economy Grocery Stores Corp. v. McMenamy*, 290 Mass. 549, 195 N.E. 747 (1935); *Matheney v. McClain*, 248 Miss. 842, 161 So.2d 516 (1964); *Edward Brown, Inc. v. Astor Supply Co.*, 4 A.D.2d 177, 164 N.Y.S.2d 107 (1957); *American Ice Co. v. Hunter*, 60 Pa.Super. 311 (1915); *Southern Properties, Inc. v. Carpenter*, 21 S.W.2d 372 (Tex.Civ.App.1929); *Dutch Maid Bakeries v. Schleicher*, 58 Wyo. 374, 131 P.2d 630 (1942).

*Id.* at 502–03. However, the court concluded in the case before it that the plaintiff employer had not *breached* the employment contract in terminating the employee, but had properly terminated the employee because the employer was losing money on the employee's sales; therefore, the court did not have to decide whether a breach of the underlying contract would "disentitle" the employer to rely on a noncompetition clause, and concluded that merely terminating the employee for cause did not have that effect either. *Id.* at

503. These issues were also visited in *Orkin*, 146 N.W.2d at 325–27. In *Orkin*, the court stated that

> [i]t would appear, then, the nub of this controversy is whether the evidence adduced is sufficient to sustain a finding that plaintiff breached the original contract prior to its legal termination, or that its conduct in terminating the old contract and in requiring a new and different one to retain and employee-employer relationship was so unreasonable and unjust as to justify the refusal of equitable relief under the clean-hands doctrine.

*Orkin*, 146 N.W.2d at 325. The trial court concluded that the employer's conduct had been "a breach of the old contract and was unfair," *Id.*, but the Iowa Supreme Court concluded that

> plaintiff did not breach this contract and did not unjustly or unfairly mistreat defendant so as to bar its right to maintain this suit for injunction, and since we otherwise have found the provisions of the covenant reasonable and proper, a decree must issue enjoining the defendant, Robert H. Burnett, from engaging directly or indirectly in the same or similar or competitive line of business as that carried on by the plaintiff-company, or from working for an individual, firm or corporation engaged in such business or similar or competitive line of business, and from in any way, directly or indirectly taking away any of the company's business or customers, or destroying, injuring or damaging the good will of the plaintiff-company with its customers within a ten-mile radius of any city, town, village, or other area in which defendant may have worked while employed by plaintiff, for a period of three years.

*Id.* at 327.

#### d. Summary Of Iowa Law

 To summarize the salient points of the Iowa law on covenants not to compete, the court notes the following: (1) such covenants in employment contracts are subjected to more careful scrutiny by the courts than they are when they appear in agreements for the sale of a business; (2) such covenants, like contracts generally, must be supported

by consideration and must not be unconscionable or contain oppressive restrictions or be obtained or executed in bad faith; (3) the general rule is that covenants not to compete will be enforced if reasonably necessary for the protection of the employer's business and are not unreasonably restrictive of the employee's rights nor prejudicial to the public interest; (4) in examining the reasonableness of the covenant, the court should consider several factors, including (a) reasonable time and area restrictions, (b) the employee's gain of special training or peculiar knowledge and customer contact through employment with the party seeking to enforce the covenant, (c) the nature of the business itself, accessibility to information peculiar to the employer's business, and the nature of the occupation which is restrained; and, finally, (5) whether the employee was terminated or quit, and, furthermore, whether the employer breached the agreement in which the covenant not to compete is contained, are factors for the court to consider in its decision to enforce the covenant, but are not determinative.

### 2. Covenants Not To Compete Under Delaware Law

Compared to the copious number of decisions by Iowa courts concerning covenants not to compete, Delaware courts have provided few reported decisions. However, these few decisions reveal that although Delaware law roughly addresses the same issues as does Iowa law with regard to such covenants, it differs in some significant respects. The

court therefore turns first to identification of the relevant standards for determining the enforceability of covenants not to compete under Delaware law, followed by an analysis of the similarities and differences between Delaware law and Iowa law on the issue.

The Delaware Court of Chancery has noted that

> [t]his court is asked regularly to specifically enforce covenants not to compete. Because the specific enforcement of such covenants involve important interests of commercial enterprises and of individuals seeking to support themselves and their families financially, and because, in that setting, the court is asked to exercise its distinctively equitable powers, each such case requires a careful evaluation of the specific facts and circumstances presented.

*McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del.Ch.1987); *see also Gamble t/a Pet World v. Walker*, Civ. No. 13592, 1994 WL 384617 *1–2 (Del. July 18, 1994) (quoting the above from *McCann Surveyors, Inc.*).[40] The court therefore reiterated the Delaware courts' caution in enforcing such covenants and the structure they use to evaluate such cases. *Id.* at 3–4. First, the court noted that "[c]ovenants not to compete when contained in employment agreements are not mechanically enforced." *Id.* at 3. The court then quoted *LewMor, Inc. v. Fleming*, Del. Ch., C.A. No. 8355, 1986 WL 1244, Allen, C. (January 29, 1986), as explaining the structure for the evaluation of cases of this kind.[41]

---

**40.** The court in *Research & Trading Corp. v. Pfuhl*, Civ.A. No. 12527 *6–7, 1992 WL 345465 (Del.Ch.1992), conducted a brief survey of the history of covenants not to compete, noting the hostility of the English common law courts to such covenants as contrary to public policy.

**41.** The full quotation from *LewMor* provided by the court in *McCann* was as follows, with emphasis added by this court:

> When evaluating the probability of ultimate success on claims of this kind, one is required to proceed on two levels. *The first question* the court must answer in determining whether specific enforcement of a contract restricting future employment is to be granted *is whether the covenant sued upon is itself valid.* This first level of inquiry may involve any of the typical issues that arise in a contract action—whether the promise was in fact made, whether it was

supported by consideration or a substitute for consideration, whether a material breach of the other party to the contract excuses performance, etc. *In addition* to these issues typically encountered in contract actions, covenants restricting future employment, in order to be valid, must be determined as well to be *reasonably limited geographically and with respect to the restriction on time;* they must as well foster a *legitimate economic interest of the plaintiff. Knowles–Zeswitz Music, Inc. v. Cara*, Del.Ch., 260 A.2d 171 (1969).

> *Once it has been determined that the restrictive covenant is valid, another range of questions arise from an application requesting specific performance of such a provision.* A restrictive covenant may be valid because at the time negotiated it was reasonably crafted to go no further than the legitimate economic interests of the employer warranted and because it was otherwise appropriately limited in time

This analytical structure is in several steps: (1) whether the covenant sued upon is itself valid as a contract, which involves examination of typical contract issues such as whether promises are made, whether there is adequate consideration, whether there has been a material breach, etc.; (2) whether elements specific to a covenant not to compete are reasonable, such as geographical and temporal limits, and whether the covenant fosters a legitimate economic interest of the plaintiff; (3) if the covenant is valid, the court considers whether it should be specifically enforced, involving questions such as (a) have circumstances presented at the time enforcement is requested made the terms of the covenant unreasonable, even if it was reasonably restricted at the time of drafting and (b) the balance of the interests of the employer and the employee. *Id.* at 3–4. Because covenants not to compete impinge on a person's ability to be gainfully employed, under Delaware law, "the customary sensitivity of a court of equity to the particular interests affected by its remedies is heightened." *Id.* at 4.

■ The principles identified in *McCann* have been consistently applied by Delaware courts. *See Gamble t/a Pet World,* Civ. No. 13592, 1994 WL 384617 *6–7 (also quoting the analytical structure from *LewMor*); *Research & Trading Corp. v. Pfuhl,* Civ.A. No. 12527 *6–7, 1992 WL 345465 (Del.Ch. Nov. 18, 1992) (also citing the two-step analysis from *McCann Surveyors, Inc.*); *Research & Trading Corp. v. Powell,* 468 A.2d 1301, 1303 (Del.Ch.1983) (hereinafter, *RTC*) ("The elements necessary to constitute a valid restrictive covenant are the same as those required for a contract in general, namely, a mutual assent to the terms of the agreement by all parties and the existence of consideration."); *Faw, Casson & Co. v. Cranston,* 375 A.2d 463 (Del.Ch.1977) (citing same elements as *RTC*); *Hammermill Paper Co. v. Palese,*

C.A. No. 7128, 1983 WL 19786 (Del.Ch., June 14, 1983) (Longobardi, V.C.) (same standards as *RTC*); Restatement (Second) of Law of Contracts § 17 (1979); *and compare Faw, Casson & Co.,* 375 A.2d at 465 (an earlier case formulating the standards for validity of such covenants somewhat differently: "In general, an agreement by an employee not to follow [the employee's] trade or business for a limited time and in a limited geographical area is not void as against public policy when the purpose of such agreement and its reasonable effect is to protect an employer from sustaining damages which an employee's subsequent competition may cause," citing *Capital Bakers, Inc. v. Leahy,* 20 Del.Ch. 407, 178 A. 648, 649 (1935)); *Knowles–Zeswitz Music, Inc. v. Cara,* 260 A.2d 171, 174 (Del.Ch.1969) (also citing the standard from *Capital Bakers*). As under Iowa law, under Delaware law, such covenants are subjected to "somewhat greater scrutiny" when they are found in employment contracts rather than in contracts for the sale of a business. *Faw, Casson & Co.,* 375 A.2d at 465 (noting, however, that this scrutiny does not require "that inferences arising out of parts of an instrument ... be allowed to control the interpretation of the scheme dealt with as a whole," citing *Stemerman v. Ackerman,* 40 Del.Ch. 431, 184 A.2d 28 (1962)); *Knowles–Zeswitz Music, Inc.,* 260 A.2d at 175 ("This principal is qualified, however, by the further rule that where a sale of a business is not involved, courts should be less prone to enforce such covenants," citing *Original Vincent and Joseph, Inc. v. Schiavone,* 36 Del.Ch. 548, 551, 134 A.2d 843, 845 (1957)).

■ Delaware courts, like Iowa courts, examine carefully what consideration is provided in exchange for the covenant not to compete. A promotion is sufficient consideration for the covenant where it is part of the promotion package, but not where it is

---

and space, but yet may not be specifically enforceable in the circumstances presented at the time of the application for such enforcement. *Where a restriction on the ability to be gainfully employed is involved, the customary sensitivity of a court of equity to the particular interests affected by its remedies is heightened.* See 6A Corbin on Contracts § 1394 (1962). If it appears that the interests the employer seeks

to protect are slight or ephemeral while the consequences of specific enforcement to the employee are grave, equity may well leave the plaintiff to pursue his legal remedies and decline to grant the special remedy of injunction. *See, e.g., Burris Foods, Inc. v. Razzano,* Del.Ch., C.A. No. 1077–Sussex [1984 WL 8230], Walsh, V.C. (July 18, 1984). *LewMor, Inc. v. Fleming, supra,* at 4–5.

imposed as an "afterthought." *Compare Faw, Casson & Co.*, 375 A.2d at 467 (covenant was one of terms made clear to defendant to be part of defendant's promotion, and was "not an afterthought sought to be imposed after the original proposal.") *with RTC*, 468 A.2d at 1303 (change in employment status and covenant were not part of same scheme, and therefore promotion could not serve as consideration for covenant). So, too, continued employment alone may serve as consideration for the covenant under Delaware law, at least where the employee's choice is between signing the covenant or being discharged. *RTC*, 468 A.2d at 1303–04 (citing for this proposition, *inter alia*, the unreported decision of the Delaware court in *Hammermill Paper Co. v. Palese*, C.A. No. 7128 at 6, and *Farm Bureau Serv. Co. of Maynard v. Kohls*, 203 N.W.2d 209 (Iowa 1972)). In *RTC*, the Delaware court, despite its concern for the impact of such a covenant on an employee when the covenant is enforced against him or her, as is discussed further below, concluded that requiring signing of such a covenant as a condition of continued employment did not necessarily amount to "forcing" the employee to sign. *Id.* at 1305.

Similarly, in a recent decision, the Delaware court considered the argument that a plaintiff could not enforce the terms of a covenant not to compete, because the plaintiff had materially breached them. *Pfuhl*, Civ.A. No. 12527, 1992 WL 345465 *7. However, the court concluded that plaintiff had not breached the covenant as to any of the defendants, and therefore the covenants were enforceable. *Id.* at *9–11.

 Delaware courts also consider the geographical and temporal limits of the covenant not to compete as a basis for determining the enforceability of the covenant. In the case before the court in *McCann Surveyors*, the court concluded that the geographical area of fifty miles from any office of the plaintiff and the time limit of three years were not unreasonable. *McCann Surveyors*, 611 A.2d at 4; *see also Pfuhl*, Civ.A. No. 12527, 1992 WL 345465 *11–12 (taking note of the rules requiring reasonable limits, but .

finding that the broad distribution of plaintiff's customers in that case and the limited nature of the relief sought as to customer and suppliers with whom defendants or their subordinates had contact were reasonable, wherever the customers were located). However, like the modern approach of Iowa courts, Delaware courts apply the rule that restrictive covenants may be enforced "only to the extent that it is reasonable so to do." *Faw, Casson & Co.*, 375 A.2d at 467 (citing *Knowles–Zeswitz Music, Inc. v. Cara*, 260 A.2d 171 (Del.Ch.1969)). Thus, the court in *Faw, Casson & Co.* felt called upon to determine the proper limits for a geographical area rather vaguely described as "the Delmarva peninsula." Similarly, the court in *Knowles–Zeswitz Music, Inc.* determined that the geographical area referred to in the covenant was "much too broad," but that the plaintiff had properly limited the area in its request for an injunction, and therefore concluded that the more limited area would be enforced. 260 A.2d at 175.

 The "central aspect" of the analysis of the enforceability of a covenant not to compete under Delaware law, however, is "a balancing of harms that are threatened to plaintiff and the consequences of specific enforcement to the defendant." *McCann Surveyors*, 611 A.2d at 4. Substantial weight is given to the plaintiff's harm when "valuable trade secret or other proprietary information has been learned by the defendant and, therefore, his competition with plaintiff's business may be particularly effective and unfair." *Id.* (citing *E.I. duPont de Nemours & Co. v. American Potash & Chemical Corp.*, 41 Del.Ch. 533, 200 A.2d 428 (1964), and *C. Edgar Wood, Inc. v. Clark*, C.A. No. 833–K, 1986 WL 1160, Allen, C. (Del.Ch. Jan. 21, 1986)). The balance weighs in favor of the defendant, however, "where ... there is little or no real advantage to plaintiff in the specific enforcement of the provision," *Id.* (citing *LewMor, Inc.*, C.A. No. 8355, 1986 WL 1244), but "the consequences to *defendant* of specifically enforcing a contract not to compete are always appropriate to consider." *Id.* (emphasis added).[42]

---

42. The court in *McCann Surveyors* emphasized this point further, noting that in 6A Corbin on

*McCann Surveyors* provides an example of this balancing of harms under Delaware law: The court denied an injunction enforcing the covenant not to compete in that case, first, because the defendant was not engaged in unfair competition such as soliciting from known customer lists of the plaintiff or using the plaintiff's proprietary information. *Id.* (citing *Wilmington Trust Co. v. Consistent Asset Management,* C.A. No. 8867, 1987 WL 8459 (Del.Ch. March 25, 1987) (Allen, C.)). Second, the court found that defendant represented only a very small part of the actual and potential competition that the plaintiff would encounter. *Id.* at 5. Finally, the business the defendant was pursuing constituted only "a tiny portion of the economic enterprise of the plaintiff, but, while small, it constitutes the principal economic activity of defendant." *Id.* Therefore, even assuming that the covenant was otherwise valid, the court declined to grant specific enforcement. *Id.; see also Pfuhl,* Civ.A. No. 12427, 1992 WL 345465 *12–13 (balancing harms, and finding plaintiff's interests sufficiently weighty and the harm to defendants "far from grave," so that injunction enforcing covenant was appropriate).

### 3. Comparison Of Iowa And Delaware Law

The examination of the decisions of the two jurisdictions leads the court to the following conclusions. Courts of both Iowa and Delaware subject covenants not to compete in employment contracts to a higher degree of scrutiny than such covenants are accorded when found in agreements for the sale of a business. Both require that such covenants

be supported by consideration, and both accept continued employment, at least in certain circumstances, to provide that consideration. Both require that the covenant contain only reasonable restrictions as to time and area, and both will modify a covenant before enforcing it to meet these reasonableness requirements. Both consider what the employee has gained from the employer as part of the employer's interest to be protected.[43] Both consider whether the employer has breached the agreement as a factor in whether the covenant not to compete should be enforced.

Although both jurisdictions ultimately base their examination of the enforceability of a covenant not to compete on an assessment of the covenant's "reasonableness," they conduct the reasonableness inquiry with some significantly different factors in mind. For Iowa courts, the reasonableness inquiry focuses on whether the covenant is "reasonably necessary for the protection of the employer's business and is not unreasonably restrictive of the employee's rights nor prejudicial to the public interest," *see, e.g., Iowa Glass Depot,* 338 N.W.2d at 381, with the restriction on the employee's rights measured almost exclusively in terms of the time and area restrictions in the covenant. *See, e.g., Pathology Consultants,* 343 N.W.2d at 434 ("Covenants not to compete are unreasonably restrictive unless they are tightly limited as to both time and area," citing *Ehlers* ); *Orkin,* 146 N.W.2d at 324 (the reasonableness of the employer's restriction is based on the employee's contact with the employer's customers, and this customer-con-

Contracts § 1394 (1962), the commentator had stated

> Before enforcing an employee's restrictive promise by injunction, the court will consider its effect upon [the employee's] life subsequently. Disproportionate hardship to the party against whom enforcement is sought has always been regarded as a reason for refusing equitable remedies ...[.] Before granting an injunction preventing an employee from earning [a] living in [the employee's] customary trade or employment, the court should make sure, not only that [the employee] contracted to forbear and is guilty of a breach, but also that the former employer is suffering substantial harm, that the employee is soliciting for-

mer customers or otherwise depriving [the] employer of business goodwill that [the employer] has paid wages for helping to create, and the employee will not be deprived of an opportunity to support himself [or herself] and [the employee's] family in reasonably comfort. *See also Gamble t/a Pet World,* Civ. No. 13592, 1994 WL 384617 *1–2 (applying the same "balancing of harms" analysis as *McCann Surveyors* discussed in the body of the text).

**43.** However, Iowa law appears to go further than Delaware law, by also considering what the employee *may* gain, or in the parlance of the decisions, may "pirate," from the employer. *Iowa Glass Depot,* 338 N.W.2d at 381 (quoting *Ehlers* ).

tact rule "finds its expression" in time and area restrictions). There is no explicit consideration of the economic impact upon the defendant employee to be found in determining the reasonableness of covenants not to compete under Iowa law.

▅▅▅ The analysis under Delaware law is an explicit "balance of harms," in which the cost to the employee of enforcing the covenant plays a much more prominent role.[44] Under Delaware law, the balance weighs in favor of the employee, "where . . . there is little or no real advantage to [the employer] in the specific enforcement of the provision," *McCann Surveyors*, 611 A.2d at 4 (citing *LewMor, Inc.*, C.A. No. 8355, 1986 WL 1244), but "the consequences to *defendant* of specifically enforcing a contract not to compete are always appropriate to consider." *Id.* (emphasis added). Furthermore, the Delaware court finds that

> Where a restriction on the ability to be gainfully employed is involved, the customary sensitivity of a court of equity to the particular interests affected by its remedies is heightened. *See* 6A Corbin on Contracts § 1394 (1962).

*Id.* at 3–4. Slight or ephemeral interests of the employer are outweighed by "grave" consequences to the employee of specifically enforcing the terms of the covenant. *Id.*

This difference between the law of Iowa and the law of Delaware is significant, possibly even determinative, on the question of which state's law should apply, because it indicates a fundamental public policy difference between the two states. However, as a practical matter in assessing the validity and enforceability of the covenant not to compete presented here, the court finds that not one whit of evidence was presented at the hearing on the request for preliminary injunction concerning the economic impact upon Youngblade of ordering compliance with the terms of the covenant not to compete. The court is mystified by Youngblade's failure to testify

as to the economic impact upon him of enforcing the covenant not to compete, as such a consideration is also of significance to the court's balancing of harms under *Dataphase* in the court's assessment of the propriety of issuing a preliminary injunction. Whatever the reason for this lacuna in the evidence, the court is unwilling to infer harm to Youngblade from the evidence actually presented. The difference in the test of reasonableness under the two bodies of law could be significant at later stages of the proceedings, when the court contemplates the propriety of ordering a permanent injunction.

### D. The Grant Or Denial Of A Preliminary Injunction: Application Of The Dataphase Factors

A preliminary injunction will issue in this case, if at all, on the basis of application of the *Dataphase* factors to the circumstances of this case. Those factors, examined more fully above in section III.A.2., are: (1) the movant's probability of success on the merits; (2) the threat of irreparable harm to the movant absent the injunction; (3) the balance of the harm to each of the parties resulting from either granting or denying the preliminary injunction and the balance of that harm against the injury that the injunction's issuance would inflict on other interested parties; and (4) the public interest. *Pottgen*, 40 F.3d 926, 929 (8th Cir.1994). The court believes that the decisive factors in the analysis here are likelihood of success on the merits and irreparable harm. Nonetheless, it will consider each of the factors. *Baker Elec. Co-op.*, 28 F.3d at 1472.

### 1. Likelihood Of Success On The Merits: The Validity And Enforceability Of This Covenant

The court's determination of the validity and enforceability of the covenant not to compete in this case is provisional at this point, because the only question properly

**44.** By way of further comparison, the Seventh Circuit Court of Appeals, also considering the covenant not to compete in one of Curtis 1000's contracts with a salesman, found that the significant difference between Illinois and Delaware law lay in the definition of the employer's interest: Under Illinois law, it had to be "a protecti-

ble interest," but under Delaware law, it only had to meet the "less demanding requirement" that the employer have a "legitimate economic interest." *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 944 (7th Cir.1994) (citing *Knowles–Zeswitz Music*, 260 A.2d at 171 as articulating the Delaware standard).

before the court is the appropriateness of granting Curtis 1000's request for a preliminary injunction under the *Dataphase* factors and *Fed.R.Civ.P.* 65(a). The validity and enforceability of this covenant pertain to the likelihood of success on the merits, because if the covenant is demonstrably invalid and unenforceable, Curtis 1000 has no likelihood of success on the merits, and no preliminary injunction will issue.

The court reiterates that at least as a provisional conclusion, the covenant not to compete has been violated by Youngblade. Youngblade actively solicited Curtis 1000's customers in his January 7, 1995, letter, and in that letter, he indicates his intention to call upon those customers. Both of these activities violate specific terms of the covenant not to compete, or threaten to violate them. Agreement, ¶ 5(d)(i) & (ii). These violations of the covenant stand if the covenant is valid and enforceable under either Delaware or Iowa law.

Similarly, under either Iowa or Delaware law, Gateway 2000 and Direct Transit fall within the prohibition of the covenant not to compete. Whether or not these businesses existed at the time the parties entered into the employment Agreement including the covenant not to compete, and whether or not they lay within the corporate limits of the city of North Sioux City, South Dakota, at that time, they assuredly are within the limits of that city now. The covenant in its original form expressly included the city of North Sioux City, and those businesses are now within that geographical area.[45] Even were it significant that these businesses lay outside the city limits of North Sioux City originally, and the covenant originally covered only territory within the city limits, the geographical area of the covenant was expanded by oral modification when Union County and Clay County were added to Youngblade's territory. Youngblade accepted the benefit of the addition of all of the territory of these counties to his sales territory, and cannot be heard to complain that with those benefits went the obligations of the covenant not to compete and every other part of the Agreement establishing the terms of his employment.

The court concluded above that the appropriate body of law against which to measure the validity and enforceability of this covenant was that of Iowa. However, in an abundance of caution, the court will also apply the law of Delaware to the question. Under either body of law, the covenant here is at least provisionally valid and enforceable.

### a. Validity And Enforceability Under Iowa Law

■ The court concludes that it need not be troubled here by any doubts about the adequacy of the consideration supporting the present covenant not to compete. The covenant was a condition of the initial employment contract, and the consideration offered in exchange for it was that employment. Furthermore, the covenant is reasonable in its restrictions and reasonably necessary for the protection of Curtis 1000's business.

The covenant is, in the first instance, reasonable as to its time and area restrictions. The covenant is for two years, a period regularly upheld as reasonable under Iowa law, *The Phone Connection,* 494 N.W.2d at 449–450, and it is limited to Youngblade's prior sales area. *See, e.g., Dain Bosworth, Inc.,* 356 N.W.2d at 593. In the second instance, the covenant is reasonable in its restriction on Youngblade's contact with customers he previously contacted on behalf of Curtis 1000, rather than attempting to bar him from contact with any party within the geographical area. This limitation also meets the concern of Iowa courts with proximity to customers, *Iowa Glass Depot,* 338 N.W.2d at 382, which is more generally expressed in time and area restrictions. *Orkin,* 146 N.W.2d at 324.

Curtis 1000 has also carried its burden to show that the covenant is reasonably necessary for the protection of Curtis 1000's business. *Dain Bosworth, Inc.,* 356 N.W.2d at 593. Youngblade plainly had the chance to "pirate" customers from Curtis 1000, had the

---

45. There was no restriction in the contract that the geographical limits were to remain as the city limits of the towns included stood at the time the Agreement was entered into by the parties. It appears obvious to the court that Youngblade would have expected to have any expansions in the city limits of the towns specified accrue to his benefit.

opportunity to take, or has actually taken, some part of the good will and patrons of Curtis 1000's business with him, as evidenced by the defection of Gateway 2000 to Youngblade's new employer and the testimony that Gateway 2000 is unlikely to return to Curtis 1000. *Iowa Glass Depot,* 338 N.W.2d at 381. Other customers also testified that they had no intention of returning to Curtis 1000, but would continue to do business with Youngblade. ·Furthermore, Youngblade received "special training or peculiar knowledge" from his former employer and it would be unjust to allow him to enrich himself at the former employer's expense. *Dain Bosworth, Inc.,* 356 N.W.2d at 593. The record demonstrates the extensive investment in training Curtis 1000 has made in Youngblade, estimated to have cost the company $40,000 in the first year. This figure should be compared, even adjusting for inflation, with the $20,000 investment in training the court found to be persuasive on this issue in *Dain Bosworth, Inc. Id.*

Finally, the record here does not support a conclusion that public policy will be violated by enforcing this covenant. In the first place, such covenants in and of themselves do not violate Iowa public policy. *Dental Prosthetic Servs.,* 463 N.W.2d at 38–39. The parties argue vehemently, however, over whether Youngblade was fired wholly or in part because he filed a suit for declaratory judgment against his employer. Youngblade asserts that his discharge, if grounded on that action, would be in violation of public policy and should excuse him from the constraints of the covenant not to compete. The court recognizes that *Ma & Pa, Inc.,* 342 N.W.2d at 502, *Ehlers,* 188 N.W.2d at 374, and *Orkin,* 146 N.W.2d at 325–27, may provide some support for this position under Iowa law.[46] However, the court reads these cases, first, to be more narrowly tailored to the question of whether there was· "bad faith" in *seeking* the covenant, *Ehlers,* 188 N.W.2d at 374, and, second, to establish employer breach or misconduct only as a "factor" in the court's analysis of the enforceability of the covenant. *Ma & Pa, Inc.,* 342 N.W.2d at 502; *Orkin,* 146 N.W.2d at 325–27. Furthermore, on the present record, the court simply finds that there is a genuine issue as to what motivated Curtis 1000 to terminate Youngblade—his filing of a lawsuit against the employer, the probability that he would move to "pirate" Curtis 1000's customers, or other factors. This issue may be of prime significance in the determination of whether Curtis 1000 is entitled to a permanent injunction. However, without a full trial on the merits of this issue, or at least a record of evidence developed much more

---

**46.** Youngblade cites several cases from other jurisdictions in support of the proposition that wrongful conduct in his discharge should bar enforcement of the covenant not to compete. Those cases are: *Showe–Time Video Rentals, Inc. v. Douglas,* 727 S.W.2d 426, 433 (Mo.App.1987) ("Where, however, the party in whose favor the covenant runs terminates the arrangement without good cause, enforcement [of the covenant not to compete] by injunction is not so clearly established."); *Hopper v. All Pet Animal Clinic,* 861 P.2d 531 (Wyo.Sup.Ct.1993) ("Simple justice requires that a termination by the employer of an at will employee be in good faith if a covenant not to compete is to be enforced."); *Security Servs., Inc. v. Priest,* 507 S.W.2d 592, 594 (Tex.Ct. App.1974) ("There is authority, however, to the effect that even though the employment may be terminated at will, equity may deny enforcement of the covenant if the employer acts arbitrarily and unreasonably in discharging the employee."); *Ritz v. Music, Inc.,* 189 Pa.Super. 106, 150 A.2d 160, 162 (1959) ("Where a principal wrongfully discharges an agent prior to the expiration of the contract of agency, the agent is relieved of a covenant not to compete."); *Economy Grocery*

*Stores v. McMenamy,* 290 Mass. 549, 195 N.E. 747 (1935) ("An employer may act so arbitrarily and unreasonably in exercising his right of termination that a court of equity will refuse aid in enforcing for his benefit other parts of the contract."); *Dictograph Products, Inc. v. Morris,* 54 N.Y.S.2d 211 (N.Y.Sup.Ct.1945) (the court refused to grant an injunction to an employer because it found that the employer had acted arbitrarily and unreasonably in its termination of the employee.). In response, Curtis 1000 argues that no public policy was violated in its termination of Youngblade, because the violation was not based on Youngblade's litigation with the company, but on "an internal difference of opinion" over compensation and service of his accounts. Curtis 1000 therefore argues that·when the employment relationship has deteriorated so significantly, termination is not in violation of public policy. Curtis 1000 cites, for example, *Alexander v. Kay Finley Jewelers, Inc.,* 208 N.J.Super. 503, 506 A.2d 379 (1986), *cert. denied,* 104 N.J. 466, 517 A.2d 449 (1986); *Deiters v. Home Depot U.S.A., Inc.,* 842 F.Supp. 1023 (M.D.Tenn.1993); *Kavanagh v. KLM Royal Dutch Airlines,* 566 F.Supp. 242, 244 (N.D.Ill.1983).

thoroughly than it has been in the record now before the court, the court cannot conclude that there is sufficient evidence to support the unenforceability of this covenant based on violation of the public policy.[47]

47. Youngblade's limited evidence on the question of Curtis 1000's motivation in terminating his employment is based primarily on hearsay from individuals not directly involved in the termination decision. Indeed, Frank Hunter, the division manager of the Minnesota division of Curtis 1000, did opine on cross-examination at the preliminary injunction hearing that he thought Youngblade was terminated for the filing of Youngblade's state court petition to determine the validity of the covenant not to compete at issue here. However, Hunter clearly indicated his lack of firsthand knowledge and his reliance on rank hearsay when he testified as follows:

> Q. Were you aware of any of the content of that conversation [between Youngblade and Bob Baker, an officer of Curtis], sir?
>
> A. Not—not—not really. I mean I don't know the exact—to the degree what exactly took place, no. I have not been told, you know, privy to the exact conversation. I did not speak to Mr. Baker.
>
> Q. Were you aware then generally in that conversation that Mr. Youngblade apprised Mr. Baker that he had filed a petition for declaratory judgment in district court here in Iowa, and that Mr. Baker told Mr. Youngblade that he was fired?
>
> A. Apparently that's what happened.
>
> Q. Can you tell the Court why the company chose to fire its employee performing at the high level that Mr. Youngblade was performing?
>
> A. I can only speak mainly for myself, but based on the information that you just stated as well as what I have heard from others was the fact that we do—obviously we have one of our top sales people in our division and in our company basically filing a petition to kind of—filing a petition to sue us while he is still working for us.

Tr. 52–53. Robert Dahl, regional vice-president, also testified that in his opinion the main reason Youngblade was terminated was because of Youngblade's court action against Curtis 1000. Yet, there is simply no record evidence that Dahl has any first-hand knowledge of the reason or reasons Youngblade was terminated. Also, Mr. Baker, the president of Curtis 1000, who offices in Atlanta, Georgia, and was the individual who discharged Youngblade in the December 30, 1994, telephone conversation, did not testify. Likewise, Youngblade, the only other participant in the conversation, also failed to testify.

More importantly, as this court only recently observed in *Thompto v. Coborn's, Inc.*, 871 F.Supp. 1097, 1117 n. 12 (N.D.Iowa 1994), the vast majority of courts that have addressed the issue have held that there is no public policy violation for terminating an employee who files a lawsuit against the employer. *See, e.g., Magerer v. John Sexton & Co.*, 912 F.2d 525 (1st Cir.1990) (Massachusetts law would not permit a common law claim for retaliatory discharge where the legislature has provided a statutory workers' compensation scheme that bars discharge for filing claims); *Smolarek v. Chrysler Corp.*, 879 F.2d 1326 (6th Cir.) (under Michigan law, retaliatory discharge claim for filing workers' compensation claims is preempted by statutory scheme), *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989); *Beam v. IPCO Corp.*, 838 F.2d 242, 247 (7th Cir.1988) (no public policy of Wisconsin is violated by terminating an employee who brings, or threatens to bring, legal action against his or her employer); *Tynes v. Shoney's, Inc.*, 867 F.Supp. 330 (D.Md.1994) ("An employer of a discontented at-will employee cannot be required to face the choice between retaining the employee or risking an abusive discharge suit" where the employee alleged that he was fired for stating his intention to file criminal charges for battery against his supervisor and employer, citing *Watson v. Peoples Sec. Life Ins. Co.*, 322 Md. 467, 588 A.2d 760 (1991) (employee fired for filing sexual harassment claims in a suit for assault and battery against her employer was not protected by public policy)); *Deiters v. Home Depot U.S.A., Inc.*, 842 F.Supp. 1023, 1028–29 (M.D.Tenn.1993) (no public policy of Tennessee violated by discharge of employee for suing employer); *Whitman v. Schlumberger Ltd.*, 793 F.Supp. 228 (N.D.Cal.1992) (no public policy of California is violated by termination of employee who threatened and ultimately filed lawsuit against employer); *Buechele v. St. Mary's Hosp. Decatur, Ill.*, 156 Ill.App.3d 637, 109 Ill.Dec. 83, 509 N.E.2d 744 (1987) (no public policy exception under Illinois law where at-will employee was terminated for suing his employer for defamation and intentional infliction of emotional distress); *Alexander v. Kay Finlay Jewelers*, 208 N.J.Super. 503, 506 A.2d 379, *appeal denied*, 104 N.J. 466, 517 A.2d 449 (1986) (at-will employee is required to forego suit against employer or risk discharge and in those circumstances no public policy is violated); *Watson*, 322 Md. 467, 478–79, 588 A.2d 760 (same); *Kavanagh v. KLM Royal Dutch Airlines*, 566 F.Supp. 242 (N.D.Ill. 1983) (same); *Meredith v. C.E. Walther, Inc.*, 422 So.2d 761 (Ala.1982) (same); *Becket v. Welton Becket & Assocs.*, 39 Cal.App.3d 815, 114 Cal. Rptr. 531 (1974) (same). This court may have some reservations about the rule espoused by these courts, but it cannot ignore the weight of these decisions. This is particularly true given the preliminary injunction posture of this litigation and the fact that this issue has not been extensively briefed nor explored by the parties.

The court therefore concludes, for the purposes of the application for a preliminary injunction only, that the covenant would be valid and enforceable under Iowa law, and hence Curtis 1000 has shown strong likeli-

hood of success on the merits. That likelihood of success on the merits is sufficient to support the kind of equitable relief requested, provided the other *Dataphase* factors also weigh in favor of granting the preliminary injunction. *Sanborn Mfg.*, 997 F.2d at 488 (In order to weigh in the movant's favor, the movant's success on the merits must be "at least ... sufficiently likely to support the kind of relief it requests.").

#### b. Under Delaware Law

For the same reasons stated above, the covenant not to compete is supported by adequate consideration and reasonably limited in time and area to meet the requirements for validity and enforceability under Delaware law. *McCann Surveyors*, 611 A.2d at 3–4. The covenant was also obtained as a condition of initial employment, and was not an "afterthought" unfairly imposed upon Youngblade. *Faw, Casson & Co.*, 375 A.2d at 467. The court therefore turns to the "central aspect" of the enforceability of the covenant under Delaware law, which is the balancing of harms to the parties as the result of enforcing or refusing to enforce the covenant. *McCann Surveyors*, 611 A.2d at 4.

In this case, there is a real, rather than a slight or ephemeral, advantage to Curtis 1000 of enforcing the covenant. *Id.* Enforcing the covenant may not stop the economic losses to Curtis 1000 and the loss of goodwill that may follow Youngblade's departure to another employer, but it may staunch the flow. Furthermore, Youngblade has engaged in exactly the conduct Delaware courts find most egregious and supportive of enforcing such covenants: he has solicited from known customer lists of the plaintiff and is using the training the employer provided and his knowledge of the employer and its business in pursuing his sales on behalf of his new employer. *Id.* Also, Youngblade's business represents a significant share of Curtis 1000's business in the territory covered by the covenant. *Id.*

The court must also conclude, on the record before it, that the consequences to Youngblade are not "grave." There is no evidence in the record that Youngblade will be substantially harmed financially, as it is apparent from the record that Youngblade is already employed with another company. Youngblade is also not precluded from using the skills he has gained and refined, not without help from Curtis 1000, but nonetheless his to use to his advantage in the marketplace.

The court concludes that, even if Delaware law were applicable to the covenant in question here, the covenant would nonetheless, at least at the preliminary injunction stage, be deemed to be valid and enforceable under that law. Therefore, even applying Delaware law, it appears to the court that Curtis 1000 has a reasonable likelihood of success on the merits sufficient to support its application for a preliminary injunction.

#### 2. Threat of Irreparable Harm

Curtis 1000 asserts that unless Youngblade is enjoined from contacting his former customers, it will suffer irreparable harm through the loss of sales, the attendant reductions in its work force, and the loss of goodwill of the business. Youngblade contends that any injury that Curtis 1000 may sustain can be calculated with accuracy and compensated by money damages. He relies on the fact that Curtis 1000 has records of Youngblade's sales. Thus, he contends that Curtis 1000 will be able to calculate with specificity any losses in sales Curtis 1000 alleges that it has lost as a result of his actions.

As noted above, a party moving for a preliminary injunction is required to show the threat of irreparable harm. *Baker Elec. Co-op., Inc.*, 28 F.3d at 1472; *Computer Systems, Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir.1989); *Dataphase*, 640 F.2d at 114. A plaintiff's harm is not irreparable if it is fully compensable by money damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992); *see Cellular Sales, Inc.*, 942 F.2d at 487; *Cotter v. Desert Palace, Inc.*, 880 F.2d 1142, 1145 (9th Cir. 1989); *ECRI v. McGraw–Hill*, 809 F.2d 223, 236 (3d Cir.1987); *Foxboro Co. v. Arabian American Oil Co.*, 805 F.2d 34, 36 (1st Cir. 1986); *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 850 (9th Cir. 1985); *Roland Mach. Co. v. Dresser Indus.*,

*Inc.*, 749 F.2d 380, 386 (7th Cir.1984); *Interox America v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984); *Itek Corp. v. First Nat'l Bank of Boston*, 730 F.2d 19, 22 (1st Cir.1984); *Deerfield Medical Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir.1981); *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1202 (9th Cir.1980); *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2nd Cir.1979); *Superior Services, Inc. v. Dalton*, 851 F.Supp. 381, 387 (S.D.Cal.1994); *Salt Pond Assocs. v. United States Army Corps of Engineers*, 815 F.Supp. 766, 784 (D.Del.1993); *Beztak Co. v. Bank One Columbus, N.A.*, 811 F.Supp. 274, 285 (E.D.Mich.1992); *Claughton v. Donner*, 771 F.Supp. 1200, 1204 (S.D.Fla.1991).

A number of courts, however, have held that irreparable injury can result by virtue of a breach of a valid covenant not to complete. *See Overholt Crop Ins. Serv. Co.*, 941 F.2d at 1371 (holding that "[i]rreparable harm 'can be inferred from a trial court's actual finding of a breach [of a restrictive covenant] by the defendant.'") (quoting *Cherne Indus., Inc. v. Grounds & Assocs.*, 278 N.W.2d 81, 91 (Minn. 1979)); *JAK Prod., Inc. v. Wiza*, 986 F.2d 1080, 1084 (7th Cir.1993) (holding under Indiana law that "[w]henever an employee uses his experience gained from an employer in violation of a reasonable covenant not to compete, irreparable injury occurs and injunctive relief is appropriate.") (citing *Peters v. Davidson, Inc.*, 172 Ind.App. 39, 359 N.E.2d 556, 561 (1977)); *Picker Int'l, Inc. v. Blanton*, 756 F.Supp. 971, 983 (N.D.Tex. 1990) (holding that "'where the uncontradicted evidence shows that a former employee is working for a direct competitor, no finding of irreparable injury is necessary to support a permanent injunction to protect trade secrets.'") (quoting *Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 470 (Tex.Ct. App.1986)); *Alside, Inc. v. Larson*, 300 Minn. 285, 220 N.W.2d 274, 278 (1974) (affirming trial court's holding that "unless defendants are restrained as requested, plaintiff will suffer irreparable injury in that it will lose customers for which it would be most difficult, if not impossible, to prove damages."); *Eutectic Welding Alloys Corp. v. West*, 281 Minn. 13, 160 N.W.2d 566 (1968) (indicating that an inherent threat of irreparable injury may be inferred from the breach of an otherwise valid and enforceable restrictive covenant not to compete). Here, at the time of the preliminary injunction hearing, Youngblade had contacted his Curtis 1000 customers to solicit them to follow him to his new employer in violation of the restrictive covenants in his employment contract with Curtis 1000. As the decisions set forth above indicate, from such actions irreparable harm can be inferred.

Similarly, the loss of customer goodwill can constitute irreparable injury because damages flowing from such losses are difficult to compute. *See Basicomputer Corp.*, 973 F.2d at 512 (holding that irreparable injury shown where facts supported finding that plaintiff would suffer loss of customer goodwill and competitive injury from defendants' alleged breach of their covenants); *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir.1991); *Medtronic, Inc. v. Gibbons*, 684 F.2d 565 (8th Cir.1982) (holding that irreparable injury shown by sales representative's employment in same sales territory, "symbiotic relationship" between sales representative and medical manufacturer, relationship between sales representative and customers, and substantial investment made by former employer in training of sales representatives); *Spiegel*, 636 F.2d at 1001 (holding that loss of customers and good will gives rise to an irreparable injury).

Here, it was undisputed that Youngblade had access to confidential client information while he was employed at Curtis 1000. Obviously, use of this knowledge would enable him to effectively solicit Curtis 1000's customers, and to undercut Curtis 1000's rates while providing virtually the same materials and products provided by Curtis 1000. Furthermore, Curtis 1000 has a legitimate business interest in protecting the goodwill it provides for its sales representatives and in the goodwill created for it by its sales representatives during their employment. When a Curtis 1000 sales representative leaves, Curtis 1000 estimates that it needs two years to hire, train, place in the field a substitute sales representative, and have that sales rep-

resentative develop a close relationship with his or her customers. If Youngblade were to work for a competitor and immediately call on his prior customers, Curtis 1000 would be placed in an unfair competitive disadvantage. Although it would be problematic to calculate the lost sales Curtis 1000 may experience in the first year of Youngblade's departure, it would be expedientially more difficult to calculate those sales Curtis 1000 may lose in the future if Youngblade is left unchecked. The printing business is a competitive field, and customers can reasonably be expected to come and go over the years. Whether any given customer will stay with Curtis 1000 becomes an increasingly speculative proposition as time passes. In addition, even long term customers may alter or change the amount of business they throw to any specific printer. This may reflect the ebbs and flows of a particular business' fortunes, a change in price structures of a printer, the advent of new product lines, or other variables. Furthermore, evidence was presented at the hearing that the loss of business from Youngblade's former customers would probably result in layoffs at the Minnesota division's St. Paul plant. *See Ferrero*, 923 F.2d at 1449 (layoffs a factor in determining irreparable harm). Such damage is extremely difficult to quantify. Therefore, the court finds that Curtis 1000 has established irreparable injury here.[48]

### 3. Balance Of Harms

■ As part of the court's analysis of the validity and enforceability of the covenant in question here under Delaware law, the court conducted a balancing of the harms to the parties that would ensue from enforcing or refusing to enforce the covenant not to compete. That same balancing is relevant to the balancing of harms from granting a preliminary injunction which at least temporarily enforces that covenant. The potential economic harm to each party of either granting or denying the injunction is relevant to the consideration of the balance of harms factor, *Baker Elec. Co-op*, 28 F.3d at 1473, and the court found above, when balancing harms under Delaware law, that the balance of potential economic harm weighs strongly in Curtis 1000's favor.

Looking also to the threat to each of the parties' rights that would result from granting or denying the injunction, *Baker Elec. Co-op*, 28 F.3d at 1473, the court finds that refusal to grant the preliminary injunction will impinge upon Curtis 1000's contractual rights, but granting the injunction will not unfairly impinge on Youngblade's right to work. As the court previously mentioned, Youngblade is already employed with a new company, and is pursuing the trade in which he is most skilled. The balance of harms weighs in favor of granting the preliminary injunction.

### 4. Public Interest

■ Nor does any public interest prevent issuance of a preliminary injunction to enforce the covenant not to compete. First, Iowa courts have recognized that "there is no public policy or rule of law which condemns or holds in disfavor a fair and reasonable agreement of this character." *Dental Prosthetic Servs.*, 463 N.W.2d at 38. Furthermore, the public interest "does not favor forcing parties to a[n] agreement to conduct themselves in a manner directly contrary to the express terms of the agreement," *Frank B. Hall*, 974 F.2d at 1026, and to refuse to grant the preliminary injunction in this case would have precisely that effect. Finally, "if these noncompete agreements are valid, the public interest calls for their enforcement." *N.I.S. Corp.*, 724 F.2d at 710; *see also Millard*, 790 F.Supp. at 863. Thus, public interest also weighs in favor of issuance of a preliminary injunction in this case.

---

48. The strong likelihood of loss of goodwill here, along with the probable layoffs at the St. Paul plant make this case distinguishable from the decision reached by the district court in *Curtis 1000, Inc. v. Pierce*, No. 94–4086–RDR, 1994 WL 608611 (D.Kan. Oct. 25, 1994). In that case, the court concluded that Curtis 1000 could calculate its losses made by a former sales representative to former Curtis 1000 customers. *Id.* at *4. Therefore, the court concluded that since Curtis 1000 had an adequate money damages remedy to it, Curtis 1000 would not suffer irreparable injury if the injunction did not issue. *Id.* at *5. Here, by contrast, the court is unpersuaded that Curtis 1000 will be able to predict with any accuracy the amount of its future losses.

The court concludes that the application of each of the *Dataphase* factors to the circumstances of this case weighs in favor of granting the preliminary injunction Curtis 1000 has requested.[49] The remaining questions therefore pertain to the nature and extent of that preliminary injunction.

### E. The Requirements Of Fed.R.Civ.P. 65(c) & (d)

#### 1. The Scope Of A Preliminary Injunction

Simultaneously with the filing of this Order Regarding Plaintiff's Motion for Preliminary Injunction Pursuant To Fed.R.Civ.P. 65(a), but by separate order, the court is issuing a preliminary injunction enjoining Youngblade from violating the terms of his covenant not to compete with Curtis 1000. Pursuant to Federal Rule of Civil Procedure 65(d), which requires, *inter alia*, that "every order granting an injunction ... shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained ...," the preliminary injunction specifically sets forth those portions of the covenant not to compete that Youngblade is enjoined from violating.

#### 2. Fed.R.Civ.P. 65(c)'s Security Requirement

At oral argument on January 26, 1995, counsel for Curtis 1000 raised the issue of the bond requirement found in *Fed.R.Civ.P.* 65(c). That rule provides, in pertinent part:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant....

*Fed.R.Civ.P.* 65(c). On its face the rule admits of no exceptions, and in fact some courts have held that the requirement is mandatory. *See, e.g., Gateway Eastern Ry. Co. v. Terminal R.R. St. Louis,* 35 F.3d 1134, 1141 (7th Cir.1994) (discretion only in determining the amount of the bond to be posted); *Continuum Co., Inc. v. Incepts, Inc.,* 873 F.2d 801, 803 (5th Cir.1989) ("*Fed.R.Civ.P.* 65(c) provides that a bond must be posted before a

federal court may issue an interlocutory injunction," and "failure to require the posting of a bond or other security constitutes grounds for reversal of the injunction"); *Coquina Oil Corp. v. Transwestern Pipeline Co.,* 825 F.2d 1461, 1462 (10th Cir.1987) ("the trial judge's consideration of the imposition of bond is a necessary ingredient of an enforceable order for injunctive relief. The plain language of the rule permits no other analysis."); *Chemlawn Serv. Corp. v. GNC Pumps, Inc.,* 823 F.2d 515 (Fed.Cir.1987) (dissolving injunction because district court failed to require bond and injunction was insufficiently supported by findings of fact and conclusions of law); *American Hosp. Supply Corp. v. Hospital Products Ltd.,* 780 F.2d 589, 597 (7th Cir.1986) (bond is mandatory); *Atomic Oil Co. v. Bardahl Oil Co.,* 419 F.2d 1097, 1100 (10th Cir.1969) (on its face, language of Rule 65(c) admits of no exceptions). Other courts have held that there may be exceptions to the requirement of a bond, but such exceptions are viewed as extremely rare. *See, e.g., Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 210 (3d Cir. 1990) ("While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory," quoting *Frank's GMC Truck Ctr., Inc. v. General Motors Corp.,* 847 F.2d 100, 103 (3d Cir.1988)); *In the matter of application of Kingsley,* 802 F.2d 571, 578 (1st Cir.1986) (setting out two factors to determine whether a bond should be required: "First, at least in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant.... Second, in order not to restrict a federal right unduly, the impact that a bond requirement would have on enforcement of the right should also be considered," citing *Crowley v. Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, and Packers,* 679 F.2d 978 (1st Cir.1982), *rev'd on other grounds,* 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984)).

---

**49.** In that the court is granting Curtis 1000's motion for a preliminary injunction based upon Count I of its complaint (breach of contract), the court need not and does not reach the merits of Count II (alleged violation of the Iowa Uniform Trade Secrets Act).

Nonetheless, some courts, such as the Sixth Circuit Court of Appeals, require only that the district court expressly address the question of whether a bond is required as security for a preliminary injunction, but leave the ultimate decision as to whether or not a bond will be required in the particular case to the trial judge's discretion. *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 100 (6th Cir.1982); *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978); *Galper v. United States Shoe Corp.*, 815 F.Supp. 1037, 1045 (E.D.Mich.1993). Courts of other jurisdictions hold that the posting of a security bond by the party seeking a preliminary injunction is required when a risk of financial harm exists for the party to be enjoined. *Hoxworth*, 903 F.2d at 210; *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 803–05 & n. 8 (3d Cir. 1989). But this rule of the Third Circuit Court of Appeals is actually narrower than it at first appears: only if the injunction "raises *no* risk of monetary harm to the defendant" will the bond requirement be dropped, *see Hoxworth*, 903 F.2d at 210 (emphasis in the original; quoting *System Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131, 1146 (3d Cir.1977)), and even where the plaintiffs are indigent, a careful weighing of the equities is required before the bond requirement can be waived. *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir.1991), *cert. denied sub nom. Snider v. Temple Univ.*, 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992) (fact that bond requirement effectively deprived indigent plaintiffs of preliminary injunction did not work a sufficient hardship, because the underlying issue could still be resolved by the underlying litigation).[50]

When originally adopted, however, *Fed. R.Civ.P.* 65(c) authorized the federal courts to grant injunctions "with or without security, in the discretion of the court or judge." *See* Judiciary Act of 1911, ch. 231, § 263, 36

---

**50.** The court in *Temple Univ.* observed that several other circuits have held that a district court may dispense with that requirement under certain narrowly drawn circumstances, citing *Crowley v. Local No. 82, Furniture & Piano*, 679 F.2d 978 (1st Cir.1982), *rev'd on other grounds*, 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984) (upholding denial of bond where Union members would have had financial difficulty posting it, and where defendants faced low burden from absence of security); *International Controls v. Vesco*, 490 F.2d 1334, 1356 (2d Cir.1974), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974) (noting that "the district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined") (citations omitted); *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300 (5th Cir.1978) (trial court may elect not to require security bond where entire purchase price of disputed sale was paid into registry of court); *Urbain v. Knapp Brothers Mfg.*, 217 F.2d 810 (6th Cir.1954) (no bond required where defendant would not appear to face material damage); *Wayne Chemical v. Columbus Agency Serv. Corp.*, 567 F.2d 692 (7th Cir.1977) (no bond required from indigent plaintiff); *People ex rel. Van De Kamp v. Tahoe Regional Plan*, 766 F.2d 1319 (9th Cir.1985) (holding non-profit environmental group would be denied access to judicial review if court did not properly exercise its discretion to dispense with security requirement); *Continental Oil v. Frontier Refining Company*, 338 F.2d 780 (10th Cir.1964) (no bond required where likelihood of harm to defendant is absent).

Similarly, the Fifth Circuit Court of Appeals has surveyed the reasons courts will sometimes waive the bond requirement:

While a district court's failure to require the posting of a bond or other security constitutes grounds for reversal of the injunction, some courts have waived the security requirement when they have found that the plaintiff was financially responsible, or was very likely to succeed on the merits. Courts that have waived the bond requirement have apparently assumed that, should the plaintiff later lose on the merits, the defendant may recover the damages inflicted by the injunction. That assumption is rendered doubtful, however, by the Supreme Court's declaration in *W.R. Grace & Co. v. Local Union 759* that "[a] party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond."

Courts that have waived the bond requirement have done so without determining whether the plaintiff should be excused from liability even if it had wrongfully obtained the injunction. If the plaintiff's claim subsequently proved to be nonmeritorious, the court would be compelled either to follow the rule that restricts liability to the bond amount and thus unjustly deny the defendant compensation, or to compensate the defendant, thus defeating the reasonable expectations of the plaintiff under Rule 65(c).

*Continuum Co., Inc.*, 873 F.2d at 803–04 (internal citations omitted). In the case before this court, none of the equitable considerations identified by these courts as grounds for dispensing with the bond requirement is present.

Stat. 1087, 1162; Act of June 1, 1872, ch. 255, § 7, 17 Stat. 196, 197; *see generally* Note, *Recovery For Wrongful Interlocutory Injunctions Under Rule 65(c)*, 99 HARV.L.REV. 828 (1986). Congress repealed the applicable section of the Judiciary Act of 1911 and provided that an injunction could not be issued unless the plaintiff posted a bond in a "proper" amount. *See* Clayton Act, ch. 323, §§ 17–18, 38 Stat. 730, 737–38 91914). This language was incorporated into the Judicial Code of 1926 § 382, 44 Stat., pt. 1, 863, 909, and the language ultimately found in present Rule 65(c) followed.

The purposes of the bond requirement include the following. The first purpose is the provision of a fund for the compensation of an incorrectly enjoined defendant who may suffer from the effects of an incorrect interlocutory order. *National Kidney Patients Assoc. v. Sullivan*, 958 F.2d 1127, 1134 (D.C.Cir.1991) ("the Rule imposes a requirement of security ("in such sum as the court deems proper") for the precise purpose of assuring compensation of the defendant for the resulting losses if the injunction proves to have been wrongfully granted," and finding that courts as a rule presume damages against the bond if the preliminary injunction is wrongful); *Hoxworth*, 903 F.2d at 210; *Instant Air*, 882 F.2d at 804; *Continuum Co., Inc.*, 873 F.2d at 803 (first purpose of bond requirement is that "it assures the enjoined party that it may readily collect damages from the funds posted or the surety provided in the event that it was wrongfully enjoined, without further litigation and without regard to the possible insolvency of the assured," citing *Coyne–Delany Co. v. Capital Dev. Bd.*, 717 F.2d 385, 391–92 (7th Cir.1983)); *Coyne–Delany*, 717 F.2d at 391–92.[51] The second purpose of the bond requirement is to deter "rash" applications for interlocutory orders, because the financial obligation encourages action with a cooler head and careful thought beforehand. *Edgar v. MITE Corp.*, 457 U.S. 624, 649, 102 S.Ct. 2629, 2644, 73 L.Ed.2d 269 (1982) (Stevens, J., concurring) ("Since a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully."); *National Kidney Patients Assoc.*, 958 F.2d at 1134 (bond requirement deters "flimsy claims"); *Instant Air*, 882 F.2d at 804 (stating this purpose of bond requirement); *and compare Continuum Co., Inc.*, 873 F.2d at 803 (second purpose of bond requirement is that "it provides the plaintiff with notice of the maximum extent of its potential liability").

The bond requirement is particularly significant for at least two reasons. First, the defendant who has been wrongfully enjoined has no recourse for damages in the absence of a bond. *W.R. Grace & Co. v. Local Union*

51. The entitlement to recover against the bond generally depends upon whether it is ultimately determined that the enjoined party in fact had the right to pursue the conduct enjoined. *See, e.g., Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1036 (9th Cir.1994) ("We hold today that a party has been wrongfully enjoined within the meaning of Rule 65(c) when it turns out the party enjoined had the right all along to do what it was enjoined from doing."); *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1054 (2d Cir.1990) ("A party has been 'wrongfully enjoined' under Fed.R.Civ.P. 65(c) if it is ultimately found that the enjoined party had at all times the right to do the enjoined act."); *Continuum Co., Inc.*, 873 F.2d at 803 ("the enjoined defendant may recover on the bond if a court later determines that it was 'wrongfully enjoined.'"). However, whether a party enjoined by a preliminary injunction is entitled to damages when a permanent injunc-

tion is denied is within the court's discretion. *Alabama ex rel. Siegelman v. United States EPA*, 925 F.2d 385 (11th Cir.1991).

The court in the *Nintendo* case noted that the proper question under rule 65(c) is whether the party seeking damages as the result of the injunction had been "wrongfully enjoined," which is the language of the rule itself, not the language employed by some courts awarding damages against the bond where the preliminary injunction had purportedly been "wrongfully issued." *Nintendo*, 16 F.3d at 1036 n. 4 (A court that complies with the applicable law in issuing a preliminary injunction does not "wrongfully" issue it.); *Continuum Co., Inc.*, 873 F.2d at 803 ("wrongfully enjoined" standard); *compare National Kidney Patients Assoc.*, 958 F.2d at 1134 ("As to damages, a defendant injured by a *wrongfully issued* preliminary injunction is presumptively entitled to recovery on the injunction bond," with emphasis added).

*759,* 461 U.S. 757, 770 n. 14, 103 S.Ct. 2177, 2185 n. 14, 76 L.Ed.2d 298 (1983) ("A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond."); *Cagan v. Mutual Benefit Life Ins. Co.,* 28 F.3d 654, 656 (7th Cir.1994) ("in all but exceptional cases the lack of an injunction bond means the unavailability of damages for wrongful injunction," citing *W.R. Grace & Co.,* 461 U.S. at 770 n. 14, 103 S.Ct. at 2185 n. 14, and finding no such exceptional case where the enjoined party "did not remind the district court of the need for a bond under *Fed. R.Civ.P.* 65(c), did not ask [the appellate court] to stay the injunction, and to this day has not attempted to quantify the damages from the delay [caused by the injunction]"). In *Continuum Co., Inc.,* 873 F.2d at 803, the Fifth Circuit Court of Appeals suggested a corollary to this first reason, stating that the bond gives the plaintiff notice of the extent of its potential liability. This notice arises ·

> since the amount of the bond "is the limit of the damages the defendant can obtain for a wrongful injunction, . . . provided the plaintiff was acting in good faith." [*Coyne–Delany,* 717 F.2d at 393; *Buddy Sys., Inc. v. Exer–Genie, Inc.,* 545 F.2d 1164, 1168 (9th Cir.1976), *cert. denied,* 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977); 11 Wright & Miller § 2973, pp. 652–65; Note, *Recovery for Wrongful Interlocutory Injunctions Under Rule 65(c),* 99 Harv.L.Rev. 828, 832–33 (1986).] The bond can thus be viewed as a contract in which the court and plaintiff "agree" to the bond amount as the "price" of a wrongful injunction. [Note, 99 Harv.L.Rev. at 833.]

*Continuum Co., Inc.,* 873 F.2d at 803 (footnoted citations included).

The second reason for the bond requirement is that, because a preliminary injunction proceeding is both expedited, resulting in only provisional findings of fact, and interlocutory, there is a higher chance that the district court will err in granting the prelimi-

nary injunction. *Clark v. K–Mart,* 979 F.2d 965, 968 (3d Cir.1992); *Hoxworth,* 903 F.2d at 210; *Instant Air,* 882 F.2d at 804.

In this circuit, the rule as to whether a bond is mandatory or discretionary is somewhat uncertain. In *Rathmann Group v. Tanenbaum,* 889 F.2d 787 (8th Cir.1989), the appellate court determined that the district court abused its discretion by not requiring a bond in addition to the $10,000 already posted on the issuance and continuation of a TRO, which can be read to mean that the bond for a preliminary injunction was mandatory even where a previous bond for a TRO was in place. *Id.* at 789.[52] However, the court cited as support for its decision to remand, *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 539 (6th Cir.1978), which found error, according to the *Rathmann Group* court, "not because [the] trial court failed to require a bond in any particular amount, but because [the] court failed to exercise discretion required by Rule 65(c) by expressly considering [the] question of requiring [a] bond," *Id.,* which suggests that whether or not a bond is required is in the discretion of the court. Almost without exception, however, courts in this circuit have required a bond before issuing a preliminary injunction. *See, e.g. Glenwood Bridge, Inc.,* 940 F.2d at 373 (ordering imposition of security "in an amount that fairly protects the [defendant] should it be ultimately found that the [defendant] has been wrongfully enjoined. *See Fed.R.Civ.P.* 65(c)."); *Hill v. Xyquad, Inc.,* 939 F.2d 627, 632 (8th Cir. 1991) (if the court is satisfied that application of the *Dataphase* factors requires issuance of a preliminary injunction, "before issuing [an] injunction it must arrive at a reasonable bond."); *Rathmann Group,* 889 F.2d at 789 (requiring bond); *Olin Water Servs. v. Midland Research Labs., Inc.,* 774 F.2d 303, 305 (8th Cir.1985) (court simply stated that bond was posted "as required by Rule 65(c)."); *Stockslager v. Carroll Elec. Coop. Corp.,* 528 F.2d 949, 951 (8th Cir.1976) (finding question

---

52. The court recognizes that the requirement of an additional bond in the *Rathmann Group* case may also be read to have been required by the fact that the previous bond was simply inadequate in amount to protect the interests of the enjoined party during the much longer period

covered by the permanent injunction. This observation does not require a different course by this court, because the court views Rule 65(c) as making the bond requirement mandatory, and any exceptions to that rule to be rare, and judge-made based on the equities of particular cases.

of whether bond was required answered by plain language of Rule 65(c)); *Telex Corp. v. International Bus. Machines Corp.*, 464 F.2d 1025 (8th Cir.1972) (preliminary injunction dissolved because trial court failed to require bond pursuant to Rule 65(c), and further failed to make any findings of irreparable harm); *Motorola, Inc. v. Alexander Mfg. Co.*, 786 F.Supp. 808, 816 (N.D.Iowa 1991) ("Security is required of plaintiff upon the imposition of a preliminary injunction. *Fed. R.Civ.P.* 65(c). The rules of civil procedure do not preclude the Chief Magistrate Judge's recommendation that the bond need not be substantial."); *Diversified Fastening Sys., Inc. v. Rogge*, 786 F.Supp. 1486, 1495 (N.D.Iowa 1991) (bond ordered "[p]ursuant to Rule 65(c)" without further comment); *Conagra, Inc. v. Tyson Foods, Inc.*, 708 F.Supp. 257, 270 (D.Neb.1989) (injunction would "become effective" upon posting of bond); *West Pub. Co. v. Mead Data Central, Inc.*, 616 F.Supp. 1571, 1583 (D.Minn.1985) (same); *but see American Train Dispatchers Assoc. v. Burlington Northern, Inc.*, 551 F.2d 749, 755 (8th Cir.1977) (refusing to pass on the issue of whether the district court erred by failing to require a bond because the appellate court dissolved the preliminary injunction on other grounds); *Bukaka, Inc. v. County of Benton*, 852 F.Supp. 807, 813 (D.Minn.1993) (bond requirement of Rule 65(c) waived because of important first amendment issues raised by plaintiff against county defendant and bond requirement could prevent judicial review of ordinance's constitutionality); *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R.R. Co.*, 642 F.Supp. 41, 49 (N.D.Iowa 1985) ("Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, the Court must consider the necessity of setting bond in any case where preliminary injunction is granted. The amount of bond and the decision of whether to require any bond rest within the sound discretion of the trial court," citing *Stockslager*, 528 F.2d at 951, and finding attempt to determine amount of any bond in the circumstances of the case would be "speculative."). In view of the express language of Rule 65(c), the purposes for the bond requirement, and the weight of these decisions, this court believes requiring a bond in some amount before issuing a preliminary injunction is far the better course.

■■■ The amount of the bond, however, is plainly in the discretion of the district court. *Rathmann Group*, 889 F.2d at 789 (citing *Stockslager*, 528 F.2d at 951); *ABA Distributors, Inc. v. Adolph Coors Co.*, 505 F.Supp. 831, 837 (W.D.Mo.1981) (citing *Stockslager*); *see also Gateway Eastern Ry. Co.*, 35 F.3d at 1141 (citing *Rathmann Group*, 889 F.2d at 789). Failure to articulate reasons for the amount decided upon, however, may require that the appellate court to reverse or remand the bond decision on the grounds of abuse of discretion. *Gateway Eastern Ry. Co.*, 35 F.3d at 1142. Also, the court abuses its discretion in setting bond and its amount if its determination is "due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determination." *Hill*, 939 F.2d at 632 (court improperly set bond at a low level to encourage settlement).

■■■ Structuring the court's discretion in this area can be difficult. *See, e.g.,* Wright & Miller, 11 Federal Practice and Procedure § 2954, p. 525 ("Given the court's discretionary power under Rule 65(c), the imprecise measure of some of the elements of damage, and the varying ability of defendants to establish their contemplated injuries, courts have responded to the obligation to set security by requiring a variety of dollar amounts to be posted by a successful applicant as a prerequisite to the issuance of injunctive relief."). Some courts of this circuit have quoted the following from 65–09 of 7 J. Moore & J. Lucas, Moore's Federal Practice 65–94 to 64–95 (2d ed. 1975), concerning factors to consider in determining the amount of the bond to be imposed:

> Bearing in mind the purpose of security, the amount of security is to be determined by the trial court in the exercise of a sound discretion. Necessarily, if a restraining order is granted at the beginning of an action, the amount of security adequate for a defendant's protection is a matter of estimate in light of the circumstances of

the case and the fact that the duration of the restraining order is limited in time; even at the preliminary injunction stage the amount remains an estimate; although at this point the development of the case and the court's decision to grant a preliminary injunction probably make the estimate less conjectural, even though the preliminary injunction has no fixed time limit to run. And so long as the restraint or injunction continues a party may move the court to increase or reduce the amount of security.

*Stockslager,* 528 F.2d at 951; *ABA Distributors, Inc.,* 505 F.Supp. at 837. Professor Moore in turn cited the Eighth Circuit's oft-cited opinion in *International L. Garment Work. Un. v. Donnelly G. Co.,* 147 F.2d 246 (8th Cir.), *cert. denied,* 325 U.S. 852, 65 S.Ct. 1088, 89 L.Ed. 1972 (1945). The court will also keep in mind the requirement that it should order imposition of security "in an amount that fairly protects the [defendant] should it be ultimately found that the [defendant] has been wrongfully enjoined." *Glenwood Bridge, Inc.,* 940 F.2d at 373; *Hill,* 939 F.2d at 632 (bond imposed must be "reasonable"). With these and such other factors as equity suggests in mind, the court turns to consideration of the proper amount of the bond to be required in this case.

 The court concludes that, while Curtis 1000's likelihood of success on the merits appears high at this point, there is still *some* financial risk to Youngblade from the preliminary injunction. The court will therefore order security for the preliminary injunction. The court prefers to err on the side of caution, and will order an amount somewhat greater than it actually believes to be necessary. In coming to its conclusion about the amount of the bond, the court notes that Youngblade has recently enjoyed an annual salary of approximately $250,000, but that he is currently employed, although at what level of compensation has not been presented to the court, and therefore will not be deprived of the entirety of that prior annual income as the result of any preliminary injunction. The parties agree that this matter can probably be brought to trial on the merits within a year or earlier, and the court concurs in that assessment, therefore the preliminary injunc-

tion should protect Youngblade for damages for at most a year. The court also has found Curtis 1000's likelihood of success on the merits to be substantial, thus lessening the necessity to provide a bond at the extreme upper limit of estimated damages. In these circumstances, the court will order a bond of $200,000 as providing adequate protection for Youngblade's interests.

## IV. CONCLUSION

In arriving at its conclusion that a preliminary injunction should issue in this case, the court has been required to sift through a variety of legal issues, and to come to conclusions, alternate conclusions, and provisional conclusions. A brief survey of these conclusions is therefore very much in order.

First, the court was required to address the issue of what standards apply to granting or denying a preliminary injunction in a diversity case, state or federal standards, or a third standard which the agreement between the parties purportedly establishes for enjoining breach certain of its terms. The court concludes that, following *Erie,* the standards for a preliminary injunction are procedural in nature, and therefore the federal rather than the state standards apply. As a practical matter, however, in this case the court found that the law of Iowa, the state in which this court sits, does not differ in an "outcome determinative" manner from the federal law establishing standards for granting a preliminary injunction. After surveying the federal standards for a preliminary injunction, articulated in this circuit in the *Dataphase* decision and its progeny, the court also considered whether the stipulated grounds for a preliminary injunction found in the employment agreement between the parties should supplant the *Dataphase* standards. The stipulated standard stated that the employer here, Curtis 1000, was entitled to injunctive relief upon proof of a violation of any of the covenants not to compete by Youngblade. While persuaded that applying this standard would be in accord with standards stated in both Iowa and Eighth Circuit Court of Appeals decisions, and also in accord with principles of freedom of contract,

which are not offset by concerns about restraints on trade which might arise from a covenant not to compete, the court was not persuaded that it should decide the issue of whether or not the stipulated standard applies. The court has reasoned that if a preliminary injunction is authorized under the standards articulated in *Dataphase* and its progeny, then it would also be authorized under the stipulated standards.

Because an important factor in the *Dataphase* analysis is "likelihood of success on the merits," the court was required to make an extensive, albeit provisional, evaluation of the validity and enforceability of the covenant not to compete in this case. If the covenant was not valid, or was not enforceable, then Curtis 1000's likelihood of success on the merits in a lawsuit to enjoin conduct violative of the covenant would not weigh in favor of a preliminary injunction. However, the court was also required to determine what law applied to that evaluation. The candidates were the law of Delaware, a state with no connection to the parties or the transactions at issue here apart from being the law chosen in the agreement between the parties and the place of incorporation of Curtis 1000, and the law of Iowa, the state with a far more substantial relationship to the parties and transactions involved in this lawsuit. The court therefore turned to application of the choice of law or conflict of laws rules of the state of Iowa to decide which law applied to the covenant not to compete.

In a contract case, the court concluded, Iowa applies the "most significant relationship" test when the parties make no choice of law. When the parties do make such a choice, Iowa applies the test or tests stated in § 187 of the Restatement (Second) of Conflict of Laws. Applying this test, the court found that the condition required for application of § 187(1) was not present here, following the Eighth Circuit Court of Appeals decision in *Baxter*, 976 F.2d at 1195–96. *Baxter* held that the parties could not have provided for the enforceability of the covenant not to compete; such an assessment of the validity of contract terms can only be made by the court.

Next, the court concluded that both conditions of § 187(2)(a) and (b) were present, either of which alone would excuse the court from applying the law chosen in the contract, instead allowing application of the law of a state with a greater material interest. First, the court concluded that the chosen state, Delaware, had no substantial relationship to the parties or the transaction, applying the "most significant relationship" test. Thus, Iowa law was applicable to the covenant not to compete under § 187(2)(a). In the alternative, the court concluded that the condition stated in § 187(2)(b) was also present: Iowa's law would apply in default under § 188; Iowa had a materially greater interest in the outcome of this issue than did Delaware; and Delaware's policy regarding covenants not to compete was repugnant to Iowa's. Specifically, the court concluded that Delaware's extensive consideration of the economic impact upon the employee of enforcing a covenant not to compete as potentially outweighing the employer's interest in enforcement of the covenant is repugnant to the Iowa policy behind such covenants, which is that covenants shown to be reasonably necessary to protection of the employer's business interests should be enforced.

Because the conditions for exceptions to applying the law of the chosen state which are stated in §§ 187(2)(a) and (b) were both present, and either alone was sufficient, the court held that it was entitled to disregard the parties' choice of Delaware law, and to apply Iowa law instead to the question of the validity and enforceability of the covenant not to compete here.

The stage was therefore set for the court to apply the *Dataphase* factors to the present case. In assessing the likelihood of success on the merits, the court, in an abundance of caution, applied both Delaware and Iowa law to the question of the validity and enforceability of the covenant not to compete here, concluding that under either body of law, the covenant was valid and enforceable. Specifically, the court concluded that the covenant was properly supported by consideration, and properly limited in time, area, and other aspects. Applying Iowa law, the court found that protection of Curtis 1000 from "pirating"

or potential "pirating" of customers was reasonably necessary in these circumstances. Applying Delaware law, the court found that there was a lack of any evidence to demonstrate economic impact upon Youngblade that would outweigh Curtis 1000's substantial interest in enforcement of the covenant not to compete and its potential economic and other injuries if the covenant was not enforced. Hence, Curtis 1000 stood a strong likelihood of success on the merits of its claim to enforce the covenant.

The other factor in the *Dataphase* analysis that the court regarded as particularly important here was the threat of irreparable harm. The court concluded that irreparable harm or the threat of it could be shown in the present case from the breach of the covenant not to compete, and from the loss of goodwill to Curtis 1000 as the result of Youngblade's violations and potential violations of the covenant. Curtis also stood to suffer from the economic impact of loss of customers loyal to Youngblade who constituted a significant percentage of its business in the Minnesota division. This economic impact could be felt in lost jobs, and other aspects less tangible. The court concluded that, although some of Curtis 1000's injuries were readily quantifiable, some other significant injuries were difficult to valuate and could not be recompensed merely by monetary damages. Thus, Curtis 1000 had made an adequate showing of the threat of irreparable harm.

Applying the remaining factors in the *Dataphase* analysis, the court concluded that the balance of harms weighed in favor of issuing the preliminary injunction. There was significant potential economic injury to Curtis 1000 from denying the injunctive relief requested, and almost no evidence of any economic injury to Youngblade as the result of granting that relief. Furthermore, the court concluded that Curtis 1000's rights under the covenants would be threatened or injured, while granting the injunction would only require Youngblade to live up to the obligations in the contract which had given him substantial rights. The court noted that Youngblade's right to work and right to use the skills he had acquired would not be impinged by granting the injunction, because Youngblade is already employed with another company working and exercising those skills. Finally, the court found that federal courts of this circuit and Iowa state courts had recognized a public interest in the enforcement of valid covenants not to compete.

Although the court was resolved to issue a preliminary injunction on the basis of application of the *Dataphase* factors, the court still found issues yet to be decided. The court has addressed the requirements of *Fed. R.Civ.P.* 65(d), that a preliminary injunction be sufficiently detailed and specific, in the separate order providing that preliminary injunction. The court next concluded that although the law of this circuit appears to be unsettled as to whether or not a preliminary injunction requires imposition of a bond or security pursuant to *Fed.R.Civ.P.* 65(c), the court would err on the side of caution, following the majority of the courts in this circuit and the plain language of the rule, and order bond to be posted.

Finally, the court turned to the plainly discretionary matter of the amount of the bond to be imposed. The court considered the annual income Youngblade has recently enjoyed in his employment with Curtis 1000, the fact that he is currently employed, although the court knows nothing at this time about how he is remunerated in his new employment, the likelihood that this matter could be brought to trial on the merits within a year, and Curtis 1000's strong likelihood of success on the merits, to conclude that a bond of $200,000 would adequately protect Youngblade from damage sustained by being wrongfully enjoined. For these reasons, Curtis 1000's motion for preliminary injunction is granted. The specific terms of that injunction and the requirement of the posting of a bond before the injunction will issue are embodied in a separate order.

**IT IS SO ORDERED.**

### ORDER GRANTING PRELIMINARY INJUNCTION

This preliminary injunction is issued pursuant to the Order Regarding Plaintiff's Motion for Preliminary Injunction Pursuant to Fed.R.Civ.P. 65(a) that was filed simulta-

neously with this Preliminary Injunction. **IT IS HEREBY ORDERED** that Plaintiff Curtis 1000, Inc.'s Motion for Preliminary Injunction is granted and that a preliminary injunction against Defendant Youngblade is hereby granted as follows:

That Defendant Daniel Youngblade, either solely for his own benefit or for the benefit of another, as that person's agent, employee, partner or joint venture, and Youngblade's officers, agents, servants, employees and attorneys, and all persons in active concert or participation with any of the foregoing, who receive actual notice of this Order by personal service or otherwise be, and they hereby are, preliminarily enjoined from doing, threatening, or attempting to do, or causing to be done, either directly or indirectly, by any means, method or device, any of the following acts in the territory previously assigned to Youngblade by Curtis 1000; the Iowa counties of Sioux, O'Brien, Plymouth, Cherokee, Woodbury, Ida, Monona, Crawford, Harrison and Shelby, the South Dakota counties of Clay and Union, and the City of South Sioux City, Nebraska:

(i) soliciting, or providing assistance to another in the taking or soliciting of, orders for printing, envelopes, business forms or other products that are the same or similar to products marketed by Curtis 1000 and which Youngblade was authorized to sell during his employment with Curtis 1000, from any account or customer to which Youngblade or Curtis 1000 made one or more sales during the two years immediately preceding the termination of Youngblade's employment and on whom Youngblade called for the purpose of soliciting business for Curtis 1000;

(ii) calling upon or assisting another in calling upon any account or customer to whom Youngblade or Curtis 1000 made one or more sales during the two years immediately preceding the termination of Youngblade's employment and on whom Youngblade called for the purpose of soliciting business for Curtis 1000, for the purpose of selling or soliciting the sale of any product which is the same or similar to those products marketed or sold by Curtis 1000 which Youngblade was authorized to sell while employed by Curtis 1000;

(iii) disclosing any confidential information, in whole or in part, to any person not in the employ of Curtis 1000, concerning Curtis 1000's accounts, customers, business methods, procedures, techniques and other information concerning Curtis 1000's business affairs (including the names of customers).

**IT IS FURTHER ORDERED** that this preliminary injunction remain in force until a hearing on the permanent injunction and the court's disposition thereof, or until further order of this court.

**IT IS FURTHER ORDERED,** pursuant to Federal Rule of Civil Procedure 65(c), that this preliminary injunction shall be effective upon Curtis 1000 providing security in the amount of Two Hundred Thousand Dollars ($200,000).

**IT IS SO ORDERED.**

## APPENDIX A
### AGREEMENT

CURTIS 1000 INC., a corporation (herein called the "Company") and **Daniel Youngblade** of
NAME

**Sioux City, Iowa 51104** (herein called the "Sales Representative") do mutually agree as follows:
CITY STATE ZIP

### 1. EMPLOYMENT

The Company hereby employs the Sales Representative, and the Sales Representative hereby accepts such employment and agrees to sell the products authorized by the Company and to perform such other services as may be required by the Company.

### 2. EQUIPMENT AND SUPPLIES

The Company shall, at its own cost and expense, furnish the Sales Representative with equipment such as a sample case, samples, price lists, Sales Representative's Guide, Product Manual, order books, stationery, etc., to be used by the Sales Representative only, to aid him in his work. Such equipment and all books, records and materials relating to the Company's business in whatever form maintained shall, at all times, be and remain the property of the Company and shall be returned to the Company at **St. Paul, Minnesota** at its request or upon termination of the Sales Representative's employment.

### 3. TERRITORY AND ACCOUNTS

(a) The Sales Representative's territory and/or accounts which he is authorized to sell, shall be as described in Exhibit "A" attached hereto and by agreement made a part hereof, which may be amended from time to time, subject to correction and modification by the Company. TERRITORY AND/OR ACCOUNTS: **IOWA COUNTIES OF: Sioux, O'Brien, Plymouth, Cherokee, Woodbury, Ida, Monona, Crawford. Harrison and Shelby. In addition the town of South Sioux City, Nebraska and the town of North Sioux City, South Dakota**

(b) If the Sales Representative is located in a major metropolitan market area where two or more sales representatives are headquartered, the Sales Representative may follow a total of fifteen (15) accounts which are located in such market area and which each produces a purchase volume in dollars equal to the current dollar value of an "AA" account per year when such accounts move no more than fifteen (15) miles outside the Sales Representative's territory. Any and all other sales representatives of Curtis 1000 Inc. may follow like accounts in like manner into the Sales Representative's territory. All commissions will be charged back to date of infraction when an account moves further than fifteen (15) miles or purchases less than "AA" per year and the Sales Representative continues selling that account without the written consent of his Sales Manager.

(c) All sales from these accounts, on products which the Sales Representative is authorized to sell to these accounts, whether received from the Sales Representative or direct from the customer by mail, telegram, or telephone, will be credited (subject to the Company's minimum order requirements) to the Sales Representative, and the commission will be paid unless the Sales Representative is paid under some other arrangement, so long as the Sales Representative continues to be employed by the Company and is devoting his full time to the Company's business and is working in accordance with the Company's instructions, or until such accounts are changed by agreement or as hereinafter provided. However, the Sales Representative is entitled to commissions only on orders placed with Curtis 1000 Inc., and not on orders from his territory or accounts placed with any other company whether or not such other company is in any way affiliated with Curtis 1000 Inc. The exclusive account provision of this Agreement is binding only on Curtis 1000 Inc. and in no way restricts other companies affiliated with Curtis 1000 Inc., by stock ownership or otherwise, from selling in that territory or to those accounts.

(d) It is mutually understood and agreed that one or more additional sales representatives may be assigned later in the general area in which the Sales Representative's accounts are located. When this does occur, the general area, including the Sales Representative's territory or accounts, may be divided by the Company between the Sales Representative and such other additional sales representative or sales representatives.

If and when such geographical divisions or individual account re-assignments are made, the Sales Representative protected by this Agreement will be compensated during a limted period of time for the commission earnings on all established business which he relinquishes from the time that such division of accounts becomes effective.

The first month after such division becomes effective, the Company agrees to pay as compensation for such account adjustments a sum of money equal to the actual average monthly commission earnings for the previous twelve (12) months on the established accounts that the Sales Representative relinquishes. Subsequent monthly payments will be on the following basis:

(i) When this average monthly commission earnings amount is less than $100, subsequent payments to the Sales Representative will be reduced each month by ten percent of the first payment, until the payments run out.

(ii) When this average monthly commission earnings amount is from $100 to $200 inclusive, subsequent payments to the Sales Representative will diminish by $10 each month until the payments run out.

(iii) When this average monthly commission earnings amount is more than $200, subsequent payments to the Sales Representative on the first $200 will be in accordance with (ii); subsequent payments on the amount in excess of $200 will diminish each month by four percent (4%) of the first payment, until the payments run out.

Such payments will continue only so long as the Sales Representative remains in the employ of the Company. Such payments will cease if Sales Representative's employment is terminated for any reason whatsoever.

### 4. COMMISSIONS

(a) When the Sales Representative is compensated on the Company's standard commission basis rather than on some form of guaranteed compensation, the Company will pay the Sales Representative commissions on orders from his accounts according to the Company schedule in force at the time of sale. Special commissions at other rates determined by the Company will be paid where special prices are quoted. No commissions in excess of the Company's regular rates for the quantity and type of envelope or other product involved will be paid regardless of the price at which the items may be sold.

(b) All orders are subject to acceptance by the Company, and no commission or bonus will be considered earned on any order that the Company may reject for any reason. Also, no order is complete and no commission is earned until the invoice is paid, and the commissions will be returned by the Sales Representative if the customer does not pay for the order in full, or if the Company, in its discretion finds it necessary to place the account with a collection agency or to institute legal action to collect the amount due.. The Company also reserves the right to charge back or collect from the Sales Representative one-half the selling price less the dollar amount of commissions on all orders rejected in whole or part due to errors made by the Sales Representative.

(c) The commissions due the Sales Representative on all orders from his accounts, entered by the Company at a firm price, will be paid from his division office in accordance with the Company's payment policy in effect at the time of sale. Commissions due on "future" orders (including Christmas Currency Envelope orders) to be shipped on or after a specified date, and orders taken at "open price" or "prices prevailing at time of shipment" will be paid at the time of shipment.

(d) With the commission check the Company will furnish an accounting of the Sales Representative's sales, earnings and deductions, and the Sales Representative, upon receipt of this accounting, agrees to notify the Company within thirty (30) days of any claim of errors. Thereafter, the Accounting shall be considered correct.

### 5. RESTRICTIVE COVENANTS

(a) The Company is engaged in the business of marketing envelopes, business forms, flat printing, and other related products of the Company, and the Sales Representative will acquire by reason of his employment certain valuable and confidential information concerning the Company's accounts, customers, business methods, procedures, and techniques. The Sales Representative agrees to keep confidential such information as the Company may from time to time impart to him regarding its business affairs (including the names of customers), and agrees that he will not at any time disclose said information in whole or in part to any person not in the employ of the Company.

(b) The Sales Representative will devote his entire working time, attention and energy to the performance of his duties and shall not directly or indirectly sell or offer for sale, goods or services of any other business while employed under this Agreement:

(c) The Sales Representative agrees that at all times he will be governed by instructions and orders of the Company as the same may be issued to him from time to time through its executive officers, department managers or other persons delegated to give such instructions, directions and orders. If the Sales Representative shall not faithfully and properly comply with such instructions, directions and orders, the same shall be sufficient reason for immediate termination of his employment.

(d) In consideration of the valuable business of the Company in the Sales Representative's territory and accounts, the time and expense incurred by the Company in training the Sales Representative, the Company's disclosing to the Sales Representative valuable and confidential information concerning the Company's accounts, customers, business methods, procedures and techniques, and recognizing the highly competitive nature of the Company's business, the Sales Representative hereby expressly covenants and agrees, which covenants and agreements are of essence to this contract that he will not, in the territory assigned to him as set forth in Paragraph 3, for a period of two years immediately following the termination of his employment, directly or indirectly, either solely for his own benefit or for the benefit of another, as that person's agent, employee, partner, or joint venturer:

(i) solicit, or provide assistance to another in the taking or soliciting of, orders for printing, envelopes, business forms or other products marketed by the Company and which Sales Representative was authorized to sell, from any account or customer to which the Sales Representative or the Company made one or more sales during the two years immediately preceding the termination of Sales Representative's employment and on whom Sales Representative called for the purpose of soliciting business for the Company;

(ii) call upon or assist another in calling upon any account or customer to whom the Sales Representative or Company made one or more sales during the two years immediately preceding the termination of Sales Representative's employment and on whom the Sales Representative called for the purpose of soliciting business for the Company, for the purpose of selling or soliciting the sale of any product which is the same or similar to those products marketed or sold by the Company which the Sales Representative was authorized to sell while employed by the Company;

(iii) Solicit, or provide assistance to another in the taking or soliciting of, orders for printing, envelopes, business forms or other products marketed by the Company and which Sales Representative was authorized to sell, from any account or customer "followed" by the Sales Representative pursuant to the terms of Paragraph·3(b) on whom Sales Representative called, within the two years immediately preceding the termination of Sales Representative's employment, for the purpose of soliciting business for the Company.

### 6. TERMINATION OF EMPLOYMENT

Either the Company or the Sales Representative may terminate the employment of the Sales Representative, upon giving one week's written notice of the intention to do so, except that such notice will not be required in the case of the Sales Representative's failure to comply with Company instructions as set forth above. A minimum of one week's pay will be retained by the Company for a period of six weeks after the Sales Representative's termination of employment to be applied against any indebtedness of the Sales Representative to the Company, including but not limited to chargebacks that may be due to the Sales Representative's errors or unauthorized actions with customers or prospects, or due to customer's refusal of merchandise or non-payment of invoices.

### 7. SEVERABILITY

The Company and the Sales Representative agree that the restrictive covenants contained in Paragraph 5 of any of its subparagraphs are severable and separate, and the unenforceability of any specific covenant therein shall not affect the validity of any other covenant set forth herein. Those covenants on the part of the Sales Representative shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action of the Sales Representative against the Company, whether predicated on this Agreement·or otherwise, shall not constitute a defence to the enforcement by the Company of said covenant. It is futher agreed that upon proof of the existence of such violation of any of the covenants in Paragraph 5, the Company will be entitled to injunctive relief by any court of jurisdiction having authority to grant such relief.

### 8. SALES REPRESENTATIVE'S PROFIT SHARING RETIREMENT TRUST

The Sales Representative will be entitled to participate in the Company's Profit Sharing Plan in accordance with the provisions and requirment set forth in the·Plan and Trust, copies of which are available for the Sales Representative to review, and a summary of which has been delivered to the Sales Representative, receipt of which is hereby acknowledged.

### 9. AGREEMENT

It is agreed by the parties hereto that this Agreement expresses and includes all the agreements of the parties and supercedes all prior agreements of the parties relating to the Sales Representative's employment, and that the terms hereof shall not be altered, modified or added to unless such alteration, modification or addition is endorsed hereon, or incorporated in a written supplemental agreement signed by each of the parties. This Agreement and all matters pertaining to is validity, construction, interpretation and effect shall be governed by the laws of the State of Delaware.

### 10. MISCELLANEOUS

This Agreement shall inure to the benefit and be binding upon, the parties hereto, and their'respective heirs, representatives, successors and assigns. The failure of the Company to insist in any one or more instance upon performance of any of the terms and conditions of this Agreement shall not be construed as a waiver or relinquishment of any right granted hereunder, or of the future performance of any such term, covenant or condition, but the obligation of the Sales Representative with respect thereto shall continue in full force and effect. Paragraph headings herein are for convenience only and shall in no case be considered in construing this Agreement. The masculine pronoun wherever used herein shall include the feminine. This agreement may be executed in one or more counterparts, each of which shall be deemed as original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties here have executed this Agreement and have affixed their seals this **21** day of **December** 19 **84**

CURTIS 1000 Inc.
("Company")

By Sales Representative in the presence of:

BY: _____

Witness _____

Form 52 (1)

SALES REPRESENTATIVE _____ (SEAL)